**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| JOSEPH A. THOMAS, LTD<br>Plaintiff | : | |
| V. | : | C.A. No. 06-440 |
| RODMAN & COMPANY, INC.<br>Defendant | : | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**MOTION FOR PRELIMINARY INJUNCTION**

## I. INTRODUCTION

The plaintiff and defendant in this action are direct competitors in the hand tool market. In a transparent attempt to steal the market share of plaintiff Joseph A. Thomas, LTD (“Thomas”) in one particular class of tools, defendant Rodman & Company, Inc. (“Rodman”), has begun importing and selling a tool nearly identical to Thomas’ product. In doing so, Rodman is in violation of the Lanham Act and Tariff Act. Rodman is, upon information and belief, importing the tool from China without marking it as to its country of origin, and the tool, components, arrangement, and packaging is accomplished in a way that creates an inaccurate association with the plaintiff’s product. Rodman has thus unfairly competed with plaintiff and its product, and continues to do so, resulting in irreparable harm to Thomas. Thomas now seeks a preliminary injunction against further unlawful conduct, as detailed herein.

## II. FACTS

Since approximately 2000, Thomas has marketed and sold, under the name "Bad Dog Biter," a hand-held, drill-powered cutting tool commonly referred to in the industry as a "nibbler." A nibbler tool, when attached to the drive of a common power drill, translates the rotary motion of the drill to cause a hardened steel "punch" or "die" to oscillate up and down at high speeds along the cutting edge of the nibbler tool. The nibbler can thereby be directed to "nibble" through sheet metal, plastic, wood, and other relatively flat, thin material. *See Verified Complaint,* ¶ 6. The Thomas Bad Dog Biter is a two-headed nibbler that employs specific improvements over earlier nibbler tools including the double-headed feature, a freely rotatable nibbler head, and the design of the nibbler mechanism which utilizes a single, pass-through punch that can be changed (replaced) periodically without having to disassemble the nibbler body.[1] *See Verified Complaint,* ¶ 7.

Thomas markets and makes most of its sales at large, exposition-style trade shows held in cities throughout the United States. *Verified Complaint* ¶ 5. The nibblers sold by Thomas are purchased and utilized by craftsmen and by hobbyists in the manufacture, repair, and reconditioning of boats and automobiles, and in woodworking and automobile collision and damage repair. Over the years, Thomas has developed substantial goodwill in its name and in its products. *Verified Complaint* ¶ 5.

Thomas' Bad Dog Biter nibbler is packaged in a distinctive blue metal drill bit box with a custom cut yellow foam rubber inner casing. *Verified Complaint* ¶ 9. The product itself has a metallic finished, stepped-cylindrical shaped body, dual black metal cutting heads, and a removable blue plastic handle-grip that fits over the cutting head not in use.

---

[1] Thomas is the owner of United States Pat. No. 7,047,613B2, covering the method of punch replacement in the two-headed nibbler device. *Verified Complaint* ¶ 8. Thomas has applied for further patent protection on other aspects of the device. *Verified Complaint* ¶ 8.

*Verified Complaint* ¶ 9. It is packaged, displayed, and sold with a replacement punch and custom wrench placed in pre-cut depressions in the box's yellow foam insert. *Verified Complaint* ¶ 9. True and accurate images of plaintiff's Bad Dog Biter nibbler are shown below:







<u>Thomas' Bad Dog Biter</u>

Rodman has for many years been selling its own nibbler tool, which it calls the "Rodman Nibbler." Rodman's chief channel of trade is the same type of trade shows at which Thomas sells the Bad Dog Biter nibbler. The Rodman Nibbler has a single cutting head, a yellow stepped-cylindrical body, and is sold in a black metal tool box in a gray, sponge like insert. *Verified Complaint* ¶ 10. True and accurate images of the Rodman Nibbler as sold by Rodman over the last several years, are shown below:












<u>Original Rodman Nibbler</u>

The body of the Rodman Nibbler clearly indicates, it is “Made in [the] U.K.”[2]

In December 2000, Rodman commenced litigation against Thomas in the United States District Court for the District of Rhode Island (C.A. No. 00-611ML) alleging trade dress and patent infringement against Thomas concerning a version of a nibbler tool Thomas previously sold. Thomas filed counterclaims seeking damages and a nullification of the patent held by Rodman’s nibbler supplier. The litigation was settled by the parties prior to trial, with no restrictions placed on the nibbler tools, as designed and packaged, each party was importing and selling at the time, namely, the Rodman Nibbler and Thomas’ Bad Dog Biter.

