# ATTACHMENTS

1. Affidavit of Dale Chesgreen
2. Printouts from Rodman & Company, Inc. website
3. Memorandum and Order (Lang v. Thomas, C.A.No: 00-611ML)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOSEPH A. THOMAS, LTD
Plaintiff,

V.

C.A. No.: 06-440ML

RODMAN & COMPANY, INC.
Defendant

**AFFIDAVIT OF DALE CHESGREEN**

Dale Chesgreen, being duly sworn, deposes and says:

1. I am the President of Rodman & Co., Inc. and have served in this capacity since January of 1973. I make this declaration based upon my personal knowledge and my review of documents in Rodman & Co., Inc.'s possession.

General Background of Rodman & Co., Inc.

2. Rodman & Co, Inc. is a handling company that offers for sale various drill bits, sheet-metal cutting tools, pliers, wrenches and other accessories.

3. Rodman & Co., Inc. has its headquarters and its only office in North Hollywood, California. It employs approximately 3 people, all of whom live in California.

Contacts With Rhode Island

4. Rodman & Co., Inc. is a corporation organized and existing under the laws of California. Rodman & Co., Inc. does not maintain an office nor have any employees in Rhode Island. Rodman & Co., Inc. is not registered, licensed or otherwise authorized to do business in Rhode Island and has not appointed an agent for service of process in Rhode Island. It does not own or lease any real or personal property in Rhode Island. Rodman & Co., Inc. does not maintain a telephone listing, mailing address or post office box in Rhode Island. Rodman & Co., Inc. has no bank accounts in Rhode Island.

5. Rodman & Co., Inc. does not advertise or direct any marketing or sales efforts towards Rhode Island. Rodman & Co., Inc. derives no income from Rhode Island sources. Rodman & Co., Inc. has never paid or been required to pay income tax to the State of Rhode Island.

6. Rodman sells their product at trade shows and state fairs across the country through independent sales representatives.

7. Rodman & Co., Inc.'s sales representatives operate as independent contractors, none of which are located in Rhode Island.

8. Rodman & Co., Inc. has not done any trade shows in Rhode Island in the last five years.

9. Rodman & Co., Inc.'s products are purchased by visiting its booths at trade shows.

10. Rodman & Co, Inc. has a website to display the products. That website is passive and nothing is sent out to actively target buyers in Rhode Island.

11. Rodman & Co. Inc. has had no direct sales made to customers in Rhode Island. Except on October 24, 2006, a Mrs. Julienne Smith called Rodman and indicated that her dad had bought a Rodman drill at the "Big E" in Massachusetts a "couple" of years ago. She claimed she borrowed the drill from her dad and her husband had broken a drill bit out of the set. She asked if a replacement drill bit could be mailed to her. The cost was $6.95.

12. Rodman & Co., Inc. has not shipped any products to Rhode Island in the last five years except for the $6.95 drill bit.

13. Rodman & Co. has not sold any of the allegedly infringing product in Rhode Island.

14. To the best of my knowledge, Rodman & Co., Inc. has no contacts with the State of Rhode Island regarding any products other than the $6.95 drill bit sent to Julienne Smith.

15. Rodman & Co. has only been offering the allegedly infringing product for sale since July of 2006.

16. Rodman & Co. only sold eight of the allegedly infringing products, two of which were purchased by a representative of Joseph Thomas, Ltd.

17. Rodman & Co. did file a Complaint for patent infringement in the United States District Court for the District of Rhode Island in the year 2000. On behalf of Rodman & Co., I appeared for and attended the proceedings before the Court during the course of the litigation.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS THE 26 DAY OF October, 2006.

DALE CHESGREEN
AKA: Warren Dale Chesgreen

Subscribed and sworn before me on this 26th day of OCTOBER, 2006.

HINA AZAM
COMM. #1411640
NOTARY PUBLIC - CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires May 14, 2007

Notary Public
Commission expires: MAY 14, 2007

Home | About Us | Products | Nibbler Video | How Purch

# Welcome to Rodman & Co., Inc.

Rodman & Company was established in 1928. We specialize in bringing the latest European specialty tools to the United States where they can be demonstrated directly to the consumer at trade shows nationwide. "PUT SUPERIOR QUALITY IN YOUR HANDS." A member of the Better Business Bureau.

***Rodman & Company, Inc.- Since 1928***
*7047 Vineland Ave., North Hollywood, California, 91605, US*
*phone: (800) 228-1806 fax: (818) 765-8158*

Privacy Policy/Terms of Service

Home About Us Products Nibbler Video How Purch

# How to Purchase

How can you purchase Rodman tools?

