**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

JOSEPH A. THOMAS, LTD
Plaintiff,

V. C.A. No.: 06-440ML

RODMAN & COMPANY, INC.
Defendant

**DEFENDANT, RODMAN & COMPANY, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Now come the Defendant, Rodman & Company, Inc. (hereinafter "Rodman"), and hereby opposes the Plaintiff's motion for preliminary injunction. Defendant further relies on its reasons set forth in its Opposition Memorandum of Law appended hereto.

Respectfully submitted,
Defendant,
Rodman & Co., Inc.
By its attorneys,

*/s/ Ronald Langlois*
Ronald Langlois, # 2891
Smith & Brink, P.C.
One State Street, Suite 400
Providence, RI 02908
Tel: (401) 351-9970
Fax: (401) 274-6218

**CERTIFICATION**

I hereby certify that I mailed a true copy of the within to **Thomas R. Noel, Esquire, John Harrington, Esquire,** Noel & Gyorgy, LLP, 50 South Main Street, Providence, RI 02903 on the 1st day of November, 2006.

*/s/ Ronald Langlois*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOSEPH A. THOMAS, LTD
Plaintiff,

v. C.A. No.: 06-440ML

RODMAN & COMPANY, INC.
Defendant

RODMAN & COMPANY'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## I. SUMMARY OF CONTROVERSY

Defendant, Rodman & Company (hereinafter "Rodman"), purchased 500 units of a commodity product called a Double-Headed Cutter, YT-160A from a state-owned Chinese manufacturer and has sold, as of this date, eight of the Double-Headed Cutters (referred to by Plaintiffs in its moving papers as the Rodman II product). The plaintiff, Joseph A. Thomas, Ltd., (hereinafter "JAT"), filed suit, alleging that the sale of these cutters represents an infringement of its trade dress, a violation of the Tariff Act, and an unfair trade practice, warranting the imposition of a preliminary injunction and damages to be determined at trial. Rodman denies these allegations, and has also filed a Motion to Dismiss, asserting the Court's lack of personal jurisdiction to entertain this suit.[1]

As the facts and legal principles discussed below will show, JAT's suit is a disingenuous attempt to remedy its loss of an exclusive manufacturing agreement with the product's manufacturer, so as to prevent Rodman from competing with its Bad Dog

[1] In filing this Opposition, Rodman does not waive the defense of personal jurisdiction. Rodman requests that its Motion to Dismiss be heard prior to any hearing or decision on the instant motion.

product by selling a different product made by the same manufacturer with a newer, improved design, with functional benefits over JAT's older product.

Rodman places quarter-sized black and gold stick-on labels reading "Made in China," on both the cardboard packaging and the metal box in which the cutter is packaged. Rodman also tells customers that the product is from China. Accordingly, Rodman has complied with the Tariff Act's requirement to make the place of origin (China) of the Double-Headed Cutters known, by labeling both the cutter's exterior cardboard package and immediate container, the metal box.

The graphics on the Rodman Double-Headed Cutter are substantially the same on the outer paper carton and the face of the metal box containing the product. The graphics include a perspective view of the Double-Headed Cutter, as well as text detailing the product's features. In contrast, the Plaintiff's metal box prominently displays the distinctive trademark of a design of a fearsome bulldog, and the words "Bad Dog," as appears in the picture below. There is therefore no likelihood of confusion between JAT's product packaging and Rodman's.



Further, the handles of the respective products are totally different in style, assembly, and levels of functionality. A layperson's side-by-side comparison of the two handles clearly reveals that the short, blunt, blue handle of the Bad Dog cutter is completely different from Rodman's handle, which is black, knurled and flares out to a larger width and length than JAT's. As the facts discussed below will show, the handle of Rodman's cutter is also more functional than Bad Dog's, and represents a legitimate difference upon which Rodman has a right to compete with Bad Dog. For these reasons, JAT cannot make the showing required for preliminary injunction to enter, and its motion should be denied.

## II. FACTS

### A. Product Packaging, Display and Sales

Since 1998, Rodman has been selling European-manufactured nibblers at trade shows under its own name. As set forth in the attached Affidavit of Dale Chesgreen, in March of 2006, Mr. Chesgreen, President of Rodman went to a trade show in Cologne, Germany and visited the booth of Hubei Provincial Jiaxin Machinery I/E Company Ltd., a Chinese manufacturer of numerous tools and other products, including various types of nibblers.

