# LIST OF EXHIBITS

| | |
|---|---|
| Exhibit 1 | Affidavit of Dale Chesgreen |
| Exhibit A | Exemplar sticker |
| Exhibit B | Rodman's patented product; Patent Number 4,748,744 |
| Exhibit C | Memorandum and Order on JAT's Motion for Partial Summary Judgment |
| Exhibit D | Motion of Defendant Joseph A. Thomas, Ltd. for Partial Summary Judgment, Civ. A. No. 00-611ML |

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

JOSEPH A. THOMAS, LTD
Plaintiff,

v. C.A. No.: 06-440ML

RODMAN & COMPANY, INC.
Defendant

AFFIDAVIT OF DALE CHESGREEN,
IN SUPPORT OF OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

I, Dale Chesgreen, hereby state the following facts are based upon my personal knowledge, under the pains and penalties of perjury:

1. I am the President of Rodman & Company, Inc. (hereinafter "Rodman").

2. Rodman sells, among other products a tool called the Rodman Nibbler. This product is manufactured in Europe, and has been sold by Rodman since 1998.

3. Rodman sells its products at trade shows throughout the United States.

4. Joseph A. Thomas, Ltd. (hereinafter "JAT") is a competitor of Rodman & Company, selling the Bad Dog Biter at trade shows throughout the United States.

5. In March, 2006, I attended a trade show in Cologne, Germany.

6. At this trade show, I visited the booth of the Hubei Provincial Jiaxin Machinery I/E Company Ltd., a Chinese manufacturer of numerous tools, including nibbler tools.

7. At the Hubei booth, I observed several different nibbler products including the Double-headed Cutter YT-160A.

8. I was informed by the Hubei representative that the YT-160A was a commodity product, and that Hubei was seeking distributors worldwide for the Double-headed Cutter YT-160A product.

9. I was also told by the Hubei representative that as of 2006, JAT no longer had an exclusive manufacturing agreement with Hubei with regard to its Bad Dog Biter product.

EXHIBIT 1

10. The Hubei representative also advised me that Hubei had redesigned the handle of the cutter to be larger than previous designs, including that of the Bad Dog Biter, in order to prevent the heating of the handle during its use.

11. While I was at the Cologne show, Hubei gave me a product catalog, which shows the YT-160A Double-Headed Cutter, which was shown in Cologne. The catalog also showed two other cutter models displayed in blue metal boxes with yellow foam, and bearing the metal finish JAT alleges is part of its trade dress. A copy of this catalog is attached hereto as Exhibit 1.

12. The YT-160A being shown in Cologne was displayed appeared in the blue metal box with a yellow foam interior. The cutter has a metal finish. The exterior of the box contained a picture of the product and an English-language listing of the product features. There was also an outer cardboard package with the same schematic drawing and list of product features.

13. The picture and text on the front of the box I saw in Cologne is the same as what Rodman currently sells, with only one distinction. I asked that the initials "MD" (short for Marta and Dale, my wife's and my names) be added to the graphics of the front of the cardboard box that the metal box comes in, as well as the front of the metal box of the Double-Headed Cutter so that Rodman can distinguish the products we sell for warranty purposes.

14. In the end, Hubei only added the "MD" marking to the front of the metal box, and not to the external cardboard packaging.

15. In July, 2006, Rodman received 500 "MD" Double-Headed YT-160A Cutters from Hubei. The cardboard shipping containers, marked "Made in China," contained 20 cutters each. When I opened the cardboard shipping containers, the individual products did not have a "Made in China" label. I therefore had stick-on labels stating "Made in China" printed.

16. Rodman places these labels on the exterior cardboard packaging, as well as on the front of the metal box containing the Double-Headed Cutter.

17. When Rodman representatives meet with customers at trade shows, we always state that the Double-Headed Cutter is made in China, and specifically compare it with the Rodman Nibbler, which is a higher-quality product manufactured in Europe.

18. The Chinese Double-Headed Cutter has five different components, placed within the yellow foam inside the blue metal box. The foam has specially designed cut-outs for each component. Hubei chooses the color of the box and the foam, as well as the finish on the Double-Headed Cutter.

19. Since July 2006, Rodman has only sold eight Double-Headed Cutters; two of these cutters were purchased by a JAT employee at a trade show in Las Vegas. This employee used to work for Rodman, and was personally known to the Rodman representative. The other six Double-Headed Cutters were sold at trade shows in Wisconsin and Las Vegas, Nevada.

20. The handle on the YT-160A Double-Headed Cutter has a large, hollow, detachable black handle. The handle has a male metal threaded insert at its narrow end, where it screws on to the nibbler head not in use. Except for the part of the handle that screws onto the unused nibbler head, the rest of the handle is not in contact with any metal. The handle flares outward from the point where it screws onto the Double-Headed Cutter, and is wider and longer than the handle on the Bad Dog cutter.

21. When you look at the two products side by side in their boxes and foam, the Bad Dog short, blunt blue handle is slid over the top of one of the metal cutter heads. Rodman's Double-Headed Cutter handle is detached, and stored in a different section of the foam insert.

22. The Bad Dog cutter is sold in a blue metal box that displays the colored logo of the growling JAT bulldog, and the name "Bad Dog Biter" in yellow text.

Signed under the pains and penalties of perjury,

Dale Chesgreen
Dale Chesgreeen

11-1-06
Date


MADE IN CHINA
MADE IN CHINA
MADE IN CHINA
000
MADE IN CHINA
MADE IN CHINA
MADE IN CHINA
MADE IN CHINA

EXHIBIT A

**United States Patent** [19]

Turner

[11] **Patent Number:** 4,748,744

[45] **Date of Patent:** Jun. 7, 1988

[54] **NIBBLING TOOL**

[75] Inventor: Kenneth J. Turner, Croydon, England

[73] Assignee: Turner Precision Engineering, Croydon, England

[21] Appl. No.: 875,049

[22] Filed: Jun. 17, 1986

[30] **Foreign Application Priority Data**

Jul. 2, 1985 [GB] United Kingdom ................ 8516711
Mar. 3, 1986 [GB] United Kingdom ................ 8605218

[51] Int. Cl.[4] ........................ B26F 1/02; B23D 27/02
[52] U.S. Cl. ........................................ 30/241; 30/228; 83/694
[58] Field of Search ................ 30/241, 242, 243, 228; 83/693, 694, 916

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,211,044 | 8/1940 | Ashton | 83/916 X |
| 2,632,950 | 3/1953 | Hedstrom | 30/241 |
| 3,235,963 | 2/1966 | Hall | 30/241 X |
| 3,785,052 | 1/1974 | Yermis | 30/241 |
| 4,158,913 | 6/1979 | Batson | 30/241 |
| 4,312,256 | 1/1982 | Herzog | 30/241 X |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 514126 | 10/1939 | United Kingdom . |
| 636983 | 5/1950 | United Kingdom . |
| 672857 | 5/1952 | United Kingdom . |
| 856176 | 12/1960 | United Kingdom . |
| 1000213 | 8/1965 | United Kingdom . |
| 1485795 | 9/1977 | United Kingdom . |
| 2099744 | 8/1984 | United Kingdom . |

*Primary Examiner*—E. R. Kazenske
*Assistant Examiner*—Michael D. Folkerts
*Attorney, Agent, or Firm*—Blum Kaplan

[57] **ABSTRACT**

The invention concerns a nibbling tool for cutting sheet material having a body (12) in which a rotary shaft (14) is mounted for rotation by an external drive. The rotary shaft is coupled to a punch (33) such that the rotary movement is converted to a reciprocal movement of the punch. The punch is guided in a die (27) with the punch and die having co-operating cutting edges. The die (27) has a circular sectioned shank (28) located as a good sliding fit in the body (12) and retained by a screw (30) projecting into a recess (29) in the shank (28). When the screw (30) is released the die can be rotated to change the cutting direction or removed and replaced without opening up the body or taking out other parts. With the die removed the punch can be removed easily. The punch is guided both at its upper end in a bore (25) in handle (23) and at its lower end by its head (38) located in a bore in a lower die portion (53) connected to the main die portion (28) by a web (55). The corners (55A) connecting the web with the main die portion and/or lower die portion are radiused or chamfered.

**13 Claims, 6 Drawing Sheets**



EXHIBIT B



II
23
34
41
12
42
29
27
50
53
II


FIG.1



23
25
26
18
15
43
13
24
12
22
17
21
41
45
42
16
31
14
30
44
22
29
28
40
34
27
35
36
56
51
55
50
51A
53
38
37
54


FIG.2




FIG 3A




FIG.3B




FIG.3C




FIG.4B




FIG.4A




FIG. 5




FIG. 6A




FIG. 6B


53
27
12
74
12
77
70
72
74
17
78
71
71
75
73
75
76
76
23

FIG. 7A


23
76
75
73
71
74
27

FIG. 7B




FIG. 8




FIG. 9A




FIG. 9B

FIG. 9C



## NIBBLING TOOL

### BACKGROUND OF THE INVENTION

This invention relates to a nibbling tool for shearing sheet material and more particularly to a hand held tool which may have its own complete drive or have a drive means comprising a rotary drive shaft designed to be coupled to an external drive means, for example the chuck of a conventional electric drill.

Nibbling tools for shearing a channel in sheet material by relative movement between the tool and material in a direction along the channel are known, for example from U.K. Specification Nos. 636983, 1485795 and 2099744, comprising a body, a punch, drive means for reciprocating the punch and a die defining a channel for guiding the punch for reciprocating movement, the punch and die having co-operating curved cutting edges extending transversely to the channel to be cut such that each reciprocating movement of the punch removes a crescent shaped chip of material so as to extend the channel. Normally a drive shaft is mounted in the body for rotation about its axis and coupling means couple the punch and drive shaft to convert the rotational movement to linear reciprocation of the punch.

Preferably the die has a lower guide portion in which the lower end of the punch is guided and this is connected to the main body portion of the die by a narrow web portion.

### SUMMARY OF THE INVENTION

One object of the present invention is to obtain a cleaner cut than that obtained by conventional nibbling tools.

Another object is to provide an improved die mounting. Accordingly in one aspect the invention provides a nibbling tool comprising a body, a punch, drive means for reciprocating the punch, a die mounted to the body and having a main body portion defining a channel for guiding the punch for reciprocating a movement, a lower guide portion in which the lower end of the punch is guided and a web portion connecting the main portion and the lower guide portion, the punch and die having co-operating cutting edges, and in which the corners connecting the web portion with the main body portion and/or the lower guide portion are radiused or chamfered.

We have found that the radiused or chamfered corners serve, by percussive movement, to remove any sharp edges or burrs left by the initial cut as the web tracks through the cut. In known nibbling tools the die and punch mounting is unsatisfactory. For example in specification No. 2099744 the die cannot be rotated and the whole tool has to be dismantled to change the die. In the tool of specification No. 1485795 the die is mounted to a separate punch guide sleeve and this leads to inaccuracies in alignment between the die and punch with decreased life of the tool. While Specification 636983 has a die which can be adjusted and removed, in order to change the punch the whole drive, which is packed with grease has to be dismantled. According to a preferred feature the die of this invention is mounted to the body by retaining means which when released allow the die to be rotated about its axis without axial movement or to be removed from and reconnected to the body without opening up the body or disconnecting other parts and releasable connecting means connecting the punch to the drive means such that when the die is removed from the body the punch can be removed from the body through the bore without dismantling the drive means. Preferably the die can be retained in any angular position about its axis of rotation relative to the body. Preferably the die has a circular sectioned shank located as a good sliding fit in a bore in the body, the shank being provided with at least one locating recess into which a retaining member movable in the body can be inserted to locate the die against axial and rotational movement.