[2] Rodman is a licensee of Turner, a British national who holds or held a patent on certain technology claimed to be contained in the nibbler.

Sometime during 2006, Rodman began importing and selling a second nibbler tool. The new tool sold by Rodman is, like the Bad Dog Biter, a two-headed nibbler with a removable plastic handle grip, a stepped-cylindrical metallic-finished body, and black steel cutting heads that are rotatable during operation (the “Rodman II Nibbler”). In adding this double headed nibbler to its product line, Rodman made a number of substantial changes to its original product, both mechanically and in its trade dress, as a side-by-side comparison of the original Rodman Nibbler and the Rodman II Nibbler illustrates:




<u>Original Rodman Nibbler</u> <u>Rodman II Nibbler</u>

As depicted above, Rodman changed the color of the original Rodman Nibbler from yellow to metallic silver, changed the metal box housing the tool from black to blue, and changed the formed interior packaging that holds the tool (and displays it at trade shows) from gray sponge-like foam to yellow foam rubber. Additionally, as shown below, Rodman is now

including in the box with the Rodman II Nibbler an extra two-sided, pass-through punch and a wrench for adjusting the nibbler tool:



The Rodman II Nibbler

The Rodman II Nibbler is essentially identical to the Bad Dog Biter. As the following side-by-side comparison indicates, both are sold in virtually identical powder-blue metal drill bit boxes with yellow, hard foam rubber inserts:



Thomas' Bad Dog Biter Rodman II Nibbler

The packaging of the Rodman Nibbler appears in almost every respect to be nearly identical to the packaging of the Bad Dog Biter - right down to the size, shape, and construction of the metal box in which the product is sold, the custom lining inside the box, and the extra head, extra biter blade/punch, and allen wrench included therein. The Rodman II Nibbler may even originate from the same source as the Bad Dog Biter, in China. Upon information and belief, it is imported in substantially completed and assembled condition. *Verified Complaint* ¶ 23.

On or about July 15, 2006, employees of Thomas purchased a Rodman II Nibbler at the "EAA Airventure" show in Oshkosh, Wisconsin. *Verified Complaint* ¶ 24. Nowhere on the product, packaging, or instructions is the Rodman II Nibbler marked or labeled with its country of origin. *Verified Complaint* ¶ 25. Additional side-by-side comparison images of the plaintiff's Bad Dog Biter nibbler and the Rodman II Nibbler are attached hereto as *Exhibit A.*

Rodman markets and sells the Rodman II Nibbler at trade shows around the country including, on some occasions, shows at which Thomas is selling the Bad Dog Biter. Rodman has stated to prospective customers at trade shows that The Rodman II Nibbler is "just like" the Bad Dog Biter, at times gesturing and referring customers to demonstrations of the Bad Dog Biter being carried out at Thomas' show booth nearby. *Verified Complaint* ¶ 20. Rodman, by these actions, is in effect teaching users how to use the identical Rodman product in a manner that practices Thomas' patent, U.S. Pat. No. 7,047,613B2.

## III. ARGUMENT

A party who seeks a preliminary injunction must show: (1) that it has a substantial likelihood of success on the merits, (2) that there exists, absent the injunction, a significant risk of irreparable harm, (3) that the balance of hardships tilts in its favor, and (4) that granting the injunction will not negatively affect the public interest. *TEC Eng'g Corp. v. Budget Molders Supply*, 82 F.3d 542, 544 (1st Cir. 1996) (in context of trade dress infringement case under Lanham Act § 43(a), 15 U.S.C.S. § 1125(a)). While all these factors must be weighed, the focal point of this four-part test is more often than not the movant's likelihood of success on the merits. *Borinquen Biscuit Corp. v. M.V. Trading Corp.*, 443 F.3d 112, 115 (1st Cir. 2006).