By visiting one of our many booths at Trade shows and State Fairs across the country. There you can watch a trained Rodman professional demonstrate our tools and also receive special discount pricing!

The show special prices are only available at Trade shows.

If you'd like to know when we will be in your area, please give us a call at (818) 765-5552 or (800) 228-1806.

***Rodman & Company, Inc.- Since 1928***
*7047 Vineland Ave., North Hollywood, California, 91605, US*
*phone: (800) 228-1806 fax: (818) 765-8158*

*Privacy Policy/Terms of Service*

# Products



Welcome to the Rodman and Co., Inc. products page.

13 Piece Multi-Purpose Drill Bit Set
Put Superior Quality in your Hands

Multi position Drill Support
Custom Holder for the Rodman Nibbler and the Multi-purpose Drill Bits

Other Drill Bit Sets and Individual Sizes
3,5,and 7 piece sets including metric sizes.

Carbide Gritted Saw Blades
For 12" Hack Saw, Jig Saw, Reciprocating, and Rod Saw

Nibbler
Rodman's exclusive Sheet Metal Cutting Head

Grinding Wheel
Special Silicon Carbide Stone

Knipex Pliers and Wrenches
Rodman Quality and Craftmanship- Made in Germany

9 PC. Tungsten Carbide Gritted Hole Saw Set
Made in Germany

***Rodman & Company, Inc.- Since 1928***
*7047 Vineland Ave., North Hollywood, California, 91605, US*
*phone: (800) 228-1806 fax: (818) 765-8158*

*Privacy Policy/Terms of Service*

Home | About Us | Products | Nibbler Video | How Purch

# About Us

## Rodman & Co., Inc.

*Rodman & Company tools - since 1928. The exclusive U.S. distributor of the Rodman Multi-Purpose Drill Bit & the Rodman Nibbler.*

| | |
|---|---|
| Monday | **8:00am - 4:30pm** |
| Tuesday | **8:00am - 4:30pm** |
| Wednesday | **8:00am - 4:30pm** |
| Thursday | **8:00am - 4:30pm** |
| Friday | **8:00am - 4:30pm** |
| Saturday | **Closed** |
| Sunday | **Closed** |

All time in Pacific Standard Time

Closed on all major holidays

**What we do**
Rodman & Company specializes in innovative tools and quality customer service. Rodman tools can be found in over 300 consumer and trade shows each year where they are demonstrated by trained Rodman professional representatives.

**Our business history**
Rodman & Co., Inc. began in 1928 as an auto parts warehouse, tool parts and repair station. It was taken over in 1973 by Dale Chesgreen who turned the company into a thriving power tool and repair center. Dale started in 1983 demonstrating clamps at a few trade shows. In 1987, Dale traveled to Koln, Germany and discovered a unique multi-purpose drill bit and other accessories. The drill bits were so successful that Dale had a work force of 13 sales representatives demonstrating at over 400 trade shows a year by the year 2000. In 1998, Rodman had introduced the unique Rodman Nibbler sheet-metal cutting tool to the U.S. market and has currently added a line of German Knipex pliers & wrenches.

**What makes us unique**
Our company believes our tools need to be seen and demonstrated to be truly appreciated.

***Rodman & Company, Inc.- Since 1928***
*7047 Vineland Ave., North Hollywood, California, 91605, US*
*phone: (800) 228-1806 fax: (818) 765-8158*
Privacy Policy/Terms of Service

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PATRICK LANG and RODMAN
& COMPANY, INC.

v. C.A. No. 00-611ML

JOSEPH A. THOMAS, LTD.

**MEMORANDUM AND ORDER**

Plaintiffs (individually "Lang" and "Rodman"; collectively, the "Plaintiffs") brought this action against Defendant, Joseph A. Thomas, Ltd. ("JAT"), alleging patent infringement, trade dress infringement, and false designation of origin under federal law, as well as common law unfair competition under state law. This case is now before the Court on JAT's motion for partial summary judgment pursuant to Fed. R. Civ. P. 56. Plaintiffs object. JAT moves for summary judgment as to: 1) Count II, 2) plaintiff Rodman's claims of patent infringement in Count III, and 3) "some of the associated claims" under Count IV. For the reasons stated herein, JAT's motion is granted in part and denied in part.