At the Hubei booth, Mr. Chesgreen saw several different nibbler products, including the Double-Headed Cutter YT-160A. Mr. Chesgreen was told that the YT-160A was a commodity product for which Hubei was seeking worldwide distributors. He was also told that as of 2006, Hubei no longer had an exclusive manufacturing agreement with JAT. Hubei also advised Rodman that the handle of the cutter was recently redesigned to be larger than previous designs, in order to prevent the heating of the

handle during its use. Hubei provided Mr. Chesgreen with a product catalog, attached as Exhibit 1 to Mr. Chesgreen's Affidavit, which shows the YT-160A and two other cutter models displayed in blue metal boxes with yellow foam, and bearing the metal finish JAT alleges is part of its trade dress.

The product being shown in Cologne also appeared in the blue box with yellow foam interior that JAT claims comprises its trade dress. The exterior of the box contained the same product drawing and English-language listing of product features as those currently displayed on Rodman's product, with one, and only one distinction: Mr. Chesgreen, upon purchasing the YT-160A product, asked that the initials "MD"[2] be added to the graphics of the front of the cardboard packaging as well as the front of the metal box of the cutter, so that it could distinguish products sold by Rodman and only honor warranties for products it sold, rather than another distributor.

In the end, the "MD" marking was added only to the front of the metal box, and not to the external cardboard packaging. (Notably absent from Plaintiff's Verified Complaint, Motion, and Memorandum is any photograph of the top of Rodman's closed metal container, despite photographing the closed cover of its own metal box.) This was the only way in which the product and its packaging differed from the condition in which they were offered for sale at the German trade show, and reflected choices made by the manufacturer, rather than by Rodman. A picture of the cardboard container and the metal box appears below:

[2] The "M" stands for Mr. Chesgreen's wife, Marta, and the "D" for his first name, Dale.



In July, 2006, Rodman received 500 "MD" Double-Headed YT-160A Cutters from Hubei. The cardboard shipping containers, marked "Made in China," contained 20 cutters each. Since the individual Double-Headed Cutters did not have a "Made in China" label, Rodman had "Made in China" stick-on labels printed. Rodman places these stickers on the front of the exterior cardboard packaging, and places a second label on the front of the metal box containing the Double-Headed Cutter. An exemplar sticker is attached hereto as Exhibit A. Hence, there are two labels stating "Made in China" on each product. Further, when discussing the product with prospective purchasers, Rodman always states that the product is made in China, and expressly contrasts it with its other product, which is manufactured in Europe.

The Double-Headed Cutter includes five different components, all positioned within a block of yellow foam that has specially designed cut-outs to accommodate each component. In turn, the foam is held within a blue metal box, which holds all the components secured by the foam. The box and foam size, material, and color are all chosen by the manufacturer. The foam thus functions as a holder for the components and has no viable aesthetic characteristics. The metallic finish of the cutter itself is also

chosen by the manufacturer. The remaining components of both nibblers are similar in mechanical function to Rodman's patented product, U. S. Patent Number 4,748,744, a copy of which is attached hereto as Exhibit B.

Between July 2006 and the date of JAT's Motion for Preliminary Injunction, Rodman sold eight Double-Headed Cutters at trade shows in California, Nevada, and Wisconsin. Two of these cutters were purchased by the Plaintiff at a trade show in Las Vegas. Further, the JAT employee who purchased the cutters is in fact a former Rodman employee, and was personally known as such to the Rodman representative at the trade show. JAT has not, however, introduced any evidence contradicting Rodman's description of the manner in which the product is discussed with customers, as compared with former employees/competitors.

C. Product Handle

Each Double-Headed Cutter is a functional tool, including a relatively large black handle. This handle is detachable and hollow, and screws on to the cutter head not in use. Except for the narrow end of the handle where there is a ½ inch, metal threaded insert to allow the handle to screw securely onto the unused cutter head, the remainder of the handle is not in contact with any metal. The handle flares outward from the point at which it screws onto the cutler head, becoming wider and longer along its length than the Bad Dog handle.

As placed in its container, the Bad Dog product's short, blunt blue handle is slid over the top of one of the metal cutter heads on the product. Rodman's Double-Headed Cutter handle is detached, and stored in a different section of the foam insert.

Further, the YT-160A's detachable flared, hollow black handle is inherently functional, and comparatively more functional than the Bad Dog cutter handle. The Double-Headed Cutter handle is flared wider, and is longer than the Bad Dog handle, making it easier to grip from an ergonomic perspective, and increasing efficiency of use by allowing the customer to adjust his grip less frequently, and to maintain a more secure grip upon the drill to which the cutter is attached during use. The fact that the YT-160A handle is both flared wider, and is hollow at the point where the customer's hand grips it, contrasted with the Bad Dog handle, which slides over (and remains in contact with) the unused metal cutter head, also improves the safety and efficiency of the product, because the new handle lessens the safety risk that the customer's hands will get hot, become slippery, or lose their grip, requiring a readjustment of his grip and/or a "cool down" period until the Bad Dog is cool enough to hold comfortably.