According to one feature, the punch has a shaft portion and a head which includes an upward cutting face on its upper surface and which is connected to the shaft portion by a tapered portion, the shaft and head portion both being cylindrical and preferably of the same diameter.

According to another feature a handle is connectable to the upper part of the body coaxial with the punch and die and the upper end of the punch is a sliding fit in a bore in the handle (preferably in a bush) so that the upper end of the punch is guided.

According to another feature the punch is also guided for sliding movement in a lower part of the die (below the cutting plane) so that the punch is guided at each end throughout its stroke in both directions.

According to another feature the punch has a shaft portion and a guide portion of lesser diameter than the shaft portion and connected therewith, the guide portion being eccentrically mounted with respect to the shaft portion so that one axially extending edge thereof is aligned with an edge of the shaft portion.

According to a further feature the drive means comprises coupling means consisting of a punch location block secured to the punch shaft and defining a non circular recess on one side opposite the head of a rotatable drive shaft, and a drive transfer bearing fitted in the recess and lightly compressed or cushioned between the location block and the drive shaft head and having a recess receiving an eccentrically mounted pin on the drive shaft head. This arrangement ensures improved smoothness of action and torque transmission.

### BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of nibbling tool, in accordance with the invention, will now be described by way of example only with reference to the accompanying drawings of which:

FIG. 1 is an elevational view of a nibbling tool,

FIG. 2 is a section on the line II—II of FIG. 1,

FIG. 3 parts A, B and C are respectively, enlarged views of two alternative forms of die web and an underneath plan view respectively of the die of the tool of FIGS. 1 and 2,

FIG. 4A is a side view of the punch of the tool on an enlarged scale,

FIG. 4B shows a modified form of part of the punch of FIG. 4A,

FIG. 5 is a view similar to FIG. 2 showing an alternative form of tool,

FIG. 6 parts A and B show an enlarged side and end view of the punch of the FIG. 5 tool,

FIG. 7 parts A and B are side and front views of a nibbling tool coupled to a drive means,

FIG. 8 is a view of the parts forming the drive coupling of the tool, and

FIG. 9 parts A, B and C show respectively a side, front and plan view of the die of the FIG. 5 tool.

It should be understood that the invention extends to embodiments in which any feature described with reference to one embodiment is combined (if appropriate) with another embodiment, with obvious modifications if necessary.

The nibbling tool of FIGS. 1 to 4 comprises a body 12 having a first bore 13 in which a rotary shaft 14 having a head 15 is mounted in needle roller bearings 16. The projecting end 17 of the shaft is hexagonal to enable it to be easily gripped by, for example the chuck of a conventional electric drill. The bore 13 opens to a counter bore or recess 18 opening to the other side of the body, which recess is closed by a cover 20 retained by a circlip 21. A cross bore 22 extends through the body and recess 18 at right angles to the bore 13. A handle 23 having a threaded shank 24 is screwed into the upper part of bore 22. The lower end of the handle defines a bore 25 in which is located a bearing bush 26. The handle may be covered with a rubber or plastics material sleeve grip with finger moulds.

A die 27 machined in a single piece from hexagonal bar has a circular sectioned cylindrical shank 28 located as a good sliding fit in the lower part of bore 22. The shank is formed with an annular right angled conical recess 29 and a conical ended screw 30 extending through a threaded bore 31 in the body locates in the recess 29 to restrain the die against rotational and axial movement in the bore 22. Frictional engagement with screw 30 is sufficient to restrain the die against rotary movement. A punch 33 formed in a single piece has an upper shaft portion 34 joined at a shoulder 35 (which limits the downward stroke) to a lower, reduced section, shaft portion 36 connected by a tapered portion 37 to a head 38 having the same diameter as the lower shaft portion 36. The main upper shaft portion 34 of the punch is guided over a substantial part of the punch length (greater than ⅓) in a bore 40 in the die throughout vertical reciprocation. The upper end of the shaft is guided in the bush 26. The punch thus extends substantially the full height of the body and dye and is guided centrally and at its lower end by the die and at its upper end by bush 26. The diameter of parts 36 and 38 is kept to at least 3 mms. preferably 3.5 mm. to give rigidity and strength with the actual cutting section width no more than 3 mm. The tapered portion 37 absorbs the shock impact of the material being cut and pushes it towards the cutting edge. This reduces vibration and allows a higher cutting speed.

Coupling means (best seen in FIG. 8) for coupling the drive shaft 14 and the punch to convert the rotary movement of the drive shaft to vertical reciprocation of the punch comprise a punch location block 41 secured to the punch by a grub screw 42 and defining a slot recess 43 in its face opposite the shaft head 15. A drive transfer bearing block 44 is slidably located in the recess 43 for horizontal sliding therein and is lightly compressed between the punch location block and the head of the shaft and receives in a recess therein an eccentric driving pin 45 on the shaft head. The bearing block 44 is hexagonal or rectangular sectioned and receives the eccentric pin as a good fit thus providing positive location and support for the bearing. Rotation of the eccentrically mounted pin causes reciprocal vertical movement of the punch and block 41 while the transfer block 44 slides horizontally. Because a considerable area is in contact between the bearing block 44 and the sides of the recess 43, the contact forces are minimised and evenly distributed. This provides a compact, efficient and easily manufactured coupling but other forms of drive and coupling may be used, for example compressed air drive. In addition this tool may have its own motor.

The punch is secured to the drive coupling only by the easily releasable connecting means in the form of grub screws 42, so that when the die or the handle is removed the punch can be withdrawn through the bore 22 without dismantling the drive coupling which is packed in grease.

The lower portion of the die is cut away from one side above and below a projecting portion 50 formed with a bore 51 for receiving the punch, the lower edge of this bore defining a curved cutting edge 51A cooperating with a curved cutting edge 52 on the upper surface of the head 38 of the punch. The lower part 53 of the die defines a bore 54 in which the head of the punch is guided for reciprocation during the whole stroke of the punch, this lower part being connected to the main die block by a narrow web 55 which is the same thickness as the punch cutting diameter so that it fits in the cut being formed in material and facilitates material feed. The corners 55A where the web joins the block and head are radiused at 0.38 cms or chamfered, as seen in FIGS. 3A and 3B. The radiused or chamfered corners serve, as the web travels through the cut, to remove sharp edges or burrs by vibrating against them. For example the web thickness may vary between 0.292 cms and 0.200 cms. The scalloped Section 56 nearest to the shank which is profiled out to the inside edge of the internal bore is provided to allow for the clearance of swarf, dirt etc. after the upward cutting stroke of the punch.

By providing good guiding of the punch, the parts defining the cutting edges are sufficiently rigid and stable that a small gap between the cutting edges can be obtained, in this example 0.0127 cms., thus keeping burr to a minimum, and this burr is removed by the radiused or chamfered corners of this web.

The mounting of the punch and die allows adjustment of the cutting direction throughout the 360° range and easy replacement of the die without removing any other parts and easy replacement of the punch by removing the die and disengaging screw 42.

The tool may be used to cut on the downward stroke (or on both the upward and downward strokes) by using the cutting edges 57 and 58.

FIG. 5 shows a modified tool having a punch intended to cut on the down stroke only. The tool is similar to that of FIGS. 1-5 and like parts have been given the same reference numerals. The lower shaft portion 36 of the punch is joined by a shoulder 60 to a lower guide portion 61 which is guided in a bore 62 in the lower die part 53.

In a modification shown in FIG. 6 the lower guide part 61 is eccentrically mounted compared with the axis of the punch so that its back edge 64 is aligned with the corresponding edge of the shaft part 36 to give better guiding. The cutting edge is shown at 65. A similar modification to the punch of FIGS. 1-4 is shown in FIG. 4B where the tapered portion 37 is eccentrically mounted to give a continuous back edge 66 acting as a further guide.

Conventionally where the drive has been taken from a power drill or the like the nibbling tool has been held by the user on to the drill while in use. FIGS. 7A and 7B

show a means for mounting the nibbling tool to an external drive such as a drill so that it need not be manually held during use. A drill head 70 is shown engaged with the projecting end 17 of the shaft 14 of the nibbling tool. A pair of clamp supports 71 having arcuate surfaces dimensioned to engage round the body 12 of the tool and a similar body portion 72 of the drill engage a base plate 73. A pair of U-bar clamps 74 extend over the other sides of the body portions 12 and 72 through bores in the clamp supports 71 and baseplate 73 and are secured thereto by nuts 75 engaging their threaded ends 76. A guard 77 may be provided mounted by flanges on the baseplate. This guard is split into two halves to facilitate fitting of the motor drive to the nibbling tool and the halves are secured together via a slot 78 allowing use of a screwed fastener. The drill with nibbling tool may be mounted on a work bench or the like, leaving both the operator's hands free to guide the sheet being cut.

What is claimed is:

1. A nibbling tool for cutting a slot in sheet material by relative movement between the tool and the material in the direction of the slot comprising a body, a punch, drive means for reciprocating the punch, a die mounted to the body and having a main body portion defining a channel for guiding the punch for reciprocating movement, a lower guide portion in which the lower end of the punch is received and a web portion connecting the main portion and the lower guide portion, the punch and die having co-operating curved cutting edges extending transversely of said direction of relative movement such that each reciprocating movement removes a crescent shaped chip of material, the web portion having a width substantially corresponding to the transverse width of the cutting edges in a direction normal to a line passing through the center of the punch and web portion, and in which the edges formed at the connection between the web portion with the main body portion and/or the lower guide portion in a direction parallel to the line passing through the center of the punch and web portion are radiused or chamfered, whereby the edges of the cut sheet material is free to vibrate against the radius or chamfered portions of the web to remove sharp edges left by the initial nibbling of the punch and die as the web tracks through the slot cut in the sheet material.

2. A nibbling tool according to claim 1 in which the die is mounted to the body by retaining means which when released allow the die to be rotated about its axis without axial movement or to be removed from and re-connected to the body without opening up the body or disconnecting other parts.

3. The nibbling tool of claim 1 wherein the punch is an elongate member and the drive means engages an intermediate portion of the punch, with punch guide means for guiding both ends of the elongate member, the guide means being located on both sides of the intermediate portion of the punch engaged by the drive means.

4. A tool according to claim 3 in which the shank die includes a circular which defines at least one locating recess into which a retaining means which is movably mounted in the body can be inserted to locate the die against axial and rotational movement.

5. A tool according to claim 4 in which the shank defines a single annular recess.

6. A tool according to claim 3 in which the punch has a shaft portion and a head portion connected to the shaft



portion by a connecting portion, and in which the connecting portion is tapered.

7. A tool according to claim 3 in which the punch has a shaft portion and a head portion connected to the shaft portion by a connecting guide portion of lesser diameter than the shaft portion and head portion, the guide portion being eccentrically mounted with respect to the shaft portion so that a first axially extending edge thereof, remote from the cutting edge, is aligned with an edge of the shaft portion, and a second axially extending edge adjacent the cutting edge is tapered, the die having a main body portion defining the channel for guiding the punch connected by a narrow web portion to a lower guide portion defining a channel for receiving and guiding the punch head and said first axially extending edge.

8. A tool according to claim 1, claim 3 or claim wherein the drive means is designed to be held to and powered by an external power means having a body portion separate from the tool body, and including releasable clamp connecting means for clamping the tool body to such a body portion.

9. A tool according to claim 1 or claim 3 in which the gap between the shearing faces of the die and punch is no more than one thousandth of an inch.

10. A tool according to claim 1 or claim 3 in which the punch is formed in a single piece and extends for substantially the full height of the body and die and including further guide means arranged to receive and guide the upper end of the punch throughout its reciprocating movement.