In the present case, each of the preliminary injunction factors weigh heavily in plaintiff's favor, and therefore a preliminary injunction should issue against the defendant enjoining: any further infringement of plaintiff's trade dress; any further false designation of origin of the defendant Nibbler; and any further violation of the Rhode Island common law of unfair competition.

### A. PLAINTIFF HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS CLAIMS.

#### 1. Plaintiff Has a Strong Likelihood of Success on the Merits of Its Claim of False Designation of Origin in Violation of § 43(a) of the Lanham Act.

Pursuant to the Tariff Act, a seller is obligated to disclose the country of origin of any non-domestic goods. 19 U.S.C. § 1304(a). That section provides in relevant part:

> Marking of articles. Except as hereinafter provided, every article of foreign origin (or its container, as provided in subsection (b) hereof) imported into the United States shall be marked in a conspicuous place as legibly, indelibly, and permanently as the nature of the article (or container) will permit in such manner as to indicate to an ultimate purchaser in the United States the English

name of the country of origin of the article.

*Id.* "Failure to indicate otherwise is a tacit representation that the good is of domestic origin, and therefore is actionable under § 43(a) of the Lanham Act." *In re Certain Caulking Guns*, 223 U.S.P.Q. 388, 405 (U.S. Inter. Trade Com'n 1984). In fact, it has been found that a "failure to designate country of origin in violation of the Tariff Act violates § 43(a) of the Lanham Act as a matter of law." *Alto Products Corp. v. Ratek Industries, Ltd.*, 1996 WL 497027, *5 (S.D.N.Y. 1996).

Upon information and belief, the Rodman II Nibbler is imported from China. The specimens of the Rodman II Nibbler observed by Thomas contain no marking as to country of origin. Such a failure to mark the defendant's nibblers with their country of origin is a violation of the Lanham Act as a matter of law, making likelihood of success on the merits of plaintiff's claim of false designation of origin extremely high.

**2. Plaintiff Has a Strong Likelihood of Success on the Merits of Its Claim of Trade Dress Infringement.**

Section 43(a) of the Lanham Act provides a cause of action to one who claims injury from a person who uses "any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods...." 15 U.S.C. § 1125(a)(1)(A). The Lanham Act exists "to protect persons engaged in . . . commerce against unfair competition [.]" 15 U.S.C. § 1127 (1996). Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), "addresses the evil of misappropriation of trade dress, the age-old ruse by which one merchant passes off his wares as those of another, tricking the latter's customers into buying from him." *Central Tools v. Products Eng'g Corp.*, 936 F. Supp. 58, 64 (D.R.I. 1996).

Trade dress includes “the design and appearance of [a] product together with the elements making up the overall image that serves to identify the product presented to the consumer.” *Chrysler Corp. v. Silva*, 118 F.3d 56, 58 (1st Cir. 1997). “The design or packaging of a product may acquire a distinctiveness which serves to identify the product with its manufacturer or source; and a design or package which acquires this secondary meaning, assuming other requisites are met, is a trade dress which may not be used in a manner likely to cause confusion as to the origin, sponsorship, or approval of the goods.” *Traffix Devices v. Mktg. Displays*, 532 U.S. 23, 28 (2001); s*ee also* J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition § 8:1, at 8-3, 8-18 (noting that trade dress “includes the totality of any elements in which a product or service is packaged or presented” and can even include the “shape and design of the product itself”).

A plaintiff asserting trade dress infringement must prove that it has a design that is (1) used in commerce; (2) non-functional; (3) distinctive or has acquired secondary meaning; and (4) that “another’s use of similar trade dress is likely to cause confusion among consumers as to the product’s source.” *Yankee Candle Co. v. Bridgewater Candle Co.*, 259 F.3d 25, 38 (1st Cir. 2001); see also *See Central Tools, Inc. v. Products Eng’g, Inc.*, 936 F. Supp. 58, 65 (D.R.I. 1996). Based on plaintiff’s priority of use in its blue metal box, product and packaging coloration, and overall product design, along with the defendant’s “copycat” use of a nearly identical metal box, product and packaging coloration, and overall product design to palm off defendant’s nibbler to trade show customers, plaintiff has an extremely high likelihood of success on the merits of its trade dress infringement claim.