I. OVERVIEW

This case concerns competitors in the sale of a hand-held, drill-powered cutting tool commonly referred to as a "nibbler." A nibbler tool mounted to a hand-held drill translates the rotational force of the drill into an up-and-down motion of a cutting punch in the nibbler head (also referred to as a die). The nibbler is able to cut through or "nibble" sheet material, including metal and plastic. The Plaintiffs claim to own trade dress in a nibbling device known as the



47

"Turner Nibbler" and claim that JAT's competing nibbler, known as the "Bad Dog Biter" infringes that trade dress. For the benefit of the reader, the salient facts are related in the course of the following discussion.

## II. STANDARD OF REVIEW

Summary judgment shall be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The Court "must view all facts and draw all inferences in the light most favorable to the nonmoving party." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Once the movant has made the requisite showing, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Summary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." Gannon v. Narragansett Elec. Co., 777 F. Supp. 167, 169 (D.R.I. 1991) (citation omitted).

## III. DISCUSSION AND FACTS

### Count II – Trade Dress Infringement

I. Facts

In Count II of their complaint Plaintiffs claim trade dress infringement of the Turner Nibbler's "outer body, metal box packaging and coloring" under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The outer body shape of the Turner Nibbler is a stepped cylinder, having two different sized radii. Protruding at a ninety degree angle from the larger of the Turner Nibbler's two cylindrical steps is a black handle with curved surface indentations. Directly opposite to the handle is the Turner Nibbler's cutting mechanism. Protruding from the smaller of the Turner Nibbler's two cylinders, at a ninety degree angle from both the handle and the cutting mechanism, is that part of the Turner Nibbler which accommodates the hand-drill. The Turner Nibbler's outer body is currently manufactured in yellow. In the past, it has been sold in silver, although on a very limited basis.[1] Its handle is black. The Turner Nibbler identifies both Rodman and Turner on its outer body and provides Rodman's business location and telephone number. Rodman began selling the Turner Nibbler in the United States in October 1998.

In outward appearance, JAT's Bad Dog Biter is similar in all aspects to the Turner Nibbler, except for the markings identifying Rodman and Turner and the coloring of its handle. In addition, the Bad Dog Biter has a second cutting head which is covered by the handle.

The black box containing the Turner Nibbler is a modified drill-bit box, i.e., one normally used to sell and house drill bits, which are also sold by Rodman and JAT. Rodman obtains the

[1] According to the deposition testimony of Dale Chesgreen, Rodman's president, only 20 silver Turner Nibbler's were ever sold.

drill-bit boxes it uses from the American Drill Box Company ("American"), and such boxes are available for sale by American to customers other than Rodman. The drill-bit box housing contains a foam casing which is designed to accommodate the Turner Nibbler's body and tools. The box is marked with a label affixed to it bearing the Rodman name. The Bad Dog Biter is also contained in a drill-bit box housing which, with the exception of its color and exterior markings, is similar in all aspects to the Turner Nibbler's housing.

II. Trade Dress

Trade dress is defined as "the design and appearance of a product together with the elements making up the overall image that serves to identify the product presented to the consumer." Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 38 (1st Cir. 2001) (citation omitted). In order for trade dress to be protected under § 43(a) the plaintiff must prove that the dress is: 1) used in commerce;[2] 2) non-functional; and 3) distinctive. I.P. Lund Trading ApS, et al. v. Kohler Co. et al., 163 F.3d 27, 36 (1st Cir. 1998). Additionally, "the plaintiff must show that another's use of a similar trade dress is likely to cause confusion among consumers as to the product's source." Yankee Candle, 259 F.3d at 38, (quoting I.P. Lund Trading, 163 F.3d at 43-44).

A. *Functionality*

For a trade dress to be protected under the Lanham Act it must be "non-functional." I.P. Lund Trading, 163 F.3d at 36 (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 775 (1992)). "The functionality doctrine prevents trademark law, which seeks to promote

---

[2] There is no dispute that both the Plaintiffs' and JAT's nibblers have been used in commerce.

competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." Qualitex Co. v. Jacobson Products Co., 514 U.S. 159, 164 (1995). "[F]unctional features or designs should be defined as those that are driven by practical, engineering-type considerations such as making the product work more efficiently, with fewer parts and longer life, or with less danger to operators, or be shaped so as to reduce expenses of delivery or damage in shipping." I.P. Lund Trading, 163 F.3d at 37 n.5 (quoting 1 J. MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:64 (4th ed. 1996)). In contrast, a design is considered non-functional if, inter alia, it is not "essential to the use or purpose of the article" and does not "affect[] the cost or quality of the article." Qualitex, 514 U.S. at 165. Thus, a functionality analysis "requires examination of the effects that granting protection to a product will have on the ability of others to compete." I.P. Lund Trading, 163 F.3d at 37 (emphasis added). Central to this inquiry is "whether granting protection to a mark 'would permit one competitor . . . to interfere with legitimate (nontrademark-related) competition through actual or potential exclusive use of an important product ingredient.'" Id. (quoting Qualitex, 514 U.S. at 170). "[A] particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection." I.P. Lund Trading, 163 F.3d at 37 (citation omitted).

In its motion, JAT argues that summary judgment is proper as to Count II because the individual aspects of the Turner Nibbler, in which the Plaintiffs claim trade dress, are "functional," and therefore not protected. In its reply memorandum, JAT acknowledges that functional elements may, when combined, qualify as a protectable product, but avers that Plaintiffs have failed to sustain their burden of proving non-functionality. While JAT correctly

states that it is the Plaintiffs' burden to prove non-functionality *at trial*, Plaintiffs are the nonmovants in the instant motion. As such, the burden of showing that a genuine issue of material fact exists does not shift to the Plaintiffs until the Defendant has presented facts evidencing its entitlement to judgment as a matter of law. Here, JAT has failed to satisfy this threshold requirement.[3] JAT has failed to make a showing that the Turner Nibbler's trade dress is functional and that granting protection to the Plaintiffs will hamper the ability of others to compete in the market. As discussed above, functionality is not determined solely on the basis of whether the product in question or its individual parts have a useful purpose. Rather, functionality turns on a number of factors, including cost, quality, and design considerations. Based on these factors, the Court must determine whether granting trade dress protection to a product will hamper competition. JAT has offered no evidence that, without being permitted to incorporate Turner Nibbler features into competing nibblers, the ability of other companies to compete in the nibbler market will be frustrated. Moreover, the Plaintiffs' have proffered evidence that other nibbler designs do exist in the marketplace.

B. *Distinctiveness*

The third requirement for trade dress protection is distinctiveness. "Distinctiveness may be either 'inherent,' that is, the 'intrinsic nature of the trade dress serves to identify a particular source, or 'acquired,' i.e., the trade dress has acquired a 'secondary meaning'" in the minds of consumers. Yankee Candle, 259 F.3d at 38 (internal citations omitted).

Trade dress may be determined to be "inherently distinctive" if it "is so unique, unusual

---

[3] JAT makes largely factual arguments, but provides little in the way of evidence on which its motion must ultimately be decided. See Fed. R. Civ. P. 56.

or unexpected in [the particular] market that it will automatically be perceived by customers as an indicator of origin." Id. at 42. Factors to consider are

> whether [the design] was a "common" basic shape or design, whether it was unique or unusual in a particular field, whether it was a mere refinement of a commonly-adopted and well known form of ornamentation for a particular class of goods viewed by the public as dress or ornamentation for the goods, or whether it was capable of creating a commercial impression distinct from the accompanying words.

I.P. Lund Trading, 163 F.3d at 40 (quoting Wiley v. American Greetings Corp., 762 F.2d 139, 141 (1st Cir. 1985)). In contrast, a product has acquired "secondary meaning" if, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." I.P. Lund Trading, 163 F.3d at 41-42 (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11 (1982)) (emphasis added).

In an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a *product's design* and/or *color* are distinctive, and therefore protectable, only upon a showing of secondary meaning. Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 212 (2000); see also Yankee Candle, 259 F.3d at 41. Conversely, in order to receive trade dress protection for "*product packaging*," the packaging may be either inherently distinctive *or* have acquired secondary meaning. Id. "The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product, or encasing it in a distinctive packaging, is most often to identify the source of the product." Wal-Mart, 529 U.S. at 212. "To the extent that there are close cases, . . . courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." Yankee Candle, 259 F.3d at 41 (quoting Wal-Mart, 529 U.S. at

215).