D. Prior Litigation Between the Parties

The parties to this suit have appeared before this Court in the past, in the matter of Patrick Lang and Rodman & Company, Inc. v. Joseph A. Thomas, Ltd., C.A. no. 00-0611 ML. In the prior suit, the factual issues centered upon a comparison of JAT's Bad Dog cutter and the Rodman Nibbler, the European-manufactured product not at issue in this suit. However, prior to the resolution of the first suit, the Court had the opportunity to address the legal issues of trade dress, including product color, functionality, product packaging and likelihood of confusion, in its Memorandum and Order on JAT's Motion for Partial Summary Judgment, attached hereto as Exhibit C. While the resolution of the prior case is not at issue here, and the standing of the parties and the origin of the prior controversy are inapplicable to the issues of personal jurisdiction raised in Rodman's

Motion to Dismiss in this action, the legal analysis of the court is applicable in many respects to the instant controversy, and is discussed below.

III. ARGUMENT

A. Applicable Legal Standards

1. Preliminary Injunction

In determining the propriety of an injunction, the Court should consider whether the plaintiff has demonstrated: (1) a substantial likelihood of success on the merits; (2) the potential of irreparable harm to the plaintiff if the injunction is not granted; (3) whether the defendant will suffer greater harm from the grant of the injunction; and (4) whether the injunction would serve the public interest. See Weaver v. Henderson, 984 F. 2d 11 (1st Cir. 1993); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991); Sterling Suffolk Racecourse, Limited Partnership v. Burrillville Racing Association, Inc., 802 F.Supp. 662, 671 (D.R.I. 1992); Kleczek v. Rhode Island Interscholastic League, 768 F. Supp. 951, 953 (D.R.I. 1991); Aetna Casualty & Surety Co. v. Rodco Autobody, 138 F.R.D. 328 (D. Mass. 1991) (citing S.P.R.L. v. Imex Co., 473 U.S. 479 (1985)); Silva v. E. Providence Housing Authority, 390 F.Supp. 691, 695 (D.R.I. 1975); Martin v. Lincoln Bar, Inc., 622 A. 2d 464, 467 (R.I. 1993).

In adducing evidence to support a finding that an injunction is warranted, the moving party must advance sworn pleadings or testimony, or otherwise admissible evidence. While the moving party may advance a verified complaint or supporting affidavits, if the initial facts are controverted by counter-affidavits, the moving party must make a further showing toward its ability to succeed on merits. K-2 Ski Co. v Head Ski Co., 467 F. 2d 1087, 1088-1089 (9th Cir. 1972).

2. Tariff Act Requirements

The Tariff Act, 19 U.S.C. § 1304(a) requires sellers to mark "every article of foreign origin (or its container, as provided in subsection (B) hereof) imported into the United States. However, the product itself need not be marked, pursuant to 19 U.S.C. § 1304(a)(3)(D) if "the marking of a container of such article will reasonably indicate the origin of such article," or if, pursuant to 19 U.S.C. § 1304(a)(3)(H), "An ultimate purchaser, by reason of the character of such article or by reason of the circumstances of its importation, must necessarily know the country of origin of such article even though it is not marked to indicate its origin." Accordingly, pursuant to 19 U.S.C. § 1304(b), "the immediate container, if any, of such article . . . shall be marked in such manner as to indicate to an ultimate purchaser in the United States the English name of the country of origin of such article," unless the "articles are excepted from marking requirements under clause (F), (G), or (H) of subdivision (3) of subsection (a) of this section [in which case] their usual containers shall not be subject to the marking requirements of this section."

3. Trade Dress Infringement

The trade dress of a product consists of its "total image and overall appearance," including its "size, shape, color or color combinations, texture, graphics, or even particular sales techniques." Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 764 n. 1 (1992). "Trade dress is the totality of elements in which a product or service is packaged or presented. These elements combine to create the whole visual image presented to customers and are capable of acquiring exclusive legal rights as a type of identifying symbol of origin." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8.01[1] [a] (3rd ed. 1996); see also L.A. Gear, Inc. v. Thom McAnn Shoe Co., 988 F.2d 1117, 1129 (Fed. Cir.), *cert. denied,* 510 U.S. 908 (1993)("Trade dress is thus viewed as the overall combination and arrangement of

design elements into the total image by which the product is perceived by the consuming public.").