11. The nibbling tool of claim 1, wherein the die is formed in a single piece detachably mounted to the body by retaining means and in which the punch is formed in a single piece and extends for substantially the full height of the body and die and including further guide means on the opposite side of the drive means from the cutting edges and arranged to receive and guide an upper end of the punch throughout its reciprocating movement.

12. A nibbling tool comprising a body, a punch having an elongate member formed in a single piece having a longitudinal axis, drive means for reciprocating the punch parallel to its axis, a die co-axial with the punch defining a channel for guiding the punch over a substantial part of the length of the punch throughout its reciprocating movement, the punch and die having co-operating cutting edges, the die being formed in a single piece having a circular sectioned shank located as a good sliding fit in a coaxial bore defined in the body and retaining means retaining the die in the body such that when the retaining means is released the die can be rotated about said axis without axial movement and can be removed from and re-connected to the body without opening up the body or disconnecting other parts, and releasable connecting means connecting the punch to the drive means such that when the die is removed from the body the punch can be removed from the body through the bore without dismantling the drive means, the punch having an elongated shaft portion and a head portion connected to the shaft portion by a connecting portion, and in which the connecting portion is tapered along the length of the connecting portion from the shank portion to the head portion and the connecting portion is eccentrically mounted so that its edge remote from the cutting edge is aligned with a longitudinal edge of the shaft portion.

13. A tool according to claim 12 which can cut on the upstroke, the downstroke or both strokes.

* * * * *

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

PATRICK LANG and RODMAN
& COMPANY, INC.

v.

C.A. No. 00-611ML

JOSEPH A. THOMAS, LTD.

**MEMORANDUM AND ORDER**

Plaintiffs (individually "Lang" and "Rodman"; collectively, the "Plaintiffs") brought this action against Defendant, Joseph A. Thomas, Ltd. ("JAT"), alleging patent infringement, trade dress infringement, and false designation of origin under federal law, as well as common law unfair competition under state law. This case is now before the Court on JAT's motion for partial summary judgment pursuant to Fed. R. Civ. P. 56. Plaintiffs object. JAT moves for summary judgment as to: 1) Count II, 2) plaintiff Rodman's claims of patent infringement in Count III, and 3) "some of the associated claims" under Count IV. For the reasons stated herein, JAT's motion is granted in part and denied in part.

## I. OVERVIEW

This case concerns competitors in the sale of a hand-held, drill-powered cutting tool commonly referred to as a "nibbler." A nibbler tool mounted to a hand-held drill translates the rotational force of the drill into an up-and-down motion of a cutting punch in the nibbler head (also referred to as a die). The nibbler is able to cut through or "nibble" sheet material, including metal and plastic. The Plaintiffs claim to own trade dress in a nibbling device known as the



EXHIBIT C

"Turner Nibbler" and claim that JAT's competing nibbler, known as the "Bad Dog Biter" infringes that trade dress. For the benefit of the reader, the salient facts are related in the course of the following discussion.

## II. STANDARD OF REVIEW

Summary judgment shall be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. The Court "must view all facts and draw all inferences in the light most favorable to the nonmoving party." Reich v. John Alden Life Ins. Co., 126 F.3d 1, 6 (1st Cir. 1997).

The moving party bears the burden of showing the Court that no genuine issue of material fact exists. Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). Once the movant has made the requisite showing, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Summary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial." Gannon v. Narragansett Elec. Co., 777 F. Supp. 167, 169 (D.R.I. 1991) (citation omitted).

## III. DISCUSSION AND FACTS

### Count II – Trade Dress Infringement

I. Facts

In Count II of their complaint Plaintiffs claim trade dress infringement of the Turner Nibbler's "outer body, metal box packaging and coloring" under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The outer body shape of the Turner Nibbler is a stepped cylinder, having two different sized radii. Protruding at a ninety degree angle from the larger of the Turner Nibbler's two cylindrical steps is a black handle with curved surface indentations. Directly opposite to the handle is the Turner Nibbler's cutting mechanism. Protruding from the smaller of the Turner Nibbler's two cylinders, at a ninety degree angle from both the handle and the cutting mechanism, is that part of the Turner Nibbler which accommodates the hand-drill. The Turner Nibbler's outer body is currently manufactured in yellow. In the past, it has been sold in silver, although on a very limited basis.[1] Its handle is black. The Turner Nibbler identifies both Rodman and Turner on its outer body and provides Rodman's business location and telephone number. Rodman began selling the Turner Nibbler in the United States in October 1998.

In outward appearance, JAT's Bad Dog Biter is similar in all aspects to the Turner Nibbler, except for the markings identifying Rodman and Turner and the coloring of its handle. In addition, the Bad Dog Biter has a second cutting head which is covered by the handle.

The black box containing the Turner Nibbler is a modified drill-bit box, i.e., one normally used to sell and house drill bits, which are also sold by Rodman and JAT. Rodman obtains the

---

[1] According to the deposition testimony of Dale Chesgreen, Rodman's president, only 20 silver Turner Nibbler's were ever sold.

drill-bit boxes it uses from the American Drill Box Company ("American"), and such boxes are available for sale by American to customers other than Rodman. The drill-bit box housing contains a foam casing which is designed to accommodate the Turner Nibbler's body and tools. The box is marked with a label affixed to it bearing the Rodman name. The Bad Dog Biter is also contained in a drill-bit box housing which, with the exception of its color and exterior markings, is similar in all aspects to the Turner Nibbler's housing.

II. Trade Dress

Trade dress is defined as "the design and appearance of a product together with the elements making up the overall image that serves to identify the product presented to the consumer." Yankee Candle Co., Inc. v. Bridgewater Candle Co., LLC, 259 F.3d 25, 38 (1st Cir. 2001) (citation omitted). In order for trade dress to be protected under § 43(a) the plaintiff must prove that the dress is: 1) used in commerce;[2] 2) non-functional; and 3) distinctive. I.P. Lund Trading ApS, et al. v. Kohler Co. et al., 163 F.3d 27, 36 (1st Cir. 1998). Additionally, "the plaintiff must show that another's use of a similar trade dress is likely to cause confusion among consumers as to the product's source." Yankee Candle, 259 F.3d at 38, (quoting I.P. Lund Trading, 163 F.3d at 43-44).

A. *Functionality*

For a trade dress to be protected under the Lanham Act it must be "non-functional." I.P. Lund Trading, 163 F.3d at 36 (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 775 (1992)). "The functionality doctrine prevents trademark law, which seeks to promote

---

[2] There is no dispute that both the Plaintiffs' and JAT's nibblers have been used in commerce.

competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature." Qualitex Co. v. Jacobson Products Co., 514 U.S. 159, 164 (1995). "[F]unctional features or designs should be defined as those that are driven by practical, engineering-type considerations such as making the product work more efficiently, with fewer parts and longer life, or with less danger to operators, or be shaped so as to reduce expenses of delivery or damage in shipping." I.P. Lund Trading, 163 F.3d at 37 n.5 (quoting 1 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 7:64 (4th ed. 1996)). In contrast, a design is considered non-functional if, inter alia, it is not "essential to the use or purpose of the article" and does not "affect[] the cost or quality of the article." Qualitex, 514 U.S. at 165. Thus, a functionality analysis "requires examination of the effects that granting protection to a product will have on the ability of others to compete." I.P. Lund Trading, 163 F.3d at 37 (emphasis added). Central to this inquiry is "whether granting protection to a mark 'would permit one competitor . . . to interfere with legitimate (nontrademark-related) competition through actual or potential exclusive use of an important product ingredient.'" Id. (quoting Qualitex, 514 U.S. at 170). "[A] particular arbitrary combination of functional features, the combination of which is not itself functional, properly enjoys protection." I.P. Lund Trading, 163 F.3d at 37 (citation omitted).

In its motion, JAT argues that summary judgment is proper as to Count II because the individual aspects of the Turner Nibbler, in which the Plaintiffs claim trade dress, are "functional," and therefore not protected. In its reply memorandum, JAT acknowledges that functional elements may, when combined, qualify as a protectable product, but avers that Plaintiffs have failed to sustain their burden of proving non-functionality. While JAT correctly

states that it is the Plaintiffs' burden to prove non-functionality *at trial*, Plaintiffs are the nonmovants in the instant motion. As such, the burden of showing that a genuine issue of material fact exists does not shift to the Plaintiffs until the Defendant has presented facts evidencing its entitlement to judgment as a matter of law. Here, JAT has failed to satisfy this threshold requirement.[3] JAT has failed to make a showing that the Turner Nibbler's trade dress is functional and that granting protection to the Plaintiffs will hamper the ability of others to compete in the market. As discussed above, functionality is not determined solely on the basis of whether the product in question or its individual parts have a useful purpose. Rather, functionality turns on a number of factors, including cost, quality, and design considerations. Based on these factors, the Court must determine whether granting trade dress protection to a product will hamper competition. JAT has offered no evidence that, without being permitted to incorporate Turner Nibbler features into competing nibblers, the ability of other companies to compete in the nibbler market will be frustrated. Moreover, the Plaintiffs' have proffered evidence that other nibbler designs do exist in the marketplace.

B. *Distinctiveness*

The third requirement for trade dress protection is distinctiveness. "Distinctiveness may be either 'inherent,' that is, the 'intrinsic nature of the trade dress serves to identify a particular source, or 'acquired,' i.e., the trade dress has acquired a 'secondary meaning'" in the minds of consumers. Yankee Candle, 259 F.3d at 38 (internal citations omitted).

Trade dress may be determined to be "inherently distinctive" if it "is so unique, unusual

---

[3] JAT makes largely factual arguments, but provides little in the way of evidence on which its motion must ultimately be decided. See Fed. R. Civ. P. 56.

or unexpected in [the particular] market that it will automatically be perceived by customers as an indicator of origin." Id. at 42. Factors to consider are

> whether [the design] was a "common" basic shape or design, whether it was unique or unusual in a particular field, whether it was a mere refinement of a commonly-adopted and well known form of ornamentation for a particular class of goods viewed by the public as dress or ornamentation for the goods, or whether it was capable of creating a commercial impression distinct from the accompanying words.

I.P. Lund Trading, 163 F.3d at 40 (quoting Wiley v. American Greetings Corp., 762 F.2d 139, 141 (1st Cir. 1985)). In contrast, a product has acquired "secondary meaning" if, "in the minds of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." I.P. Lund Trading, 163 F.3d at 41-42 (quoting Inwood Labs., Inc. v. Ives Labs., Inc., 456 U.S. 844, 851 n.11 (1982)) (emphasis added).

In an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, a *product's design* and/or *color* are distinctive, and therefore protectable, only upon a showing of secondary meaning. Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 212 (2000); see also Yankee Candle, 259 F.3d at 41. Conversely, in order to receive trade dress protection for "*product packaging*," the packaging may be either inherently distinctive *or* have acquired secondary meaning. Id. "The attribution of inherent distinctiveness to certain categories of word marks and product packaging derives from the fact that the very purpose of attaching a particular word to a product, or encasing it in a distinctive packaging, is most often to identify the source of the product." Wal-Mart, 529 U.S. at 212. "To the extent that there are close cases, . . . courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning." Yankee Candle, 259 F.3d at 41 (quoting Wal-Mart, 529 U.S. at

215).