**a. Plaintiff has priority of use of the distinctive trade dress of the Bad Dog Biter Nibbler.**

Thomas’ exclusive rights in its distinctive trade dress derive from priority of use. *See*

*Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 815 (1st Cir. 1987). Since approximately 2000, Thomas has been selling its Bad Dog Biter nibbler in a distinctive blue metal box with a yellow foam rubber inner casing. The product itself has a metallic finished, stepped-cylindrical shaped body, dual black metal cutting heads, and a removable plastic handle-grip. It is packaged, displayed, and sold with a replacement punch and custom wrench placed in pre-cut depressions in the box's yellow foam insert. Images of Thomas' Bad Dog Biter, as displayed and sold in its blue box and yellow-foam insert, are depicted on page 3 of this *Memorandum*.

Rodman has for many years been selling its own nibbler tool, which it calls the "Rodman Nibbler." The original Rodman Nibbler has a single cutting head, a yellow stepped-cylindrical body, and is sold in a black metal tool box in a gray, sponge-like foam insert. Images of the Rodman Nibbler, as displayed and sold for years, are depicted on pages 4 and 5 of this *Memorandum*.

Sometime during 2006, Rodman began importing and selling the Rodman II Nibbler, which is essentially identical to the Bad Dog Biter. The new Rodman tool is, like the Bad Dog Biter, a two-headed nibbler with a removable plastic handle grip, a stepped-cylindrical metallic-finished body, and black steel cutting heads that are rotatable during operation. Rodman sells it in virtually identical powder-blue boxes with yellow, hard foam rubber inserts. True and accurate side-by-side comparison images of the plaintiff's Bad Dog Biter nibbler and the Rodman II Nibbler are depicted on *Exhibit A*.

Thomas sold the Bad Dog Biter with its distinctive trade dress for approximately six years before Rodman began selling the Rodman II. Thomas has clear priority of use.

**b. Plaintiff's trade dress is used in commerce, non-functional, and distinctive.**

**i. Use in commerce.**

As an initial matter, both products have been and continue to be sold in trade shows, and thus there is no disputing that both products are used in commerce.

**ii. Non-functional.**

To be protected under the Lanham Act, trade dress must not be functional. *See* 15 U.S.C. § 1125 (a)(3); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 775, 120 L. Ed. 2d 615, 112 S. Ct. 2753 (1992).[3] "[T]he functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 36 (1st Cir. 1998). The *Lund* Court cited with approval the definition of functional contained in McCarthy on Trademarks and Unfair Competition, that "'functional' features or designs should be defined as those that are driven by practical, engineering-type considerations such as making the product work more efficiently, with fewer parts and longer life, or with less danger to operators, or be shaped so as to reduce expenses of delivery or damage in shipping." *Id.* quoting 1 McCarthy § 7:64. In addition, a design is non-functional if it is not "essential to the use or purpose of the article" and does not "affect[] the cost or quality of the article." *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 165 (1995).

Thomas' Bad Dog Biter nibbler is packaged in a distinctive blue metal box with a customized yellow foam inner casing. The product itself has a metallic finished, stepped-

[3] Moreover, the fact that a product contains some functional elements does not preclude Lanham Act protection. "A particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection." *I.P. Lund Trading ApS v. Kohler Co.*, 163 F.3d 27, 37 (1st Cir. 1998).

cylindrical shaped body, dual black metal cutting heads, and a removable blue plastic handle-grip. It is packaged, displayed, and sold with a replacement punch and custom wrench placed in pre-cut depressions in the box's yellow foam insert. Thomas' blue metal box with a customized yellow foam inner casing along with a metallic finished body are clearly non-functional elements as they are neither "driven by practical, engineering-type considerations" nor "essential to the use or purpose of the article," but are intended to differentiate Thomas' product from other nibblers on the market and to link the Bad Dog Biter to Thomas' reputation for high quality tools in the minds of the consumer.