Plaintiffs contend that the distinct combination of the elements comprising the Turner Nibbler's design, color, and drill-bit box housing should be analyzed under the "inherent distinctiveness" standard. The teachings of Wal-Mart and Yankee Candle however, clearly counsel against that approach. Wal-Mart, 529 U.S. at 212; Yankee Candle, 259 F.3d at 40-41. JAT argues that Plaintiffs' trade dress claim is based on product design or, in the alternative, it is one of the "close cases" referred to by the First Circuit, each argument requiring a showing of secondary meaning. Clearly the Plaintiffs' design and coloration claims qualify as "product design," and require a showing of secondary meaning. See id. What is less clear, however, is how this Court should classify Plaintiffs' claim as to the Turner Nibbler's drill-bit box housing. While JAT argues that the box is part of the product design requiring a showing of secondary meaning, it refers to the box as "packaging" in its memorandum, reflecting, perhaps, the difficulty in classifying these types of cases. Def. Mem. for Summ. J., at 15. There has been no showing by the Defendant that the drill-bit box housing is anything more than a form of packaging, i.e., that the box is somehow an extension of the product, or that consumers purchase the Turner Nibbler, in part, because of the drill-bit box, which is what this Court must find to require a showing of secondary meaning. See Wal-Mart, 529 U.S. at 215 (discussing the distinction between product design and product packaging). Based on the evidence presented, or lack thereof, it seems clear to this Court that the drill-bit box is a form of packaging and, as such, may qualify for protection upon a showing of *either* inherent distinctiveness or secondary meaning.

Because the test for establishing secondary meaning is more rigorous than the test for

inherent distinctiveness, see Yankee Candle, 259 F.3d at 43, if Plaintiffs' establish that a genuine issue exists with respect secondary meaning, JAT's motion for summary judgment must fail.

1. *Secondary Meaning*

JAT argues that Plaintiffs' have failed to establish secondary meaning with respect to the Turner Nibbler's design, color, and packaging, stating that Plaintiffs have not conducted any consumer surveys to establish secondary meaning and, as to the drill-bit box housing, have not established that it is unique in the industry.[4] Def. Mem. for Summ. J. at 13-15, 16. Additionally, JAT contends that Plaintiffs cannot pursue their claim as to the color silver, because only a "handful" of silver Turner nibblers were ever sold.

Plaintiffs correctly point out that consumer surveys are not the exclusive evidence by which a plaintiff may prove secondary meaning, and that "[s]econdary meaning may be 'established in a number of ways,' and courts may weigh a number of factors . . . ." in making a determination on whether a trade dress has acquired secondary meaning. I.P. Lund Trading, 163 F.3d at 42 (citation omitted). These factors include: length or exclusivity of the product's mark, size or prominence of the plaintiff's business, existence of substantial advertising by plaintiff, the product's established place in the market, and proof of intentional copying. Id. at 42 (citations omitted). Proof of secondary meaning does, however, require "at least *some* evidence that consumers associate the trade dress with the source." Yankee Candle, 259 F.3d at 44. In support of their claim that the Turner Nibbler and its drill-bit box housing have acquired secondary meaning, Plaintiffs have proffered evidence of: 1) intentional copying of the Turner Nibbler by

[4] Save these general allegations, JAT has not provided this Court with much in the way of evidence to support its argument that the Turner Nibbler has not acquired secondary meaning.

JAT, 2) substantial advertising and promotion of the Turner Nibbler, 3) exclusivity of the product's trade dress, including its packaging and yellow coloring, in the industry, and 4) significant length of use of the trade dress in the marketplace. Plaintiffs have also proffered some evidence that its customers associate the Turner Nibbler with its source, noting instances of customer surprise at learning JAT's Bad Dog Biter was not sold by Rodman, and calls from customers thinking they had bought JAT's competing nibbler from Rodman. These factors all weigh in Plaintiffs' favor on the issue of secondary meaning[5] and raise genuine issues of fact on the issue of distinctiveness. In addition, Plaintiffs have demonstrated that JAT's use of similar trade dress will likely cause, and has caused, confusion among consumers as to the product's source. Therefore, as to Count II, to the extent it alleges protected trade dress in the Turner Nibbler's outer body, drill-bit box housing, and the color yellow, the Court finds that JAT has failed to show that it is entitled to judgment as a matter of law.

With respect to the color silver, JAT points to the deposition testimony of Dale Chesgreen, Rodman's president, in which he states that only 20 silver nibblers were ever sold, as fatal to Plaintiffs' contention that silver nibblers could have acquired secondary meaning. Plaintiffs do not contest JAT's argument on this issue.