As this Court stated in its Memorandum and Order on JAT's Motion for Partial Summary Judgment in the prior litigation between the parties, a party asserting trade dress infringement must prove that the offending product design: (1) is non-functional, (2) is either inherently distinctive or has acquired secondary meaning, and (3) that prospective consumers are likely to be confused as to the source of the allegedly infringing product, believing it to be the moving party's instead. Central Tools, Inc. v. Products Eng'g, Inc., 936 F.Supp. 58, 65 (D.R.I. 1996). All of these inquiries are questions of fact. See Versa Products Co., Inc. v. Bifold Co. Ltd., 50 F.3d 189, 200 (3rd Cir. 1995) (confusion); Rachel v. Banana Republic, Inc., 831 F.2d 1503, 1506 (9th Cir. 1987) (functionality); Ambrit, Inc. v. Kraft, Inc., 812 F.2d 1531, 1535 (11th Cir. 1986) (inherent distinctiveness).

In asserting a claim alleging trade dress infringement, the moving party must also identify particular elements of the trade dress it seeks to protect "in order to avoid an overly broad application of the Lanham Act and the danger of uncertainty among [the plaintiff's] present and future competitors." Central Tools, 936 F.Supp. at 65. The functionality analysis prevents the Lanham Act "from ...inhibiting legitimate competition by allowing a producer to control a useful product feature." Qualitex Co. v. Jacombson Products Co., Inc., 514 U.S. 159, 164 (1995). See also Thomas & Betts Corp. v. Panduit Corp., 138 F.3d 277, 297 (7th Cir. 1998).

The question of functionality is a predicate to the entire trade dress infringement analysis. If the claimed feature is found to be functional, then there is no protected trade

dress, and the Court does not proceed to questions of confusion, inherent distinctiveness and/or secondary meaning. See Wal-Mart Stores, Inc. v. Samara Bros, Inc., 529 U.S. 205, 216 (2000).

The Supreme Court has specifically restricted the claim of product design trade dress, since "product design almost invariably serves purposes other than source identification." Traffix Devices v. Marketing Displays, Inc., 532 U.S. 23, 25 (2001); see Wal-Mart, 529 U.S. at 216. The Court went on to note the "well established rule that trade dress protection may not be claimed for product features that are functional." Traffix, 532 U.S. at 25, citing Qualitex, 514 U.S. at 164-65, and Two Pesos, 505 U.S. at 775.

"[A] product feature is functional…if it is essential to the use or purpose of the article or if it affects the cost or quality of an article .... a functional feature is one the exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." Traffix, 532 U.S. at 32, and citing Qualitex, 514 U.S. at 165. (internal citations omitted). Likewise, a product is functional if it makes "the product work more efficiently . . . or with less danger to operators." I.P. Lund Trading ApS v. Kohler, Co., 163 F.3d 27, 37 n. 5 (1st Cir. 1998), citing *McCarthy*, supra.

Under the Lanham Act, the plaintiff must also show that a mark is either inherently distinctive or has acquired secondary meaning. Wal-Mart, however, established that product design in and of itself cannot be inherently distinctive, because in "reality," "almost invariably, even the most unusual of product designs . . . is intended not to identify the source, but to render the product itself more useful or more appealing." Id. at 213.

The First Circuit has defined secondary meaning as "a word's, or a sign's, ability to tell the public that the word or sign serves a special trademark function, namely, that it denotes a product or service that comes from a particular source." DeCosta v. Viacom International, Inc., 981 F.2d 602, 606 (1st Cir. 1992), or that "'the trade dress of a product has been copied down to the smallest detail.'" Central Tools, 936 F.Supp. at 68 (D.R.I. 1996) (quotations omitted). However, the plaintiff "must show that, in the minds of the public, the *primary significance* of a product feature or term is to identify the *source* of the product rather than the product itself." Inwood Labs v. Ives Labs, 456 U. S. 844, 851 n. 11 (1982)(emphasis added). The moving party must therefore produce proof that the customer's perception of the product color plays a primary role in its image of the product. Wal-Mart, affirming Qualitex, stated that "In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist." Id. at 213.

In Central Tools, this Court rejected any contention that containers with form-fitted interiors could be inherently distinctive:

> Central Tools' trade dress is incapable of conveying an immediate knowledge of its origin to the viewer; rather, it is a refinement of a common type of packaging. Hundreds of tool companies put their products in blow-molded plastic boxes, and Snap-on and enjoin the parties to this matter in using form-fitted interiors .... [E]ach element of Central Tools' trade dress is unremarkable. Dial indicators find uses in many industries and the Flex-Arms and Vise-Grips are made by other companies and thus cannot point to Central Tools as the manufacturer of origin.

Id., 936 F. Supp. at 67. See also Seabrook Foods, Inc. v. Barr-Well Foods, Ltd., 568 F. 2d 1342, 1344 (C.C.P.A. 1977) (no inherent distinctiveness if there is a "'common', basic shape or design").