Plaintiffs contend that the distinct combination of the elements comprising the Turner Nibbler's design, color, and drill-bit box housing should be analyzed under the "inherent distinctiveness" standard. The teachings of Wal-Mart and Yankee Candle however, clearly counsel against that approach. Wal-Mart, 529 U.S. at 212; Yankee Candle, 259 F.3d at 40-41. JAT argues that Plaintiffs' trade dress claim is based on product design or, in the alternative, it is one of the "close cases" referred to by the First Circuit, each argument requiring a showing of secondary meaning. Clearly the Plaintiffs' design and coloration claims qualify as "product design," and require a showing of secondary meaning. See id. What is less clear, however, is how this Court should classify Plaintiffs' claim as to the Turner Nibbler's drill-bit box housing. While JAT argues that the box is part of the product design requiring a showing of secondary meaning, it refers to the box as "packaging" in its memorandum, reflecting, perhaps, the difficulty in classifying these types of cases. Def. Mem. for Summ. J., at 15. There has been no showing by the Defendant that the drill-bit box housing is anything more than a form of packaging, i.e., that the box is somehow an extension of the product, or that consumers purchase the Turner Nibbler, in part, because of the drill-bit box, which is what this Court must find to require a showing of secondary meaning. See Wal-Mart, 529 U.S. at 215 (discussing the distinction between product design and product packaging). Based on the evidence presented, or lack thereof, it seems clear to this Court that the drill-bit box is a form of packaging and, as such, may qualify for protection upon a showing of *either* inherent distinctiveness or secondary meaning.

Because the test for establishing secondary meaning is more rigorous than the test for

inherent distinctiveness, see Yankee Candle, 259 F.3d at 43, if Plaintiffs' establish that a genuine issue exists with respect secondary meaning, JAT's motion for summary judgment must fail.

1. *Secondary Meaning*

JAT argues that Plaintiffs' have failed to establish secondary meaning with respect to the Turner Nibbler's design, color, and packaging, stating that Plaintiffs have not conducted any consumer surveys to establish secondary meaning and, as to the drill-bit box housing, have not established that it is unique in the industry.[4] Def. Mem. for Summ. J. at 13-15, 16. Additionally, JAT contends that Plaintiffs cannot pursue their claim as to the color silver, because only a "handful" of silver Turner nibblers were ever sold.

Plaintiffs correctly point out that consumer surveys are not the exclusive evidence by which a plaintiff may prove secondary meaning, and that "[s]econdary meaning may be 'established in a number of ways,' and courts may weigh a number of factors . . . ." in making a determination on whether a trade dress has acquired secondary meaning. I.P. Lund Trading, 163 F.3d at 42 (citation omitted). These factors include: length or exclusivity of the product's mark, size or prominence of the plaintiff's business, existence of substantial advertising by plaintiff, the product's established place in the market, and proof of intentional copying. Id. at 42 (citations omitted). Proof of secondary meaning does, however, require "at least *some* evidence that consumers associate the trade dress with the source." Yankee Candle, 259 F.3d at 44. In support of their claim that the Turner Nibbler and its drill-bit box housing have acquired secondary meaning, Plaintiffs have proffered evidence of: 1) intentional copying of the Turner Nibbler by

---

[4] Save these general allegations, JAT has not provided this Court with much in the way of evidence to support its argument that the Turner Nibbler has not acquired secondary meaning.

JAT, 2) substantial advertising and promotion of the Turner Nibbler, 3) exclusivity of the product's trade dress, including its packaging and yellow coloring, in the industry, and 4) significant length of use of the trade dress in the marketplace. Plaintiffs have also proffered some evidence that its customers associate the Turner Nibbler with its source, noting instances of customer surprise at learning JAT's Bad Dog Biter was not sold by Rodman, and calls from customers thinking they had bought JAT's competing nibbler from Rodman. These factors all weigh in Plaintiffs' favor on the issue of secondary meaning[5] and raise genuine issues of fact on the issue of distinctiveness. In addition, Plaintiffs have demonstrated that JAT's use of similar trade dress will likely cause, and has caused, confusion among consumers as to the product's source. Therefore, as to Count II, to the extent it alleges protected trade dress in the Turner Nibbler's outer body, drill-bit box housing, and the color yellow, the Court finds that JAT has failed to show that it is entitled to judgment as a matter of law.

With respect to the color silver, JAT points to the deposition testimony of Dale Chesgreen, Rodman's president, in which he states that only 20 silver nibblers were ever sold, as fatal to Plaintiffs' contention that silver nibblers could have acquired secondary meaning. Plaintiffs do not contest JAT's argument on this issue.

Without any proof to the contrary, it seems inconceivable to this Court that Plaintiffs can make a claim as to the color silver where only 20 silver nibblers were ever made, and then the color was abandoned because Chesgreen "[did not] like them." Secondary meaning requires a

---

[5] For the purposes of this motion, the Court notes that Plaintiffs have satisfied their burden of presenting evidence that the Turner Nibbler's packaging (drill-bit box housing) is also inherently distinctive, i.e., unique to the nibbler industry and capable of creating a distinct commercial image.

showing that the consumer makes a connection between the product and its source. Where only a "handful" of the product, with that characteristic which is claimed to have created the connection, were ever made, the repetition which is the basis for the acquisition of secondary meaning is absent. See Qualitex, 514 U.S. at 163 ("[O]ver time, customers may come to treat a particular color on a product or its packaging (say, a color that in context seems unusual, such as pink on a firm's insulating material or red on the head of a large industrial bolt) as signifying a brand. And, if so, that color would have come to identify and distinguish the goods--i.e., "to indicate" their "source"--much in the way that descriptive words on a product (say, "Trim" on nail clippers or "Car-Freshner" on deodorizer) can come to indicate a product's origin."). Therefore, JAT's motion as to Plaintiffs' silver coloration claim is granted.

Accordingly, JAT's motion for summary judgment on Count II is granted in part and denied in part.

Count III – Patent Infringement

I. Facts

Count III of Plaintiffs' complaint alleges patent infringement. Lang claims to be the owner by assignment of United States Patent No. 4,748,744 (the "744 Patent") filed by Kenneth J. Turner ("Turner") on June 17, 1986.[6] Rodman claims to be an exclusive licensee of the Turner Nibbler. The 744 Patent describes "a nibbling tool for cutting sheet material." Plaintiffs allege that JAT's Bad Dog Biter infringes the 744 Patent. Specifically at issue in the patent claim is the

[6] In 1986, immediately after Turner filed his patent application with the United States Patent and Trademark Office ("PTO"), he filed and recorded in the PTO an assignment of the patent rights from "Kenneth John Turner" to "Turner Precision Engineering, a British Corporation" (the "Turner Patent").

presence and degree of "radiusing" or "chamfering" in the inner corners of the tool's cutting head or "die," a feature which the Plaintiffs claim serves to "deburr" the cut sheet material. Turner Nibblers are manufactured by an entity called Turner Precision Engineering ("TPE"), located in Great Britain. TPE is owned by Turner, the original patentee of the 744 patent. TPE supplies nibblers to Lang, who supplies them to Rodman for sale in the United States. Rodman sells Turner Nibblers at expositions and trade shows.

II. Patent Infringement

JAT claims that summary judgment is proper as to plaintiff Rodman's claims under Count III because Rodman is a "bare licensee" under the Turner Nibbler patent and, as such, has no standing to sue on the patent. See Textile Productions, Inc. v. Mead Corporation, 134 F.3d 1481, 1484 (Fed. Cir. 1998) (stating that while the assignee or exclusive licensee of a patent holder may be able to sue for patent infringement, a bare licensee does not have standing to sue). JAT also contends that Lang cannot assert a claim for patent infringement damages that pre-date May, 2000, because the patent assignment was not effective until that date. Lastly, JAT contends that its machined steel heads do not infringe on the Turner patent.

Plaintiffs argue that under the Distributor Agreement Rodman is actually an exclusive licensee having "sole rights to sell the Product in the [U.S.]." Therefore, Plaintiffs contend that Rodman has standing to sue as a co-plaintiff for infringement of the Turner Nibbler patent. See id. (stating that an exclusive licensee that does not hold all "substantial rights" under the patent has standing to sue third parties as a co-plaintiff with the patentee). Lang disputes JAT's contention that the patent assignment was not effective until May, 2000, and has provided the Court with a Deed of Assignment dated December 23, 1999. There is clearly a factual dispute as

to the nature of plaintiff Rodman's proprietary rights with regard to the Turner Nibbler patent, and as to the effective date of the Lang assignment. Similarly, JAT's argument that its machined steel heads do not infringe on the Turner patent raises a genuine issue of fact. As such, JAT's motion for summary judgment on Count III is denied.

Count IV – Common Law Unfair Competition

JAT does not make a substantive argument for summary judgment as to Count IV; rather, it states in a footnote that this claim fails to the extent summary judgment is entered on Counts II and III. In light of the Court's ruling on Counts II and III, JAT's motion for summary judgment on Count IV is denied.

## IV. CONCLUSION

For the reasons stated above, Defendant's motion for summary judgment on Count II is granted in part and denied in part. Defendant's motion as to Counts III and IV is denied.

SO ORDERED.

Mary M. Lisi

Mary M. Lisi
United States District Judge
April 22, 2002

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

PATRICK LANG and :
RODMAN & COMPANY, INC. :
Plaintiff :
:
:
V. : C.A. No. 00-611ML
:
:
JOSEPH A. THOMAS, LTD :
Defendant :

**MOTION OF DEFENDANT JOSEPH A. THOMAS, LTD.**
**FOR PARTIAL SUMMARY JUDGMENT**

Defendant, Joseph A. Thomas, Ltd., ("Thomas"), moves for partial summary judgment against certain claims of the Plaintiffs, Rodman and Company, Inc. ("Rodman") and Patrick Lang ("Lang"). Summary Judgment is appropriate and necessary as to all claims asserted by the Plaintiffs under Count II of the *Complaint* (trade dress infringement), all of the claims asserted by Plaintiff Rodman under Count III (patent infringement), all claims alleging patent infringement by Thomas devices employing machined steel heads, and all claims alleging patent infringement occurring prior to the date Plaintiff Lang alleges that he took title to the patent in suit. In support hereof, Thomas relies on its Memorandum In Support and a Rule 12.1 Statement of Undisputed Facts, filed contemporaneously herewith.

EXHIBIT D

Dated: April 25, 2001

JOSEPH A. THOMAS, LTD.
By Its Attorneys,

Thomas R. Noel, Esq. (#4239)
COUNSELOR AT LAW, P.C.
50 South Main Street
Providence, RI 02903
(401) 621-7744
(401) 621-5688 (Facsimile)

Craig M. Scott, Esq. (#4237)
DUFFY & SWEENEY, LTD
300 Turks Head Building
Providence, RI 02903
(401) 455-0700
(401) 455-0701 (Facsimile)

**CERTIFICATION**

I hereby certify that I served a copy of the foregoing via Federal Express on this 25th day of April 2001 to Ronald P. Langlois, Esq., Smith Brink, P.C., 2 Charles Street, 3rd Floor, Providence, RI 02904 and to Victor H. Polk. Jr., Esq. and Joshua M. Dalton, Esq., Bingham Dana LLP, 150 Federal Street, Boston, MA 02110.

TRN/era

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

PATRICK LANG and
RODMAN & COMPANY, INC.
Plaintiff

V. C.A. No. 00-611ML

JOSEPH A. THOMAS, LTD
Defendant

RECEIVED
APR 25 2001
U.S. DISTRICT COURT
DISTRICT OF R.I.