**iii. Distinctive.**

In order to receive trade dress protection, a product must either be inherently distinctive or have acquired secondary meaning. *See Two Pesos*, 505 U.S. at 769; *TEC Eng'g Corp.*, 82 F.3d at 545. "The inquiry into distinctiveness turns on the total appearance of the product, not on individual elements." *Lund*, 163 F.3d at 39. Distinctiveness can be shown in one of two ways. First, distinctiveness may be "inherent" in that the "intrinsic nature [of the trade dress] serves to identify a particular source." *Id.*[4] Second, distinctiveness may be "acquired" in that the trade dress has "secondary meaning" whereby the public views its primary significance as identifying the source of the product rather than the product itself. *Id.* "To establish secondary meaning, a manufacturer must show that, in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Id.* at 41-42. Secondary meaning may also be proven through "circumstantial evidence, specifically the length and manner of the use of the trade dress, the

[4] The Supreme Court has limited the types of trade dress that may be found to be inherently distinctive. For example, product design/configuration can never be inherently distinctive. *See Wal-Mart Stores v. Samara Bros., Inc.*, 529 U.S. 205, 212 (2000); *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 162 (1995)(color alone may never be inherently distinctive).

nature and extent of advertising and promotion of the trade dress, [] the efforts made to promote a conscious connection by the public between the trade dress and the product's source . . . the product's 'established place in the market' and proof of intentional copying." *Yankee Candle Co.*, 259 F.3d at 43.

The facts strongly suggest that Thomas' trade dress has acquired secondary meaning. Thomas has been selling its Bad Dog Biter nibbler with the metallic finished, stepped-cylindrical shaped body in a distinctive blue metal box with a customized yellow foam inner casing since approximately 2000. "[T]rademark law has long embraced the tenet that five years of continuous and exclusive use of a mark or trade dress generates a presumption of secondary meaning." *Yankee Candle Co. v. Bridgewater Candle Co.*, 99 F. Supp. 2d 140, 154 (D. Mass. 2000) (citing 15 U.S.C. § 1052(f)), *aff'd*, 259 F.3d 25.[5]

The nature and extent of Thomas' promotion of the trade dress and Thomas' efforts to promote a conscious connection by the public between the trade dress and the product's source also supports a finding of secondary meaning. Thomas markets and sells its products primarily at large, exposition-style trade shows, exactly the type of market where eye-catching and distinctive product design and packaging is essential to both attract customers and to build brand and product loyalty. The unique blue and yellow packaging and the metallic finished body differentiates Thomas' product from other nibblers on the market, such as the yellow and black Rodman Nibbler.

Moreover, it is clear that Rodman has copied Thomas' trade dress and it would be disingenuous for Rodman to deny that that the copying was intentional or, indeed, that it was

[5] The plaintiff recognizes that statute to which the district court in *Yankee Candle* cited for this presumption, 15 U.S.C. § 1052(f), applies in the registration of trademarks; however, the district court held it was also applicable to trade dress claims.

directed at Thomas' nibbler product. Rodman is a direct competitor of Thomas, and by purchasing and reselling a direct copy from a foreign source, has moved away from its own claimed trade dress toward that of Thomas. There is no other explanation for Rodman's marketing and selling of the nearly identical product, with the nearly identical combination of metal box, product body formation, product and packaging coloration, and overall product design, in the same trade show outlets as Thomas utilizes, but that Rodman is attempting to take advantage of the association that consumers have made linking the Bad Dog Biter with its unique and distinctive trade dress.

**iv. Rodman's use of a strikingly similar trade dress for the Rodman II Nibbler has created a serious likelihood of confusion among the relevant purchasing public.**

Rodman's deliberate use of the same colors for its metal box, foam inner casing, and product body, along with the strikingly similar copying of the shape of plaintiff's product body, plainly infringes upon Thomas' trade dress by creating a likelihood of confusion as to the source, nature, and characteristics of products connected to the trademark and trade dress. Accordingly, Thomas is likely to prevail on its claim of trade dress infringement.