Without any proof to the contrary, it seems inconceivable to this Court that Plaintiffs can make a claim as to the color silver where only 20 silver nibblers were ever made, and then the color was abandoned because Chesgreen "[did not] like them." Secondary meaning requires a

---

[5] For the purposes of this motion, the Court notes that Plaintiffs have satisfied their burden of presenting evidence that the Turner Nibbler's packaging (drill-bit box housing) is also inherently distinctive, i.e., unique to the nibbler industry and capable of creating a distinct commercial image.

showing that the consumer makes a connection between the product and its source. Where only a "handful" of the product, with that characteristic which is claimed to have created the connection, were ever made, the repetition which is the basis for the acquisition of secondary meaning is absent. See Qualitex, 514 U.S. at 163 ("[O]ver time, customers may come to treat a particular color on a product or its packaging (say, a color that in context seems unusual, such as pink on a firm's insulating material or red on the head of a large industrial bolt) as signifying a brand. And, if so, that color would have come to identify and distinguish the goods--i.e., "to indicate" their "source"--much in the way that descriptive words on a product (say, "Trim" on nail clippers or "Car-Freshner" on deodorizer) can come to indicate a product's origin."). Therefore, JAT's motion as to Plaintiffs' silver coloration claim is granted.

Accordingly, JAT's motion for summary judgment on Count II is granted in part and denied in part.

Count III – Patent Infringement

I. Facts

Count III of Plaintiffs' complaint alleges patent infringement. Lang claims to be the owner by assignment of United States Patent No. 4,748,744 (the "744 Patent") filed by Kenneth J. Turner ("Turner") on June 17, 1986.[6] Rodman claims to be an exclusive licensee of the Turner Nibbler. The 744 Patent describes "a nibbling tool for cutting sheet material." Plaintiffs allege that JAT's Bad Dog Biter infringes the 744 Patent. Specifically at issue in the patent claim is the

---

[6] In 1986, immediately after Turner filed his patent application with the United States Patent and Trademark Office ("PTO"), he filed and recorded in the PTO an assignment of the patent rights from "Kenneth John Turner" to "Turner Precision Engineering, a British Corporation" (the "Turner Patent").

presence and degree of "radiusing" or "chamfering" in the inner corners of the tool's cutting head or "die," a feature which the Plaintiffs claim serves to "deburr" the cut sheet material. Turner Nibblers are manufactured by an entity called Turner Precision Engineering ("TPE"), located in Great Britain. TPE is owned by Turner, the original patentee of the 744 patent. TPE supplies nibblers to Lang, who supplies them to Rodman for sale in the United States. Rodman sells Turner Nibblers at expositions and trade shows.

II. Patent Infringement

JAT claims that summary judgment is proper as to plaintiff Rodman's claims under Count III because Rodman is a "bare licensee" under the Turner Nibbler patent and, as such, has no standing to sue on the patent. See Textile Productions, Inc. v. Mead Corporation, 134 F.3d 1481, 1484 (Fed. Cir. 1998) (stating that while the assignee or exclusive licensee of a patent holder may be able to sue for patent infringement, a bare licensee does not have standing to sue). JAT also contends that Lang cannot assert a claim for patent infringement damages that pre-date May, 2000, because the patent assignment was not effective until that date. Lastly, JAT contends that its machined steel heads do not infringe on the Turner patent.

Plaintiffs argue that under the Distributor Agreement Rodman is actually an exclusive licensee having "sole rights to sell the Product in the [U.S.]." Therefore, Plaintiffs contend that Rodman has standing to sue as a co-plaintiff for infringement of the Turner Nibbler patent. See id. (stating that an exclusive licensee that does not hold all "substantial rights" under the patent has standing to sue third parties as a co-plaintiff with the patentee). Lang disputes JAT's contention that the patent assignment was not effective until May, 2000, and has provided the Court with a Deed of Assignment dated December 23, 1999. There is clearly a factual dispute as

to the nature of plaintiff Rodman's proprietary rights with regard to the Turner Nibbler patent, and as to the effective date of the Lang assignment. Similarly, JAT's argument that its machined steel heads do not infringe on the Turner patent raises a genuine issue of fact. As such, JAT's motion for summary judgment on Count III is denied.

Count IV – Common Law Unfair Competition

JAT does not make a substantive argument for summary judgment as to Count IV; rather, it states in a footnote that this claim fails to the extent summary judgment is entered on Counts II and III. In light of the Court's ruling on Counts II and III, JAT's motion for summary judgment on Count IV is denied.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment on Count II is granted in part and denied in part. Defendant's motion as to Counts III and IV is denied.

SO ORDERED.

Mary M. Lisi

Mary M. Lisi
United States District Judge
April 22, 2002