The First Circuit identified eight factors, none of them controlling in itself, that must be evaluated when assessing the likelihood of confusion: (1) the similarity of the marks; (2) the similarity of the goods; (3) the relationship between the parties' channels of trade; (4) the relationship between the parties' advertising; (5) the classes of prospective customers; (6) evidence of actual confusion; (7) the defendant's intent in adopting the mark; and (8) the strength of the plaintiff's mark. Star Financial Services, Inc. v. Aastar Mortgage Corp., 89 F.3d 5, 10 (1st Cir. 1996); Boston Athletic Ass'n v. Sullivan, 867 F.2d 22, 29 (1st Cir. 1989).

In the prior action, this Court discussed the case of Yankee Candle Company, Inc., v. Bridgewater Candle Company, LLC, 99 F. Supp.2d 140, 150-156 (D.Mass. 2000) in its Memorandum and Order on JAT's Motion for Partial Summary Judgment. See Exhibit C. Yankee Candle is both factually and legally controlling of this controversy, as it states that "[T]he Lanham Act... gives the plaintiff a cause of action for the use by any person of "any symbol or device . . . likely to cause confusion . . . as to the origin . . . of his or her goods." Id. at 150. Specifically, "The general purpose of trade dress protection is to "protect that which identifies a product's source." Id. at 150 (citations omitted). "In other words, the Lanham Act protects both producer and consumer from another's attempt to sell a product so similar that the consumer would think it the original." Id. at 151. "At the heart of the Lanham Act's protection lies the potential for consumer confusion." Id.

The Yankee Candle Court found that the comparative trade dress of the two products at issue was such that "if the court needed to decide the issue of likelihood of confusion, it would hold that no reasonable juror could conclude that there is a likelihood

of confusion, where clearly marked company names are featured on the face of the products and catalogues." Yankee Candle, 99 F.Supp.2d at 156, citing Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 1045 (2d Cir. 1992)("prominence of trade names . . . weighs heavily against a finding of consumer confusion."). Where the company's name "clearly and unequivocally appears in large, bold font on the front" of the product whose trade dress in question, and the name "does not appear to be confusingly similar to or a play on" the plaintiff's name, there is a serious "doubt whether [the defendant was] . . . trying to confuse the public." Id., quoting Pampered Chef v. Magic Kitchen, 12 F.Supp.2d 785, 795 (N. D. Ill. 1998). See also Jovan, Inc. v A. R. Winarick, Inc., 196 U.S.P.Q. 507, *7 (N.D. Ill 1997) (Use of defendant's own brand name does not infringe trade dress and precludes preliminary relief on unfair competition grounds), quoting Bose Corporation v. Linear Design Labs, 467 F.2d 304, 310 (U.S.P.Q. 1972) ("[There] is hardly the likelihood of confusion or palming off when the name of the manufacturer is clearly displayed.").

Accordingly, the ability to identify the source of the product via its name or packaging can be dispositive in trade dress cases. As Yankee Candle states:

> The difference between product packaging and product design/configuration is rather subtle, at first sight. What separates these two kinds of trade dress is each one's ability to identify its source. On the one hand, a product's name or package obviously and directly identifies its source. On the other hand, a product's design, or configuration, or simply the way that it appears, is primarily aesthetic and not source-identifying.
>
> Yankee Candle, 99 F.Supp 2d at 152-153.

The Yankee Candle Court also addressed the issue of secondary meaning in trade dress cases, ruling that the moving party must show that a "substantial portion" of the public has come to associate the trade dress with the product. Id. at 153, citing Labrador

Software Inc. v. Lycos, Inc., 32 F. Supp. 2d 31, 34 (D. Mass. 1999). In so doing, the it recited the First Circuit's standard of:

> three factors in making the determination of whether secondary meaning has attached: 1) the length and manner of its use; 2) the nature and extent of advertising; and 3) the efforts made in the direction of promoting a conscious connection, in the public's mind between the trade dress and a particular product. Other factors can include the "product's established place in the market and proof of intentional copying. The plaintiff ... bears the burden of proving that secondary meaning has attached.
>
> Id. at 153. (Internal citations omitted).

The Court went on to state that proof of a "conscious connection," must include evidence of "look for" advertisements, which "specifically directs the consumer's attention to a particular aspect of a product, like a color, or shape of a container." Id. at 154, citing Thomas & Betts Corp. v. Panduit Corp., 65 F.3d 654, 662 (7th Cir 1995); International Jensen, Inc. v. Metrosound USA, Inc., 4 F.3d 819, 824 (9th Cir. 1993). "[M]ere advertising per se," Yankee Candle, 99 F.Supp.2d at 154, is insufficient.