**MEMORANDUM IN SUPPORT OF MOTION OF DEFENDANT JOSEPH A. THOMAS, LTD. FOR PARTIAL SUMMARY JUDGMENT**

## I. INTRODUCTION

Defendant, Joseph A. Thomas, Ltd., ("Thomas"), has moved for partial summary judgment against certain claims of the Plaintiffs, Rodman and Company, Inc. ("Rodman") and Patrick Lang ("Lang"). Summary Judgment is appropriate and necessary as to all claims asserted by the Plaintiffs under Count II of the *Complaint* (trade dress infringement), all of the claims asserted by Plaintiff Rodman under Count III (patent infringement), and some of the associated claims under Count IV. As to these claims, partial summary judgment is mandated for Thomas as a matter of law and pursuant to the undisputed facts. *See Thomas' Rule 12.1 Statement of Undisputed Facts* (the "*Statement of Facts*"), filed contemporaneously herewith.

This matter is a battle between competitors in the hand-tool market. The prize is the right to sell a hand-held drill-powered cutting tool commonly referred to in the industry as a "nibbler". Nibblers have existed and have been sold commercially for

decades. Here, the purveyors of one nibbling tool, known as the "Turner Nibbler", are attempting to stop defendant's sale of a competing nibbling tool, the "Bad Dog Biter". The Plaintiffs do so by alleging three distinct causes of action in four counts. Count I alleges that Thomas sold nibblers that were not properly marked as to country of origin. Count II alleges trade dress infringement. Count III alleges patent infringement. Count IV repeats the allegations of the previous counts under the rubric of common law unfair competition.[1]

Summary judgment as to Count II, trade dress infringement, is appropriate because the elements for which the Plaintiffs jointly claim rights are not actionable. As the Plaintiffs have now admitted, the elements claimed are all functional, and are not protectible as a matter of law. Additionally, the Plaintiffs have no evidence of secondary meaning or inherent distinctiveness, required elements for a finding of trade dress infringement.

Summary judgment is appropriate as to all claims of Plaintiff Rodman asserted under Count III, patent infringement, because Plaintiff Rodman is a bare licensee of the patent at issue and has no standing to come to this Court or maintain this action. Rodman's patent claims are absolutely barred. Additionally, the Plaintiffs' own expert now admits that the Thomas Bad Dog Biter sold today, nibblers incorporating machined-steel heads, do not infringe the patent. Finally there can be no recovery for any infringement whatsoever prior to at least the date the present assignee, Lang, purports to have assumed rights in the patent.

---

[1] Count IV fails, therefore, to the extent summary judgment is entered for Thomas on Count II and III. The Complaint, simply put, lumps both plaintiffs together. It makes no distinction that one of the two plaintiffs is bringing any particular cause of action or has sustained any particular element of damages alleged.

## II. RELEVANT FACTS

The Plaintiffs jointly claim in this action that they own trade dress in a nibbling device known as the Turner Nibbler and that Thomas' competing nibbler, the Bad Dog Biter, infringes that trade dress.[2] Specifically, the *Complaint* claims trade dress in the Turner Nibbler's "outer body, metal box packaging and coloring". *Complaint*, ¶¶ 37-39.

Count III of the *Complaint* alleges patent infringement arising out of Thomas' sales of the Bad Dog Biter. Count III is internally contradictory as to whether *one* or *both* Plaintiffs are claiming patent infringement and patent infringement damages.[3] It is assumed for purposes of this Motion that both Plaintiffs so claim.

Rodman sells Turner Nibblers at expositions and trade shows in the United States. *Complaint*, ¶ 13. (Attached as *Exhibit A* to the *Statement of Facts*, are photographs of a representative Turner Nibbler sold by Rodman and the black metal box in which it is sold.)[4] Turner Nibblers sold by Rodman in the United States are marked with a label affixed to them identifying Rodman and including its business address. See Exhibit A. The black boxes in which Rodman sells the Turner Nibbler in the United States are marked with an imprinted label featuring the Rodman name and logo. The box itself is a modified drill-bit box, i.e., one normally used to sell and house drill bits, which are also sold by Rodman, Thomas, and others. Rodman in fact obtains the boxes it uses

---

[2] Complaint paragraphs 36-41 refer to trade dress owned by a single "Plaintiff". Nowhere does the Complaint identify *which* Plaintiff is intended as the trade dress Plaintiff. Paragraph 42 alleges harm to both "Plaintiffs", without explanation.

[3] Paragraph 46 refers to "Plaintiffs" (plural) in the first sentence and to "Plaintiff" (singular) later.

[4] *See* Deposition (April 12, 2001) of Kenneth John Turner ("*Turner Depo*"), relevant portions of which are attached to the *Statement of Facts* as Exhibit C, at page 50)

from American Drill Box Company, and such boxes are available "off-the-shelf" from American Drill Box Company (and other suppliers) to any customer who wishes to purchase them. *Statement of Facts*, ¶ 7.

Attached as Exhibit B to the *Statement of Facts* is a series of photographs depicting the Bad Dog Biter, and the blue metal boxes in which it has been sold. The blue metal boxes in which Bad Dog Biters are sold have labels clearly indicating the name "Bad Dog Double Headed Nibbler" trademark and design. The Bad Dog Biter is a two-headed nibbler, with two cutting dies and a two-sided cutting punch. Two cutting heads allows the user to get more cutting life from a Bad Dog Biter as from a standard, single-headed nibbler.

Rodman began selling the Turner Nibbler in approximately October, 1998. *Complaint*, ¶ 12. Rodman purchases the Turner Nibblers from Lang, who in turn purchases them from the original patentee, Mr. Turner. A few months after Rodman commenced sales of the Turner Nibbler, Rodman and Lang signed a document entitled Appointment of Distributors (the "Distributors Agreement"). (A copy of the Distributors Agreement is attached to the *Statement of Facts* as Exhibit D.) The Distributors Agreement identifies Mr. Turner as the "Manufacturer" and includes a line for his signature, but Turner never signed it. *Turner Depo*., p. 172.[5] Moreover, it refers to another document, the "Main Distribution Agreement" (¶ 2.2), and to a separate "Schedule 1" listing of intellectual property intended to be covered (¶ 3.5), but no such attachments appear or have ever been produced by Rodman or Lang. The partially executed Distributors Agreement refers to Rodman as the "Local Sole Distributor," and

---

[5] Turner testified that he never signed any agreement regarding distribution of the Turner Nibbler with Lang and Rodman. *Turner Depo*. p. 173.

to Lang as the "Exclusive Distributor." ¶ 1. The Product is defined as the "Turner Nibbler and any spare parts therefore". *Id.*, at ¶ 3.6.[6] To this day, no other written agreement governs the relationship between Rodman and either Mr. Lang or Mr. Turner concerning the sale of the Turner Nibbler.

The patent in suit is United States Patent number 4,748,744 (the" '744 Patent") filed by Mr. Kenneth J. Turner on June 17, 1986. The '744 Patent describes "a nibbling tool for cutting sheet material". The '744 Patent actually covers purported improvements on nibbler devices that have been commercially made and sold for decades and for many years prior to the issuance of the '744 Patent.[7] Before he filed his patent application Mr. Turner in fact supplied nibbler heads --he claims without radiused or chamfered corners -- to the holder of an earlier nibbler patent, Mr. James Diggins, also of the United Kingdom.[8] Immediately after Mr. Turner filed, through counsel, his patent application with the United States Patent and Trademark Office ("PTO"), he and counsel filed an assignment of the patent rights from "Kenneth John Turner" to "Turner Precision Engineering, a British Corporation…" A true and accurate copy of the assignment dated September 20, 1986, as recorded in the PTO (the "1986 Assignment"), is attached to the *Statement of Facts* as Exhibit E. That was the state of the ownership of the "744 Patent for approximately 14 years.

---

[6] At the time Lang and Rodman signed Exhibit C, however, no agreement existed appointing Lang as the exclusive distributor of the Turner Nibbler, and Lang took no rights to the '744 Patent until sixteen months later. In fact, Turner had been supplying Turner Nibblers for resale in United States directly through another company, International Trade Services ("ITS"). Lang had sued Turner in the United Kingdom for breach of an earlier distribution agreement in relation to the sale of the Turner Nibbler to ITS.

[7] Specifically at issue in this matter is the presence and degree of "radiusing" or "chamfering" in the inner corners of the tool's cutting head or "die," a feature which the patent claims serves to "deburr" the cut sheet material.

[8] *Turner Depo.*, pp 21-27. Diggins has an earlier United States patent on his nibbler device.

Lang purports to be the present owner by assignment of the '744 Patent originally issued to Mr. Turner. Lang's assignment from Mr. Turner is dated May 9, 2000. The Plaintiffs did not provide any evidence of an assignment from original patentee Turner to Lang in their pleadings. *See Complaint*, ¶ 6. At Hearing on Plaintiffs' demand for emergency injunctive relief in January, 2001, upon challenge by the Defendant and after admonition by the Court, Plaintiffs' counsel produced, in court, a copy of the assignment document. A true and accurate copy of the assignment ("Assignment") as produced by Plaintiffs is attached to the *Statement of Facts* as Exhibit F. On that date, however, Mr. Turner did not own the '744 Patent, it having been assigned by Mr. Turner to "Turner Precision Engineering, a British Corporation", in 1986. In July, 2000, two months after the May 9, 2000 Assignment, and nearly two months after first claiming patent ownership and alleging patent infringement in correspondence to Thomas, Mr. Turner's (or perhaps Mr. Lang's) New York counsel filed what they called a "Corrective Assignment," asserting that Turner Precision Engineering was not in fact a "British corporation", but was a mere nominee under which Mr. Turner had done business. Lang and/or Turner, through counsel in July, 2000 thereby purportedly "corrected" the state of the title of the '744 Patent, and purportedly did so "nunc pro tunc" or retroactively.[9]

---

[9] Thomas is currently investigating the state of the title of the '744 Patent, and possible alienation of the '744 Patent during the fourteen years between 1986 and 2000. For example, Turner has recently testified that Turner Precision Engineering existed for a period of years as a partnership involving Turner and his former wife, was dissolved in the late 1990's, and that he had recently obtained a divorce from his former marital and business partner. For purposes of this Motion, however, Thomas asserts only that Lang took no interest in or to the '744 Patent until at least May 9, 2000.

## III. ARGUMENT

### A. The Court Must Grant Summary Judgment for Thomas Dismissing All Count II Trade Dress Infringement Claims.

Count II of the Complaint alleges trade dress infringement under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125 et seq. Section 43 (a) of the Lanham Act provides a cause of action to one who claims injury from a person who uses "any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods...." 15 U.S.C. § 1125(a)(1)(A). Infringement cannot lie, however, if a plaintiff does not have protectible trade dress in the first place. "Trade dress protection must subsist with the recognition that it in many instances there is no prohibition against copying goods and products." *Traffix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. ____, 121 S. Ct. 1255, 1258, 149 L. Ed. 2d 164 (2001).

A plaintiff asserting trade dress infringement must prove that it has a design that (1) is non-functional, (2) is either inherently distinctive or has acquired secondary meaning, and (3) that prospective consumers are likely to be confused as to the source of the allegedly infringing product, believing it to be the plaintiff's. *Central Tools, Inc. v. Products Eng'g, Inc.*, 936 F. Supp. 58, 65 (D.R.I. 1996). Though non-functionality has long been recognized as an essential factor, Congress has amended the Lanham Act and the burden of proof concerning non-functionality is now squarely upon the plaintiff. Section 1125 (a)(3) provides:

> In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who

> asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

15 U.S.C. § 1125(a)(3).

Moreover, a trademark plaintiff must identify particular elements of the trade dress it seeks to protect "in order to avoid an overly broad application of the Lanham Act and the danger of uncertainty among...present and future competitors."

> [T]he discrete elements which make up that totality should be separated out and identified in a list. Only then can the court and the parties coherently define exactly what the trade dress consists of and determine whether that trade dress is valid and if what the accused is doing is an infringement.