The infringement of unregistered trade dress is prohibited by § 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), where likelihood of confusion would result. *See Volkswagenwerk Aktiengesellschaft*, 814 F.2d at 815-16. In order to prove infringement of protected trade dress, the plaintiff must show that another's use of a similar trade dress is likely to cause confusion among consumers as to the product's source. *Lund*, 163 F.3d at 43-44. The First Circuit has established eight factors that a district court should consider in evaluating the likelihood of confusion: (1) the similarity of the trade dress; (2) the similarity of the goods and/or services; (3) the relationship between the parties' channels of trade; (4)

the relationship between the parties' advertising; (5) the classes of prospective purchasers; (6) evidence of actual confusion; (7) the defendant's intent in adopting its dress; and (8) the strength of plaintiff's dress. *Lund*, 163 F.3d at 43. No one factor is conclusive, and the district court must consider each. *Id.* In the present case, these factors all point in favor of a finding of trade dress infringement.

**Similarity of the trade dress.**

Similarity of the trade dress "is determined on the basis of the total effect of the designation, rather than a comparison of the individual features." *Id.* The similarity of metal box and foam insert, the coloring, and the product body formation of the Rodman II is strikingly similar to that of the plaintiff. An examination of the products demonstrates the level to which Rodman copied the look and feel, and in many cases the exact details, of the Bad Dog Biter:




Thomas' Bad Dog Biter Rodman II Nibbler

*See also, Exhibit A.*

**Similarity of the products.**

The scope of protection afforded a given trade dress is strongest when an infringing trade dress is used on the same kind of product with which the trade dress is directly associated. *See generally* 4 McCarthy on Trademarks and Unfair Competition § 26:20 (4th ed. 2000). Here, both parties sell an almost identical product intended for identical uses.

**Relationship between the parties' channels of trade and advertising; classes of prospective purchasers.**

The First Circuit's practice is to examine these three factors simultaneously. *Pignons S. A. de Mecanique de Precision v. Polaroid Corp.*, 657 F.2d 482, 488 (1st Cir. 1981). In this case, the channels of trade and the prospective purchasers of the Rodman II Nibbler and the Bad Dog Biter nibbler are precisely the same. Both parties sell their nibblers principally at large, exposition-style trade shows held in cities throughout the United States; indeed, the parties often attend and sell at the same shows. In addition, the parties both market their nibblers to the same prospective purchasers: craftsmen and hobbyists engaged in the manufacture, repair, and reconditioning of boats and automobiles, and in woodworking and automobile collision and damage repair.

**Evidence of actual confusion.**

A showing of actual confusion is not necessary to show a likelihood of confusion. *Volkswagenwerk Aktiengesellschaft*, 814 F.2d at 818. In addition, it is accepted that evidence of actual confusion is not as important in cases where the there has been "no protracted period of product coexistence." *See Borinquen Biscuit Corp.*, 443 F.3d at 121. In the present case, Thomas' Bad Dog Biter nibbler has been on the market for six years, while defendant's Rodman II Nibbler has just recently begun to be offered at trade shows. Given this extremely small period of product coexistence, plaintiff submits that evidence of actual

confusion is not necessary. However, there is evidence that Rodman is affirmatively attempting to create actual confusion, telling prospective purchasers that the Rodman II nibbler is "the same" as the Bad Dog Biter being sold across the aisle.[6]

**Defendant's intent in adopting its dress.**

As with evidence of actual confusion, a party need not show intent to prevail on a § 43(a) claim. *R.J. Toomey Co. v. Toomey*, 683 F. Supp. 873, 877 (D. Mass. 1988). In the present case, Rodman was well aware of Thomas, its Bad Dog Biter, and its distinctive trade dress, and made the deliberate choice to copy the trade dress. Thomas' existing trade dress was specifically noted by Rodman in the settlement of the prior litigation between the parties. Such knowledge creates the presumption of bad faith and an intent to infringe Thomas' trade dress deliberately. *See e.g.*, *Id.* at 878 (finding bad faith where parties product and market overlapped, and defendant was "indisputably aware" of plaintiff's mark, but nevertheless used it); *see also Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1208 (1st Cir. 1983).