B. JAT's Claimed Trade Dress

The individual elements of JAT's claimed trade dress include: 1) a blue yellow box; 2) a yellow foam insert inside the metal box, with cut out sections into which the components of the product are nestled, 3) a metallic finished, stepped cylindrical shaped body, 4) dual black metal cutting heads, and 4) a removable blue plastic handle that fits over the cutting head not in use. See JAT's Memorandum in Support of its Motion for Preliminary Injunction at 2.

C. No violation of the Tariff Act

There is no basis for the Plaintiff's allegation that Rodman has violated the Tariff Act. It is clear from the labeling on both the outer cardboard packaging and the label on the metal box on each Double-Headed Cutter that Rodman has complied with the Tariff

Act, 19 U.S.C. §1304(a). Indeed, the double marking of each Double-Headed Cutter on both the cardboard packaging and the metal box itself clearly indicates to the purchaser that the product was made in China. Further, Rodman's verbal presentation of the product at trade shows calls express attention to its origin.

This proof rebuts the presumption raised by JAT's assertion in its Verified Complaint that the Lanham Act has been violated. See K2 Ski Co., 467 F.2d at 1088-1089. Accordingly, JAT cannot show any likelihood of success on the merits of its claim that Rodman does not make the origin of the product clear.

D. No Violation of the Lanham Act Given the Product's Functionality, JAT's Inability to Prove Secondary Meaning, and Inability to Prove Customer Confusion

1. JAT Cannot Show Nonfunctionality

Here, the entire product is totally functional. The cardboard packaging covering the metal box prevents it from being scratched prior to purchase, and helps keep the metal box closed during pre-purchase shipping. The display of the product diagram and the list of product features on both the cardboard packaging and the metal box alerts the customer to what he is buying. The metal box also holds the product securely inside, preventing its loss. As stated in Central Tool, the box is a typical, functional means to store and transport mechanical tools. The yellow foam is likewise functional, holding the tool components in place, preventing rattling inside the metal box and cushioning the Double-Headed Cutter from potentially damaging jostles and jars. Each component of the tool secured by the foam has a functional purpose, not an aesthetic purpose.

These are all functional characteristics that improve the efficiency and safety of the product, thereby foreclosing further analysis of JAT's trade dress argument. See I.P. Lund, 163 F.3d at 37, n. 5.

Further, any argument that there is distinctiveness or nonfunctionality in Rodman's use of a metal box or a molded insert used to secure the parts within the box is utterly disingenuous, in light of the fact that JAT maintained the opposite position in the prior litigation, arguing that "such boxes are routinely used in the tool industry." Motion of Defendant Joseph A. Thomas, Ltd. for Partial Summary Judgment, Civ. A. No. 00-611ML (D.R.I.) at 15-18, attached hereto as Exhibit D. Thomas went on to argue that the box was functional for holding the product's component parts, and customarily used within the tool industry, rendering any distinctiveness argument a nullity. See id. at 16. It also relied upon Central Tools to argue that "containers with form fitted interiors" were not inherently distinctive, and that in "close cases of determining product design versus product packaging" the inquiry "should be resolved in favor of finding product design." Id. at 16.

2. JAT Cannot Show that a "Blue" box, "Yellow Foam," or a "Metallic Finished Body" Have Secondary Meaning

a. Rodman's Product is a Commodity Purchased "As Is" from the Same Manufacturer

Here, the evidence clearly shows that there is no secondary meaning attached to the color and finish of the box, foam, or cutter. JAT argues that Rodman "copied" the color of JAT's box, foam, and cutter body in order to infringe upon the "good will" JAT claims its product has built in the six years that it has sold the Bad Dog cutter, but then undercuts its own argument by stating that "The Rodman II Nibbler may even originate

from the same source as the Bad Dog Biter, in China. Upon information and belief, it is imported in substantially completed and assembled condition." JAT Memorandum in Support of Preliminary Injunction at 8.

As set forth in the factual discussion above, the Rodman product is purchased from the same manufacturer, and the manufacturer's product catalog clearly shows that all of its cutters are contained in blue boxes and yellow foam. To allege that Rodman exercised some control over the color of the packaging or the finish of the cutter is to ignore the "as is" nature of a commodity product bought from a manufacturer. Notably, despite casting aspersions on Rodman's intent in selling its product, and alleging that Rodman had control over any or all aspects of its product's packaging, JAT has alleged no evidence that either Rodman or JAT ever had a choice in the box color, foam color, or cutter finish. JAT's argument that Rodman cannot sell the YT-160A, after JAT lost its exclusive manufacturing rights, and/or that Rodman must incur the expense of having Hubei alter the pre-set color of the box and foam, and change the finish of the cutter, in order to preserve JAT's "trade dress" interest in an older, less effective model, runs counter to the line of cases cautioning against a broad interpretation of trade dress that would "inhibit[] legitimate competition." Qualitex Co. v. Jacombson Products Co., Inc., 514 U.S. 159, 164 (1995). See also Thomas & Betts Corp. v. Panduit Corp., 138 F.3d 277, 297 (7th Cir. 1998). JAT's position runs counter to the policy expressed in these cases of fostering competition based on legitimate, functional differences in the product, and inhibits the right of both parties' customers to make a choice between two commercially available and different products.