*Central Tools, 936 F. Supp. at 65.* The Complaint identifies the elements claimed by both plaintiffs as protectible trade dress: the "outer body," "metal box packaging," and the "coloring" of the Turner Nibbler. *Complaint,* pp.39-40.

**1. <u>The Elements the Plaintiffs Claim Are Not Protectible Trade Dress Under the Lanham Act.</u>**

a. <u>The Outer Body Constitutes Product Design and Is Functional And Therefore Not Protectible.</u>

The Turner Nibblers sold by Rodman have always been of the same basic configuration (*See Exhibit A*), which the parties have described as a "stepped cylindrical" body shape. *Deposition of Dale Chesgreen ("Chesgreen Depo.")*, relevant portions of which are attached to the *Statement of Facts* as Exhibit G, p. 129. It is described as such because it is comprised of a barrel-shaped cylinder with two, stepped body diameters, a major diameter and a minor diameter. The stepped cylindrical body is a metal casing in which the nibbler's interior working parts are housed. This is a feature of product design. Recent decisions of the Supreme Court have significantly restricted the claim of product design trade dress, as the Court has been careful to note that "product design almost

invariably serves purposes other than source identification." *Traffix Devices* 121 S. Ct. at 1258; See *Wal-Mart Stores, Inc. v. Samara Bros, Inc.*, 529 U.S. 205, 120 S.Ct. 1339, 146 L. Ed. 2d. 182 (2000).[10]

Functionality

The Court in *Traffix* reiterated the "well established rule that trade dress protection may not be claimed for product features that are functional." 121 S. Ct. at 1258, citing *Qualitex Co. v. Jacobson Products Co, Inc.*, 514 U.S. 159, 164-65, 115 S.Ct. 1300, 131 L. Ed. 248 (1995) and *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 775, 112 S.Ct. 2753, 120 L. Ed. 2d 615 (1992). The question of functionality serves as a gate-keeper to the analysis. If the claimed feature is found to be functional, then trade dress protection does not lie and the question of secondary meaning "need not be considered." *Traffix,* 1215 S. Ct. at 1259. It is the plaintiffs who have the burden of proof on this issue; plaintiffs must prove *non-functionality* under the statute. Neither Lang nor Rodman can meet their burden.

The outer body design of the Turner Nibbler is purely functional. It enables the attachment of the nibbler tool to standard bench clamps, which are of standard industry sizes. When one cuts sheet material, the nibbler and its attached power drill can be mounted to a work bench by placing the smaller barrel of the outer body housing into the clamp, which is itself secured to the bench, as Rodman's own President acknowledged:

> Q: Why is the housing of this unit the shape that it is? Meaning, I'll describe it as step cylindrical. There is a wider cylinder and a narrower cylinder to the house itself.

[10] Under *Traffix* and *Wal-Mart*, a trade dress plaintiff must prove not only that the features of the product design at issue are *not functional*, but also that they have acquired distinctiveness through *secondary meaning*, as product design features cannot be inherently distinctive.

A: That is to fit the bench clamps that I was telling you about earlier that mount the nibbler and the drill to the bench clamp. It has a nose on the collar of the clamp that fits around this and a clamp that holds it to the bench.

. . . . .

Q: It's a standard size clamp, isn't that correct?

A: Yes.

*Chesgreen Depo.*, pp. 36-37. In other words, the shape of the Turner Nibbler's housing serves the function of allowing it to be fit into a standard bench clamp. Plaintiff Lang agrees:

Q: Do you know the reason that it was changed to a stepped cylindrical shape?

Mr. Dalton: Objection.

A: Yes.

Q: And what –what's the reason?

A: In order to fit it onto a bench clamp on the table.

Deposition of Patrick Lang *("Lang Depo.),* relevant portions of which are attached to the *Statement of Facts* as Exhibit H., p 51.

The functionality analysis prevents the Lanham Act "from …inhibiting legitimate competition by allowing a producer to control a useful product feature." *Qualitex*, 115 S. Ct. at 1304. "[A] product feature is functional, and cannot serve as a trademark, if it is essential to the use or purpose of the article or if it affects the cost or quality of an article…. Expanding upon the meaning of this phrase, we have observed that a functional feature is one the exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." *Traffix*, 1215 S. Ct. at 1259, *quoting*

*Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850, n. 10, 102 S. Ct. 2182 72 L. Ed. 2d. 606 (1982) (internal citations omitted) and *citing Qualitex*, 115 S. Ct. 1300.

The outer body design of the Turner Nibbler is clearly functional – it serves as a surface for a standard bench clamp. As set forth above, the plaintiffs have admitted as much. The trade dress claims relating to this element must be rejected. It is not protectible trade dress as a matter of law.

To the extent the Plaintiffs attempt to claim any feature of the plastic handle grip on the Turner Nibbler as protected trade dress (whether or not they would classify it as part of the product's "body housing"), the handle grip itself is also purely functional. As Rodman's President conceded:

Q: … do you have a way of describing the shape of this handle?

A: A handle grip like handle bars on a bicycle to hold your hands to keep from slipping off.

. . . .

Q: Do you know why the [knurls] are on the handle?

A: For the same reason I just finished telling you, to keep your hands from slipping off and get a good grip, control.

Q: It has a function right, right?

A: Yeah, a function, control.

*Chesgreen Depo.*, pp.137-138. Again, Mr. Lang agreed:

Q: Do you know why -- do you have an understanding as to why the Turner grip has those ridges –

MR. DALTON: Objection.

Q: on it?

MR. DALTON: Objection

A: I have an understanding, yes.

Q: What's that understanding?

A: In order to hold it in your fingers, in your hand to guide it.

Q: That would be its function, correct?

A: Ergonomical, yeah, I believe.

Q: That would be its function, correct?

MR. DALTON: Objection.

A: Yes.

*Lang Depo.*, p.88. Because the body housing and handle grip are functional, Plaintiffs cannot meet their burden of proving trade dress infringement.

Secondary Meaning

Even if the Court concludes, for the purpose of this summary judgment, that these claimed features are non-functional, the second step of product design analysis, which is unnecessary upon a finding of a functionality, would require a finding that the element sought to be protected had acquired secondary meaning. *Wal-Mart*, 529 U.S. 205, 216, 120 S. Ct. 1339, 1346. Ordinarily, a mark may be shown to be inherently distinctive or to have acquired secondary meaning over use and time. *Wal-Mart,* however, established that product design in and of itself cannot be inherently distinctive. The Court noted the "reality that, almost invariably, even the most unusual of product designs -- such as a cocktail shaker shaped like a penguin-- is intended not to identify the source, but to render the product itself more useful or more appealing." *Id.* At 1344. In

order to establish secondary meaning, a plaintiff "must show that, in the minds of the public, the *primary significance* of a product feature or term is to identify the *source* of the product rather than the product itself." *Inwood* 102 S. Ct. 2182 (1982)(emphasis added). Here, there is no evidence whatsoever of secondary meaning relating to the outer body housing or the handle grip of the Turner Nibbler. The Plaintiffs have conducted no consumer surveys to establish the same, and can point to no evidence by which they could argue that secondary meaning exists.[11] The Plaintiffs claims concerning these features fail as a matter of law.

b. The Color of the Turner Nibbler is Not Protectible Trade Dress.

The Plaintiffs claim, without further detail, product "coloring" as protectible trade dress. The Complaint states that the Turner Nibblers sold by Rodman have come in two colors, yellow and silver, and that Thomas "copied" those colors. *Complaint*, ¶ 16. In reality, Rodman sold only a "handful...around 20" silver (actually polished metallic silver) Turner Nibblers. *Chesgreen Depo.*, p.130. The others have all been yellow. Despite the allegations lodged by the Plaintiffs in their complaint less than four months ago, the Plaintiffs therefore cannot be pursuing any claim based on the color silver.[12]

Plaintiffs' claimed rights to the color yellow of the body housing must fail. Although color is not per se *unprotectible,* proving protection in a product color is a

---

[11] The Plaintiffs have answered in interrogatories that they conducted "no formal surveys, polls, or studies...regarding whether [the] trade dress has acquired distinctiveness or secondary meaning." Rodman Int. Answer 18; Lang Int. Answer 18.

[12] The Plaintiffs would obviously have no claim for distinctiveness based on such limited use. Moreover, Falcon brand nibblers have for years, and are presently, sold in brushed metallic silver. It is also assumed that the Plaintiffs' "coloring" claim has nothing to do with the plastic handle grip of the Turner Nibbler. The evidence is undisputed that the Turner Nibblers sold by Rodman have always had black handle grips (Chesgreen Depo., p.143), and Thomas' handle grips have been either red or blue, but not black.

rigorous exercise, which the Plaintiffs do not come close to satisfying. Color, like product design, requires proof of secondary meaning. *Qualitex*, 115 S. Ct. at 1303 (no "obvious theoretical objection to the use of color alone as trademark, where that color has attained 'secondary meaning' and therefore identifies and distinguishes a particular brand (and thus indicates its 'single source')"). The Supreme Court in *Qualitex* likened color to a "merely descriptive" mark, which requires proof of secondary meaning for registration:

> The imaginary word "Suntost," or the words "Suntost Marmalade," on a jar of orange jam immediately would signal a brand or a product "source"; the jam's orange color does not do so. But, over time, customers may come to treat a particular color on a product or its packaging (say, a color that in context seems unusual, such as pink on a firm's insulating material or red on the head of a large industrial bolt) as signifying brand. And, if so, that color would have come to identify and distinguish the goods -- i.e., "to indicate" their "source"-- much in the way that descriptive words on a product (say, "Trim" on nail clippers or "Car-Freshener" on deodorizer) can come to indicate a product's origin.

*Id.* The Supreme Court has recently affirmed its earlier analysis that there is no consumer predisposition to equate a color with a source of manufacture:

> [W]here it is not reasonable to assume consumer predisposition to take an affixed word or packaging as indication of source -- where, for example, the affixed word is descriptive of the product ("Tasty" bread) or of a geographic origin ("Georgia" peaches) -- inherent distinctiveness will not be found. That is why the statute generally excludes, from those word marks that can be registered as inherently distinctive, words that are merely descriptive" of the goods… or "primarily geographically descriptive of them," see §15 U.S.C... In the case of product design, as in the case of color, we think consumer predisposition to equate the feature with the source does not exist.

*Wal-Mart*, 120 S. Ct. at 1344 (citations omitted) (emphasis added). Thus, proof of secondary meaning is required for product color claimed by trade dress Plaintiffs. Here, neither Plaintiff proffers any evidence of secondary meaning whatsoever. Neither

Plaintiff has conducted consumer surveys, and there is no evidence upon which a finding of secondary meaning could be made.

c. The Packaging of the Turner Nibbler Sold by Rodman is Not Protectible Trade Dress.

The Complaint cites the "metal box" packaging of the Turner Nibblers sold by Rodman as the remaining element of trade dress over which Plaintiffs claim protection. Rodman has since January, 1999 used a black, metal box as packaging for its nibbler product. The Plaintiffs cannot claim it as their own, and cannot credibly claim that is has been copied.[13] The black metal box used by Rodman is a standard (*Chesgreen Depo*. p. 126) metal drill-bit box. Such boxes are routinely used in the tool industry, including by Rodman itself:

> Q: Have you ever used this type of metal box for any other product that you sell?
>
> A: Certainly.
>
> Q: What other products?
>
> A: Drill bits.
>
> Q: Is it, in fact, the same box?
>
> A: Almost but it is a little thinner, say ½ inch thinner with an index to hold the drill-bits
>
> . . . .
>
> Q: Its a sturdy box, right?
>
> A: Correct.

*Chesgreen Depo*., p.125.