**Strength of dress.**

"Under the Lanham Act, strong marks enjoy the greatest protection against infringement." *Int'l Ass'n of Machinists & Aero. Workers v. Winship Green Nursing Ctr.*, 103 F.3d 196, 206 (1st Cir. 1996). A "strong" mark is "one so arbitrary, fanciful, and unique that its use through promotion has come to symbolize the source of origin rather than a not very extraordinary description of the qualities of the product." *R.G. Barry Corp. v. A. Sandler Co.*, 406 F.2d 114, 116 (1st Cir. 1969) (emphasis added). In assessing a mark's strength,

---

[6] Moreover, courts are nearly unanimous in holding that intentional copying creates presumptive confusion. *See*, *e.g.*, *Academy of Motion Picture Arts & Sciences v. House Promotions, Inc.* 944 F.2d 1446, 1456 (9th Cir. 1991) (when a party selects a mark similar to another, a court can properly presume that the defendant intends to confuse and will accomplish that purpose); *Mobil Oil Corp. v. Pegasus Petroleum Corp*., 818 F.2d 254, 258 (2d Cir. 1987) ("intentional copying gives rise to a presumption of likelihood of confusion").

several factors are relevant: the length of time the mark has been used; its renown in the plaintiff's field of business; and the plaintiff's actions to promote the mark. *Star Fin. Servs. v. Aastar Mortg. Corp*., 89 F.3d 5, 11 (1st Cir. 1996). Here, Thomas has been selling the Bad Dog Biter in its current configuration since 2000. Indeed, Rodman's decision to use essentially identical trade dress on the Rodman II nibbler is a strong indication that plaintiff's trade dress is distinctive, well-known, and has acquired secondary meaning in the trade craft and hobbyist market.

**c. Summary**

Analysis of the above factors overwhelmingly supports the finding that Thomas is likely to succeed on the merits of it's § 43(a) claim for trade dress infringement.

**3. Plaintiff Has a Likelihood of Success on the Merits of Its State Common Law Unfair Competition Claim**

Unfair competition occurs when "the device or means employed would be likely to confuse and mislead the public generally to purchase the product or patronize the shop of one person when the actual intention was to purchase the product or patronize the shop of another." *Nat'l Lumber & Bldg. Materials Co. v. Langevin*, 798 A.2d 429, 433 (R.I. 2002) (*quoting Merlino v. Schmetz*, 66 R.I. 425, 428, 20 A.2d 266, 267 (1941). Injunctive relief is an appropriate remedy in unfair-competition cases. *Nat'l Lumber*, 798 A.2d at 434. A plaintiff is not required to show actual confusion to obtain injunctive relief in an unfair competition action. *Fund for Community Progress v. United Way of Southeastern New England*, 695 A.2d 517, 521-22 (R.I. 1997); *Bostitch, Inc. v. King Fastener Co.*, 87 R.I. 274, 288 (R.I. 1958)("actual confusion need not be proved if the respondent has made a package enough like that of the complainant so that confusion is probable, and that the respondent's intent to create confusion and his success in confusing the complainant's customers can be

inferred from the respondent's action in so copying the complainant's package.").

It is clear that Rodman deliberately mimicked Thomas' trade dress and thus intended to confuse and mislead the public. Accordingly, Thomas is likely to succeed on the merits of its claim of common law unfair competition.