b. JAT Cannot Show that the Colors at Issue Are Associated with the Bad Dog Product Alone

To prove that the blue box, yellow foam, and metal finish have secondary meaning, JAT must prove that these colors are identified, in its' customers' minds, with its product and its product alone. To do so, it must show that it has made an effort to advertise the products so that the public associates a blue box and yellow foam with the Bad Dog Biter. See Yankee Candle, 99 F.Supp.2d at 154. However, JAT has not alleged and did not produce any such evidence. Its advertising relies upon the "Bad Dog" name and image; it touts the company's aggressive pursuits of quality, and even includes products with the names "Bad Dog Drool," "Saw Dog," and "Rover." There is no "look for the Bad Dog Biter in the blue box with the yellow foam" advertising. Bad Dog describes its Biter on the company profile of its website thusly:

> Just like you, we've got high expectations of our products. We're not happy until they're perfect. The Bad Dog Biter *Steerable, Double-headed* Sheet Material Cutter is a great example of the tweaking and upgrading a Bad Dog product continually goes through. The latest incarnation of the popular product includes a patent-pending spinning head and re-vamped blade and double bearing assembly for more fluid cutting and longer wear.
>
> www.baddogtools.com/new/company.php, October 29, 2006.

In describing the product itself in more detail, after displaying a picture of the front of the blue metal box with the Bad Dog logo and name, Bad Dog displays the following information:



**Bad Dog Biter Kit** $169.95

***Turns your hand drill into a nibbling tool!***
Kit includes aluminum Biter body complete with two steerable heads and a HSS blade, one spare HSS blade, one spare head, one spare set screw, combo-wrench for quick head change all packed in a durable, foam-lined metal toolbox.

- Cutting Heads Adjust 360 degrees for easy cutting in even the tightest of spaces
- Follow precise patterns with the Biter's exclusive steerable heads
- Cuts corrugated, Round or Flat Stock
- Cuts any shape to 1/2" Radius
- No Distortion of Material
- No Dangerous Sparks
- Two heads means you get twice the cutting time of single-headed nibbling tools

www.baddogtools.com/new/cat.php?id=1, October 29, 2006

JAT calls no attention whatsoever to its product's finish, foam or box color. The focus is on the tool components only. The picture on its website does not even display the metal box in an opened state, thereby preventing the online customer from seeing the interior yellow foam and the tool components nestled therein. Any argument that the yellow foam, much less the product finish or box color are central to Bad Dog's message regarding its product is squarely contradicted by its own advertising. The box color and foam color have no role in JAT's "mere advertising"," Yankee Candle, 99 F.Supp. 2d at 154. Accordingly, JAT cannot show that the box and foam color or the cutter finish have any secondary meaning.

3. JAT Cannot Show Likely Confusion with Rodman's Product

a. The Product Appearance and Package Labeling Is Sufficiently Different to Avoid Likely Confusion

JAT argues that there is a strong likelihood of confusion between the two products, and that Rodman should therefore be enjoined from selling its product.

However, it is difficult to conclude that the common yellow foam and blue boxes of products which have totally different graphics, handle designs, and placement of parts would result in confusion to the consumer, such that Rodman is guilty of trade dress infringement. Here, as in Yankee Candle, there is little likelihood that an ordinary customer would confuse the graphics and markings on the lid of the blue metal Bad Dog cutter box with the markings on the cardboard packaging and metal box top containing Rodman's Double-Headed Cutter. As JAT stated at page 18 of its Motion for Partial Summary Judgment in the prior litigation, its packaging bears a "distinctive" Bad Dog cutter Biter label with a distinctive 'Bad Dog' trademark." Id. at 18.

The Rodman product packaging, in contrast, bears a product drawing and a listing of product features resembling a blueprint or engineering specifications diagram. There is no indication anywhere on the Rodman packaging that it is a Bad Dog product, eliminating any confusion in the consumer's mind. Indeed, a side-by-side comparison of the covers of the respective products eliminates any customer confusion. Clearly, the Bad Dog design on the top of its metal box is strikingly different from the graphics and depiction on the lid of the box containing Rodman's Double-Headed Cutter, thereby preventing confusion to the public.