---

13 Though the Complaint merely makes reference to it, the Plaintiffs apparently also claim rights to the cut-out foam insert that sits inside the metal drill-bit box and holds the nibbler product and parts.

The Plaintiffs therefore admit that the metal box is functional in that it is a sturdy container for the Turner Nibbler (*Chesgreen Depo*., p. 125), and the box and foam insert together serve the function for which their use may be fairly obvious:

> Q: Is there any other reason to put the nibbler in a foam insert inside the metal box?
>
> A: It protects it, looks nice.
>
> Q: It holds the tool in place, doesn't it?
>
> A: And protects it, keeps it from getting scratched.

*Chesgreen Depo*., p. 147. The Plaintiffs can make no trade dress claims to features that are functional. See *Traffix*, 121 S. Ct. 1259.

Even if the Plaintiffs could prove the non-functionality of the metal box and/or the cut-out foam casing used by Rodman, the Plaintiffs would have to prove distinctiveness by way of acquired secondary meaning. They are precluded from doing so. The metal box claimed by Rodman is in fact available to any customer of Rodman's supplier, American Drill Box Company:

> Q: I could go to American Drill Bit -- Drill Box and purchase this box from them isn't that correct?
>
> A: Sure.

*Chesgreen Depo*., p. 126. The Plaintiffs have no evidence of secondary meaning, have commissioned no consumer surveys regarding the same, and readily admit that the metal box is commonly used for other tool products and is available from their source to anyone who might want to buy it.

The Supreme Court has cautioned that close cases of determining product design versus product packaging should be resolved in favor of finding product design:

> To the extent there are close cases, we believe that courts should err on the side of caution and classify ambiguous trade dress as product design, thereby requiring secondary meaning. The very closeness will suggest the existence of relatively small utility in adopting an inherent-distinctiveness principle, and relatively great consumer benefit in requiring a demonstration of secondary meaning.

*Wal-Mart,* 120 S. Ct. at 1346. To the extent that the Court were to find the metal box packaging and foam insert to be in a category different from "product design," however, the Plaintiffs would be required to assert *either* inherent distinctiveness or secondary meaning. Nevertheless, there is no evidence to suggest that either the metal box or cut-out foam insert is inherently distinctive. To the contrary, there is simply nothing unusual about them. The case of *Central Tools*, infra, is instructive.

In *Central Tools*, this court rejected the Plaintiff's contention that its purported trade dress -- containers with form-fitted interiors-- was or could be inherently distinctive:

> Central Tools' trade dress is incapable of conveying an immediate knowledge of its origin to the viewer; rather, it is a refinement of a common type of packaging. Hundreds of tool companies put their products in blow-molded plastic boxes, and Snap-on and CDI join the parties to this matter in using form-fitted interiors. ...[E]ach element of Central Tools' trade dress is unremarkable. Dial indicators find uses in many industries and the Flex-Arms and Vise-Grips are made by other companies and thus cannot point to Central Tools as the manufacturer of origin.

936 F. Supp. at 67. See *Seabrook Foods, Inc. v. Barr-Well Foods, Ltd.*, 568 F. 2d 1342, 1344 (C.C.P.A. 1977) (factors to be considered for finding inherent distinctiveness include "whether it was a 'common', basic shape or design, whether it was unique or unusual in a particular field, [and] whether it was mere refinement of a commonly

adopted and well-known form of ornamentation for a particular class of goods viewed by the public as a dress or ornamentation for the goods").

Moreover, each black metal drill-bit box sold by Rodman is marked with a unique Rodman identifying label. *See Exhibit A.* By contrast, each Thomas Bad Dog Biter box is blue and has a Thomas Bad Dog Biter label with a distinctive "Bad Dog" trademark. *See Exhibit B.*[14] The only "common" element is that they are both universally available metal drill-bit boxes, which is conclusively non-distinctive. Given the clear markings contained on each, Rodman cannot credibly claim even the possibility of consumer confusion, the ultimate question in a trade dress case, even if they were to survive the non-functionality and distinctiveness tests.

For the reasons cites, Thomas is entitled to summary judgment on all claims of trade dress infringement.

**B. <u>The Court Must Grant Summary Judgment for Thomas Dismissing All Claims of Plaintiff Rodman for Patent Infringement.</u>**

To prevail on patent infringement claims, a patent *owner* must show that the claims of the patent, when properly construed, read on the accused product, in this case Thomas' Bad Dog Biter. In construing the claims, the court must look to the patent itself, the prosecution history, and, where appropriate, extrinsic evidence. *Loral Fairchild Corporation v. Sony Corporation, et al.*, 181 F.3d 1313 (Fed. Cir. 1999).

The protection, if any, granted by the '744 patent is necessarily thin. As the patent prosecution history and evidence of other products demonstrate, nibbler tools and nibbler technology have existed for several decades. The alleged "improvement"

---

[14] Thomas at one time used a blue trapezoidal box, also pictured.

granted by the '744 patent at issue is a "chamfering" or a "radiusing" of one or more internal surfaces such that, according to the patentee's own claim, results in the cut material emerging without burrs. The plaintiffs claim that defendant's two-headed biter has chamfered or radiused surfaces – to the degree of a few thousandths of an inch. Defendant asserts that its surfaces are *not* chamfered or radisued so at to deburr, and that the '744 Patent is invalid due to the existence of radiused or chamfered inner corners in other nibbler products prior to the alleged invention in the '744 Patent.

This Motion, however, concerns plaintiff Rodman's lack of standing to maintain an action for infringement under the Patent Act in the first place. Standing is a "threshold question." *Procter & Gamble Company v. Paragon Trade Brands, Inc.*, 917 F. Supp. 305, 307 (D. De. 1995). "It is well established…that before a federal court can consider the merits of a legal claim, the person seeking to invoke the jurisdiction of the court must establish the requisite standing to sue." *Ortho Pharmaceutical Corp v. Genetics Institute, Inc.*, 52 F. 3d 1026, 1032-33 (Fed. Cir. 1995). The burden of proving standing is Rodman's. "Standing cannot be inferred from the averments in the pleadings, but must affirmatively appear in the record." *Procter & Gamble*, 917 F. Supp at 307. In response to a motion for summary judgment concerning standing, the party alleging standing "must set forth by affidavit or other appropriate means 'specific facts' to support its standing." *Id.* The question of standing is a jurisdictional one, which the appellate court will review *de novo*. *GAIA Technologies, Inc. v. Reconversion Technologies , Inc.*, 93 F. 3d 774, 777 (Fed. Cir. 1996), reversed on other grounds.

The Patent Act provides the basis for the standing requirement. The Act provides that "a *patentee* shall have remedy by civil action for infringement of his

patent." *35 U.S.C. § 281*(emphasis added). The statute goes on to define patentee, however, as "not only the patentee to whom the patent was issued but also the successors in title to the patentee." *35 U.S.C. 100 (d)*. A patent may be conveyed, but a transfer of patent interests must be in writing.[15]

Here, original patentee Turner purportedly assigned the '744 Patent to Plaintiff Patrick Lang by the written assignment dated May 9, 2000. The rights of Lang to maintain this action therefore derive, if at all, from that assignment.[16] Rodman, however, can make no claim of assignment and can assert no such standing. While it has long been established that an assignee of the patent holder may sue for infringement in its own name, a bare licensee, without patent ownership rights, may not. *See Textile Productions, Inc. v. Mead Corporation*, 134 F. 3d 1481 (Fed. Cir. 1998); *Rite-Hite Corp. v. Kelley Company, Inc.*, 56 F. 3d. 1538 (Fed Cir. 1995); *Otrho Pharmaceutical, infra.* Rodman is, at most, a mere licensee; as such, it has no standing to bring or maintain this action.

A party that is not the patentee (or assignee) may bring an action for patent infringement if it does so with the patentee or in the name of the patentee under certain circumstances. In such a case, the non-patentee Plaintiff is referred to as a "co-plaintiff." The Court must examine, however, whether the purported co-plaintiff asserting standing in reality holds "a property interest in the monopoly of the patent." *Ortho Pharmaceutical,* 52 F. 3d at 1031, citing *Western Electric Co. v. Pacent Reproducer Corp.*, 42 F.2d 116 (2d Cir. 1930). Not every licensee is a permitted co-plaintiff.

---

[15] "Application for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing..." *35 U.S.C. § 261*.

[16] See footnote concerning doubts as to the true chain of title, which is not raised as an issue for summary judgment.

> Saying that a licensee must sue with or in the name of the patentee does not mean that every licensee under a patent has rightful place in an infringement suit. A licensee must have 'standing' under the patent statute. A license may amount to no more than a covenant by the patentee not to sue the licensee for making, using or selling the patented invention.

*Ortho Pharmaceutical*, 52 F.3d at 1031. A mere (or bare) licensee who does not hold sufficient property rights in the patent may not sue. "Practice of the invention by others may indeed cause him pecuniary loss but does him no legal injury." *Id.* The Court noted:

> To have co-plaintiff standing in an infringement suit, a licensee must hold some of the proprietary sticks from the bundle of patent rights, albeit a lesser share of rights in the patent than for an assignment and standing to sue alone...The proprietary rights granted by any patent are the rights to exclude others from making, using, or selling the invention in the United States. A patent license may have the effect between the parties to the license of transferring some of those proprietary rights from the patentee to its licensee. Such license then does more than provide a covenant not to sue, *i.e.*, a "bare" license. In addition, the license makes the licensee a beneficial owner of some identifiable part of the patentee's bundle of rights to exclude others. Thus, a licensee with proprietary rights in the patent is generally called an "exclusive" licensee. But it is the licensee's beneficial ownership of a right to prevent others from making, using or selling the patented technology that provides the foundation for co-plaintiff standing, not simply that the word "exclusive" may or may not appear in the license.

*Id.* (citations omitted) (emphasis added). There is no evidence in this matter that Rodman holds such proprietary rights and is anything more than a distributor of a product for which a patent is claimed.

The Court of Appeals for the Federal Circuit explained in *Textile Productions, infra*, that a determination of whether a licensee is an exclusive licensee (with co-plaintiff standing) or a bare licensee (with "no standing at all") is made by

"ascertaining the intent of the parties to the license as manifested by the terms of their agreement and examining the substance of the grant. The use of the word 'exclusive' is not controlling; what matters is the substance of the arrangement." 134 F. 3d at 1484. An exclusive license is " a license to practice the invention ... accompanied by the patent owner's promise that others shall be excluded from practicing it within the field of use wherein the licensee is given leave." *Id.* The Court in *Textile* denied co-plaintiff standing under a requirements contract for a patented product. The Court noted that the contractual rights of the exclusive supplier conferred no right to exclude others from making the invention. The purported co-plaintiff was to be the "exclusive source" to "manufacture and supply 100%" of the product for the licensor, who was described in the agreement as the "sole customer" for the product. 134 F.3d at 1483. The Court noted, however, the absence of a "right to sue" provision and the absence of any covenant by the licensor not to permit others to make the product. "To qualify as an exclusive license, an agreement must clearly manifest the patentee's promise to refrain from granting to anyone else a license in the area of exclusivity." *Id.*

In *Rite-Hite, infra,* the Federal Circuit Court denied co-plaintiff standing to distributors under what the Court described as "sales contracts" that "did not transfer any proprietary interest" in the patent and "did not give the [distributors] the right to sue." 56 F. 3d. at 1553.

> The... contracts permitted the [distributors] only to solicit and make sales of products made by Rite-Hite in a particular "exclusive" sales territory. While the agreements conveyed the right to sell restraints covered by the patent, any "exclusivity" related only to sales territories, not to patent rights.
> ...Any remedy [a distributor] might have had for violation of its rights would lie in a breach of contract action against Rite-Hite...