## B. THOMAS IS ENTITLED TO A PRESUMPTION OF IRREPARABLE HARM IN THE ABSENCE OF AN INJUNCTION.

Thomas has clearly demonstrated the likelihood of confusion in the context of its trade dress infringement and false designation of geographic origin claims, and is thus entitled to a presumption of irreparable harm. *See Societe Des Produits Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992) ("By its very nature, trademark infringement results in irreparable harm because the attendant loss of profits, goodwill, and reputation cannot be satisfactorily quantified and, thus, the trademark owner cannot adequately be compensated. Hence, irreparable harm flows from an unlawful trademark infringement as a matter of law."); s*ee also American Bd. of Psychiatry & Neurology v. Johnson-Powell*, 129 F.3d 1, 3 (1st Cir. 1997) ("Reducing the standard of proof for irreparable harm in trademark actions reflects the intent of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), 'to encourage commercial companies to act as the fabled 'vicarious avenger' of consumer rights.'") Moreover, such a presumption is undoubtedly strengthened in the present case due to the unquantifiable nature of Thomas' loss of goodwill and damage to its reputation and the extreme likelihood that Rodman will continue with its infringing behavior. Given the very real likelihood that Rodman will continue to attempt to market the Rodman II at the same shows at which Thomas markets the Bad Dog Biter, the Court should grant the requested injunction. *See American Bd. of Psychiatry & Neurology v. Johnson-Powell*, 129 F.3d 1, 4 (1st Cir. 1997) ("Certainly a court should grant an interlocutory injunction in a trademark

case when a realistic risk of future infringement (within the time covered by the injunction) has been demonstrated.”).

In the context of the state common law unfair competition claim, in situations where the plaintiff’s “good will, reputation, and unique identity” is threatened, “an injunction is appropriate since a legal remedy such as monetary damages would be inadequate to compensate the [plaintiff] for its loss.” *Fund for Community Progress v. United Way*, 695 A.2d 517, 523 (R.I. 1997); *see* also *In re State Employees*’ *Unions*, 587 A.2d 919, 926 (R.I. 1991) (irreparable injury occurs where a later determination would be an “empty victory”). The risk to Thomas’ goodwill, reputation, and unique identity by allowing Rodman to continue its egregious behavior is significant, and clearly demonstrates that Thomas will suffer irreparable harm if not granted preliminary relief.

### C. THE BALANCE OF THE EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR ISSUANCE OF AN INJUNCTION.

The balance of the equities weighs heavily in Thomas’ favor. Rodman was well aware of the Bad Dog Biter and its trade dress, both from the prior litigation and from operating at the very same trade shows, and Rodman deliberately adopted a trade dress strikingly similar to the one it knew Thomas was using, and failed to properly designate the geographic origin of its product. While Thomas will continue to suffer irreparable injury to its business and goodwill from Rodman’s conduct, Rodman will suffer no harm in being prevented from selling a product which it is not legally entitled to sell. Rodman cannot credibly argue that the equities demand anything less than a preliminary and permanent injunction against its conduct.

Finally, enjoining Rodman’s actions serves the public interest. The Lanham Act was intended to make “‘actionable the deceptive and misleading use of marks,’ and ‘to protect

persons engaged in . . . commerce against unfair competition.'" *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 28 (U.S. 2003). Therefore, it would clearly serve the public interest for an injunction to issue against Rodman prohibiting any further violation of the Lanham Act, any further infringement of Thomas' trade dress, and any further acts of unfair competition.

## IV. CONCLUSION

In a desperate effort to damage Thomas' business reputation and extensive goodwill, to deceive the public, and to steal market share from Thomas, Rodman has willfully and deliberately imitated Thomas' trade dress and misrepresented by omission the origin of its product. Such blatantly illegal conduct must be stopped, and therefore Thomas respectfully requests that the Court grant its Motion for Preliminary Injunction.

Date: October 13, 2006

JOSEPH A. THOMAS, LTD
By Its Counsel,

/s/ Thomas R. Noel
Thomas R. Noel, Esq. (#4239)
John R. Harrington, Esq. (#7173)
NOEL & GYORGY LLP
50 South Main Street
Providence, RI 02903
(401) 272-7400
(401) 621-5688 (Facsimile)
TNoel@LawNoel.com

## CERTIFICATE OF SERVICE

I do hereby certify that on the 13th day of October, 2006, I served a true copy of this document to the following by Certified Mail, Return Receipt Requested: Rodman & Company, Inc., 7047 Vineland Ave., North Hollywood, CA 91605.

/s/ Thomas R. Noel