Even when the respective boxes are open, the Bad Dog product is displayed within the protective foam with the short, blunt blue handle already mounted on one of the cutter heads. In contrast, Rodman's Double-Headed Cutter handle is positioned within the foam separately from the cutter itself, exposing both heads of the cutter. Further, looking at the handle itself, the difference between the two products is clear. Rodman's handle is black, hollow, and flared, with a threaded metal insert at the narrow end of the handle for screwing on to the unused drill head; JAT's handle is blue, narrower, and placed directly atop one cutter head.

The cutters themselves are also different in appearance. Rodman's cutter heads have "female" threads cut into the metal, so as to allow the handle to screw on. JAT's cutter handles are smooth below the cutter tips, so that the plastic handle can slide over the metal. Accordingly, JAT has failed to show that "the trade dress of a product has been copied down to the smallest detail.'" Central Tools, 936 F. Supp. at 68.

In this case, there can be no confusion between the Bad Dog cutter and the YT-160A, even with regard to the packaging of a blue metal box and yellow foam.

Accordingly, JAT is unable to show an essential prong of trade dress violation, namely confusion or likely confusion. See Yankee Candle, 99 F. Supp.2d at 151.

b. JAT Cannot Show Intent to Infringe its Trade Dress

"In a product configuration case . . . intent, while a factor to be considered, plays a minor role." Yankee Candle, 99 F.Supp.2d at 155. Here, other than the bare assertion in JAT's Verified Complaint, JAT has no evidence concerning Rodman's intention to copy Bad Dog's trade dress. JAT cannot make such a showing in any event, since, as discussed above, the manufacturer's brochure and the Chesgreen Affidavit provided in support of this Memorandum make it clear that the Double-Headed Cutter is a commodity product sold by a Chinese manufacturer, Hubei, to not only Rodman, but also to other distributors worldwide. JAT's product comes in a blue box with yellow foam because this is what Hubei offers.

c. JAT Cannot Show Strength in its Purported Trade Dress

JAT's argument that a blue metal box, yellow foam, and a metal-finished cutter are "strong" trade dress has no merit. As discussed above, the coloration of the product and the packaging are the choice of Hubei, not JAT, and JAT's advertising of the product does not focus upon these elements of its alleged trade dress in any event. Rather, the advertising focuses upon the distinctive product name and logo displayed on the cover of the blue metal box, and the product's features. Accordingly, there is no strength in the trade dress alleged by JAT.

4. JAT Cannot Show Irreparable Harm

There is no evidence of irreparable harm to JAT, given that there is no violation of the Lanham Act, much less any unfair trade practice. First, Rodman does not know if its product will sell, as only eight products have been sold as of this date, two of which JAT bought. JAT's product sales have therefore not been shown to be endangered, and even if they had, they would be quantifiable and could be addressed through the legal remedy of monetary damages. Furthermore, as set forth above, JAT cannot show that its alleged trade dress of a blue metal box, yellow foam, or a metal-finished cutter affords it unquantifiable good will, since it does not advertise on these features and uses a distinctive logo and name, on the lid of its product, easily differentiated from the schematic on the top of the Rodman metal box.

5. The Balance of Equities Does Not Favor JAT

Finally, concerning the balance of equities, there is no evidence to establish that Rodman will suffer no harm if this court enjoins it from selling a commodity product manufactured by a Chinese company, especially one with whom JAT failed to renew an exclusive manufacturing relationship. Further, as the YF160A is functional, and a functional improvement over the Bad Dog cutter, the public interest in furthering fair competition will be impaired, and will deprive both companies' prospective customers of a choice between the two products, the very danger warned against in Central Tools, 936 F. Supp. at 65.

## IV. CONCLUSION

For the reasons stated above, JAT cannot show that it is entitled to a preliminary injunction, as Rodman's product is labeled "Made in China," the two products do not have confusing packaging, and Rodman's product features functional improvements over

JAT's product, justifying the allowance of competition between the two companies. JAT cannot show harm, and there is no public interest served by barring Rodman from selling the YT-160A. Accordingly, Rodman moves that this Honorable Court deny JAT's Motion for Preliminary Injunction.

Respectfully submitted,
Defendant,
Rodman & Co., Inc.
By its attorneys,

/s/ Ronald Langlois
Ronald Langlois, # 2891
Smith & Brink, P.C.
One State Street, Suite 400
Providence, RI 02908
Tel: (401) 351-9970
Fax: (401) 274-6218

**CERTIFICATION**

I hereby certify that I mailed a true copy of the within to **Thomas R. Noel, Esquire, John Harrington, Esquire,** Noel & Gyorgy, LLP, 50 South Main Street, Providence, RI 02903 on the 1st day of November, 2006.

/s/ Ronald Langlois