*Id.*

Here, Rodman is, as the operative document's title implies, a distributor, not a licensee of the '744 Patent.[17] To the extent Rodman relies on the Distributors Agreement for anything, that document is insufficient as a basis for transferal of proprietary *patent* rights. It is of no import that the document refers to Rodman as "Local Sole Distributor" or that the Plaintiffs *want* Rodman to be a Plaintiff now. A patentee may not *give* a right to sue to a party who has no proprietary interest in the patent. *Id.*, citing *Crown Die & Tool Co. v. Nye Tool & Machine Works* 261 U.S. 24, 44, 43 S. Ct. 254, 259 (1923). "The patentee's later second thoughts are irrelevant... to confer standing.... To resolve the issue of standing, we must examine the licensing agreement to determine whether the parties intended to effect a transfer of proprietary rights to the licensee as an incident to protection of its interests." 52 F. 3d 1032.

A patent carries with it various primary rights including, the exclusive right to make, use, and sell the patented invention, the right to transfer the rights to another, and the right to sue infringers. Examination of these representative rights of ownership reveals that Rodman would fall far short even if the Distributors Agreement were given effect. Under the unsigned Distributors Agreement that the Patent Holder -- Turner -- refused to sign, Rodman was granted no more than a right to sell Turner Nibblers --upon purchasing them from Lang and Turner. While Rodman under the agreement has the right to sell the Turner Nibbler, Rodman is not granted any right

---

[17] The Distributors Agreement is, on its face, ineffective. Turner, the exclusive holder of the patent rights at the time, never executed it. The parties -- Turner, Lang, and Rodman -- in fact sold and continued selling Turner Nibblers at the time, but Lang could not claim any transfer of rights under that document, and neither can Rodman take from Lang rights that Lang did not have at the time. Lang's rights today derive from an assignment from Turner that occurred more than sixteen months later. Though Lang purportedly took title to the '744 Patent in May, 2000, there is no evidence of any written agreement between Lang and Rodman at or after that time by which Rodman can claim a transfer of proprietary rights under which co-plaintiff standing could arise.

whatsoever to make it. Rodman acknowledges in the document that the "Manufacturer" (Turner) is the "owner of the Intellectual Property." *Exhibit D*, ¶ 2.5. Though the document refers to Rodman as the "Local Sole Distributor", there is nothing exclusive about the arrangement at all. Significantly, nowhere in the Distributors Agreement does Lang promise to refrain from selling Turner Nibblers himself or promise not to license others to do so. (And, of course, Turner never promised to do so.) The "agreement," moreover, is terminable for any reason upon three months notice. (¶¶ 3.7-3.8.) Rodman is precluded from assigning, delegating or otherwise disposing of any rights under the agreement (¶ 6.3), and the agreement terminates by its own terms should Rodman become insolvent. (¶ 8.4).

Finally, and perhaps most importantly, the Distributors Agreement does not (and cannot) authorize Rodman to sue infringers. In fact, it restricts Rodman concerning the use and treatment of intellectual property. It requires the Local Distributor (Rodman) to notify the Manufacturer (Turner) of any suspected infringement (¶ 6.2.2) and it *limits* Rodman to taking only "such reasonable action *as the Manufacturer [Turner] may direct* at the expense of the Manufacturer" regarding potential infringement. ¶ 6.2.3 (emphasis added). Finally, it requires Rodman as Local Distributor to "compensate" Turner as the Manufacturer for any use of intellectual property other than as limited by the agreement. (¶ 6.2.5).

Perhaps the clearest indication of the intent of Distributors Agreement is contained in the initial "Recitals" section. Lang and Rodman signed the document "in order to record the terms upon which [Lang] will supply [Rodman] with Products." *Exhibit D* Recital 2.4. The Distributors Agreement, even if it were fully executed, is no

more than a sales and supply agreement. *See Rite-Hite, 56 F. 3d. at 1553.* ("The grant of a bare license to sell an invention in a specified territory, even if it is the only license granted by the patentee, does not provide standing without the grant of a right to exclude others.") Rodman has no proprietary interest in the patent at all, and consequently has no standing in this action. Summary judgment, dismissing Rodman as a Plaintiff in Count III, is required.[18]

### C. **Thomas is entitled to summary judgment concerning any patent infringement claims concerning nibbler heads made of machined steel.**

The Bad Dog Biter has been sold with dies formed by a metal casting process ("casted heads"), but now utilizes heads made by a different process ("machined steel heads"). All Bad Dog Biters now contain, and the majority of the Bad Dog Biters sold have employed, machined steel heads. The Plaintiffs have proffered the original patentee and the current manufacturer of the Turner Nibbler, Mr. Turner himself, as their expert concerning measurements of the Thomas nibbler heads. Mr. Turner claims to have measured a quantity of Thomas nibbler heads to determine if portions of existing radii or chamfers extend beyond the diameter of the punch, and therefore, under Plaintiffs' theory, infringe. The measurements performed by Mr. Turner serve as the entire basis for the Plaintiffs' claim of patent infringement.[19] Mr. Turner has now testified, however, that he has found *no* radius or chamfer outside the punch diameter of the Bad Dog Biter nibbler heads constructed of machined steel:

---

[18] Further, the Distributors Agreement makes reference to a "Main Agreement," (¶ 8.3), and to a "Schedule 1" listing of intellectual property (¶ 3.5), neither of which have ever been produced or identified. The document, unsigned and incomplete, simply cannot serve as a basis for co-plaintiff standing.

[19] Thomas maintains that Mr. Turner's measurements are incomplete and do not demonstrate infringement.

Q: Have you done comparator – optical comparator measurements on other Thomas Nibbler heads aside from those that you did in August and those that you did this morning?

A: Yes.

Q: How many?

A: Since August -- I'm guessing -- I know I've done maybe three heads.

Q: Three heads?

A: Yes.

Q: What were the circumstances that brought you to do shadowgraph measurements of three heads since August?

A: Well, I'm only going to recall the last one I did.

Q: Go ahead.

A: And that is the machine die.

Q: And what did you find in relation to that shadowgraph of the machined die?

A: That it didn't extend beyond the punch diameter.

Q: And did you record that anywhere?

A: I didn't record it.

Q: Did you tell that to anybody?

A: No.

Q: You kept that all to yourself?

A: Yes. No, I did tell somebody.

Q: Who?

A: Patrick Lang.

MS. WILKINS: Objection.

Q: When did you tell Mr. Lang?

A: Within the last month.

Q: If it didn't extend beyond the punch diameter with the punch inserted, then is it your belief that it did not infringe the '744 patent?

MS. WILKINS: Objection.

A: That's what I believe.

Q: Did you test any other machined heads aside from what you did today?

A: Yes.

Q: What -- when?

A: At the same time.

Q: The same time as when?

A: I checked the first one.

Q: Okay. So you did three at once?

A: No. The -- the nibbler, as you know, has two heads on. The first head I checked, then I did -- I checked the second head.

Q: Go ahead.

A: And had my findings on that as well.

Q: What were your findings on that?

A: That it didn't extend beyond the punch diameter.

Q: Did you check the third head that day?

A: I'm pretty certain there was a third head. I can't be 100 percent sure. But all the machined heads I checked did not extend beyond the punch diameter.

*Turner Depo.*, pp. 283-85. As the Plaintiffs proffer no evidence that the Bad Dog Biter machined steel heads contain the allegedly infringing feature, summary judgment as to

Count III is necessary as to liability concerning Bad Dog Biter nibblers with machined steel dies.

**D. Lang Cannot Assert a Claim for Patent Infringement Damages that Pre-Date The Purported May, 2000 Assignment.**

A party seeking to recover money damages for infringement of a United States Patent "must have held the *legal title* to the patent *during the time of the infringement*." *Arachinid v. Merit Indus., Inc.*, 939 F.2d 1574 (Fed. Cir. 1991) (emphasis in original); *see also Crown Die & Tool Co. v. Nye Tool & Mach Works,* 261 U.S. 24 (1923). The single exception to this well-settled rule occurs only when an assignment of a patent is coupled with an express assignment of rights to pursue past infringements. Any alleged conveyance of rights to pursue infringements that pre-date the patent assignment should not be inferred from the language of the patent assignment. *See Moore v. Marsh*, 74 U.S. (7 Wall.) 515, 522 (1868) ("it is a great mistake to suppose that the assignment of a patent carries with it a transfer of the right to damages for an infringement committed before such assignment"); *Jones v. Berger,* 58 Fed. 1006 (D. Md. 1893)("The rule that to pass the right to sue for past infringement words must be used in the assignment with expressly transfer to the assignee the right of action"); 5 *Walker on Patents* (E. Lipscomb 3d ed. 1986) Sec. 19:21 ("An assignment of a patent does not carry with it a transfer of the right to damages for an infringement committed before the assignment…").

The single exception to this rule does not apply to the facts of this case. At the January, 2001 hearing on plaintiffs motion for preliminary injunction, Lang came to Court without ever disclosing the basis for his claim of patent ownership. In fact, he did not include any purported assignment in his "Exhibit Book" presented to defense counsel

moments before the hearing was set to begin. No assignment into Lang was evident from a search of the PTO records.

Upon inquiry from the Court as to the basis of Lang's standing, plaintiffs produced for the first time a "Patent Assignment" dated May 9, 2000 from Turner to Lang. *Exhibit F.* The document that plaintiff relies on to vest Lang with ownership by assignment of the '744 Patent, however, does not expressly confer Lang with the right to sue for past infringement. In fact, it makes no mention of "past infringements." None should be inferred now from the document itself.

At a minimum, Lang has no standing to pursue patent infringement damages that pre-date May 9, 2000. *See Procter & Gamble v. Paragon Trade Brands, Inc.*, 917 F. Supp. 305, 310 (D.Del. 1995) ("As a general matter, parties should possess rights before seeking to have them vindicated in court. Allowing a subsequent assignment to automatically cure a standing defect would unjustifiably expand the number of people who are statutorily authorized to sue"). Turner, plaintiff's expert and the putative patent holder before May 9, 2000, is an active participant in this case. He elected not to be a party plaintiff in this action for tactical reasons. His rights, if any, to sue for past infringement do not accrete by operation of law to Lang or anyone else unless they are expressly assigned. Because there is no express assignment to Lang to sue for past infringements, summary judgment should issue in favor of defendant for all patent infringement claims that pre-date May 9, 2000.

## IV. CONCLUSION

For the reasons cited herein, Thomas requests that the Court enter partial summary judgment dismissing Count II of the Complaint in its entirety, and so much of

Count II as relates to any claim of the plaintiff Rodman, claims concerning Thomas' nibblers incorporating machined steel heads, and claims for infringement occurring prior to May 9, 2001.

Dated: April 25, 2001

JOSEPH A. THOMAS, LTD.
By Its Attorneys,

Thomas R. Noel, Esq. (#4239)
COUNSELOR AT LAW, P.C.
50 South Main Street
Providence, RI 02903
(401) 621-7744
(401) 621-5688 (Facsimile)

Craig M. Scott (TRN)

Craig M. Scott, Esq. (#4237)
DUFFY & SWEENEY, LTD
300 Turks Head Building
Providence, RI 02903
(401) 455-0700
(401) 455-0701 (Facsimile)

**CERTIFICATION**

I hereby certify that I served a copy of the foregoing via Federal Express on this 25th day of April 2001 to Ronald P. Langlois, Esq., Smith Brink, P.C., 2 Charles Street, 3rd Floor, Providence, RI 02904 and to Victor H. Polk. Jr., Esq. and Joshua M. Dalton, Esq., Bingham Dana LLP, 150 Federal Street, Boston, MA 02110.

TRN/era