**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| JOSEPH A. THOMAS, LTD<br>Plaintiff | : | |
| v. | : | C.A. No. 06-440ML |
| RODMAN & COMPANY, INC.<br>Defendant | : | |

**OBJECTION TO DEFENDANT'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND VENUE**

The plaintiff, Joseph A. Thomas, Ltd. ("Thomas"), hereby objects to defendant, Rodman & Company, Inc's, *Motion to Dismiss for Lack of Personal Jurisdiction and Venue*. Thomas relies on its reasons set forth in its Memorandum of Law appended hereto, and on the copy of the *Settlement Agreement* filed contemporaneously herewith under seal due to its designation as "confidential."

WHEREFORE, Joseph A. Thomas, Ltd. hereby requests that the court deny and dismiss defendant's *Motion to Dismiss*.[1]

[1] Thomas has previously moved to stay the determination of the *Motion to Dismiss* pending preliminary jurisdictional discovery. Should the court have any doubt about its jurisdiction over Rodman based on the arguments presented, Thomas urges the court to grant its *Motion for Stay* to permit limited jurisdictional discovery on the defendant who, at least historically, is no stranger to Rhode Island or to this court.

Date: December 4, 2006

JOSEPH A. THOMAS, LTD
By Its Counsel,

/s/ Thomas R. Noel .

Thomas R. Noel, Esq. (#4239)
John R. Harrington, Esq. (#7173)
NOEL & GYORGY LLP
50 South Main Street
Providence, RI 02903
(401) 272-7400
(401) 621-5688 (Facsimile)
TNoel@LawNoel.com

**CERTIFICATE OF SERVICE**

I do hereby certify that on the 4th day of December, 2006, a copy of this document was sent by electronic means to Ronald P. Langlois, Smith & Brink, P.C., One State Street, Suite 400, Providence RI 02908.

/s/ Thomas R. Noel

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOSEPH A. THOMAS, LTD<br>Plaintiff | : | |
| V. | : | C.A. No. 06-440ML |
| RODMAN & COMPANY, INC.<br>Defendant | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION TO DISMISS**

## I. INTRODUCTION

The plaintiff, Joseph A. Thomas, Ltd. ("Thomas"), and the defendant, Rodman & Company, Inc. ("Rodman") are direct competitors in the hand tool market. Four years after settling their earlier dispute in this court, an action commenced by *Rodman* here in Rhode Island concerning a hand tool known as a "nibbler," Thomas was compelled to file this action against Rodman to halt Rodman's unfair and tortious business activities concerning the next generation of the same tool. Rodman has copied the trade dress the earlier litigation authorized Thomas to utilize, and is importing and selling an improved nibbler tool that is essentially identical to Thomas'.

Like the prior litigation commenced by Rodman in this court, this action claims violation of the Lanham Act, violation of state unfair competition laws, and violation of the Tariff Act, 19 U.S.C. § 1304(a), this time due to *Rodman's* actions and conduct, including its failure to mark the tools with their country of origin, China. Nevertheless, just four years after dismissing its lawsuit against Thomas here, entering a written

settlement agreement with a Rhode Island entity that contains prospective, restrictive terms, and taking a security interest from a Rhode Island individual to secure the deal, Rodman now claims it cannot be subject to suit here.

Contrary to Rodman's assertion, there exists a sufficient basis for this court to exert personal jurisdiction – including Rodman's commencement and maintenance of the earlier litigation against Thomas in this court, the settlement negotiations and agreement ending that litigation in November 2002, and Rodman's intentional tortious conduct directed toward Thomas now. The allegations in Thomas' Complaint, which must be taken as true, make it abundantly clear that Rodman is engaged in tortious conduct aimed at stealing Thomas' market share in the improved nibbler tool in a manner Rodman knew would impact Thomas here in Rhode Island. Rodman, no stranger to this forum and signatory to a Rhode Island settlement agreement that is at least evidentiary in this matter,[1] should reasonably expect to be haled into this Court to answer for its tortious conduct directed toward Thomas.

## II. <u>FACTS</u>[2]

Since approximately 2000, Thomas has marketed and sold, under the name "Bad Dog Biter," a hand-held, drill-powered cutting tool commonly referred to in the industry as a "nibbler." A nibbler tool, when attached to the drive of a common power drill,

---

1 Thomas does not claim damages in this action based on a *breach* of the settlement agreement. The actions complained of, however, most certainly arise out of and are related to the business and conduct of the parties as contemplated within the settlement agreement.

2 The following facts are taken from the Verified Complaint. This Court must accept the plaintiff's properly documented evidentiary proffers as true for purposes of determining whether personal jurisdiction is appropriate. *Brian Jackson & Co. v. Eximias Pharm. Corp.*, 248 F. Supp. 2d 31, 34 (D.R.I. 2003) (*citing Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 290 F.3d 42, 51 (1st Cir. 2002); *Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998) (taking as true, whether or not disputed, the facts as set forth by the plaintiff and construing them in the light most congenial to the plaintiff's jurisdictional claim).

translates the rotary motion of the drill to an up-and-down motion causing a hardened steel "punch" or "die" to oscillate up and down at high speeds along the cutting edge of the nibbler tool. The nibbler can thereby be directed to "nibble" through sheet metal, plastic, wood, and other relatively flat, thin material. *See Verified Complaint,* ¶ 6. The current Thomas Bad Dog Biter is a two-headed nibbler that employs specific improvements over earlier nibbler tools including the double-headed feature, a freely rotatable nibbler head, and the design of the nibbler mechanism which utilizes a single, pass-through punch that can be changed (replaced) periodically without having to disassemble the nibbler body. *See Verified Complaint,* ¶ 7.[3] Thomas markets and makes most of its sales at large, exposition-style trade shows held in cities throughout the United States. *Verified Complaint* ¶ 5.

Thomas' Bad Dog Biter nibbler is packaged in a distinctive blue metal drill bit box with a custom cut yellow foam rubber inner casing. *Verified Complaint* ¶ 9. The product itself has a metallic finished, stepped-cylindrical shaped body, dual black metal cutting heads, and a removable blue plastic handle-grip that fits over the cutting head not in use. *Verified Complaint* ¶ 9. It is packaged, displayed, and sold with a replacement punch and custom wrench placed in pre-cut depressions in the box's yellow foam insert. *Verified Complaint* ¶ 9.

Rodman was for many years selling its own nibbler tool, which it calls the "Rodman Nibbler." Rodman's chief channel of trade is the same type of trade shows at which Thomas sells the Bad Dog Biter nibbler. The Rodman Nibbler, however, has a

---

3 Thomas is the owner of United States Pat. No. 7,047,613B2, covering the method of punch replacement in the two-headed nibbler device. *Verified Complaint* ¶ 8. Thomas applied for further patent protection on other aspects of the device. Those further claims have recently been allowed, and Thomas intends to add patent infringement claims to this action.

single cutting head and lacks the improved features of the Bad Dog Biter cited above, and its trade dress is readily different than that of the Bad Dog Biter, employing a yellow stepped-cylindrical body that is displayed in a black metal tool box in a gray, sponge-like insert. *Verified Complaint* ¶ 10. Further, the body of the Rodman Nibbler clearly indicates that it is "Made in [the] U.K."[4]

In December 2000, Rodman commenced litigation against Thomas in the United States District Court for the District of Rhode Island (C.A. No. 00-611ML) alleging patent and trade dress infringement, false designation of origin, and common law unfair competition under state law against Thomas concerning the version of a nibbler tool Thomas previously sold.[5] Thomas filed counterclaims seeking damages and a nullification of the patent held by Rodman's nibbler supplier. After nearly two years of litigation in this court, the parties negotiated and entered into a settlement agreement prior to trial (the "Settlement Agreement").[6]

The parties were permitted to continue making and selling the nibbler tools each was making and/or selling at the time, namely, the Rodman Nibbler and Thomas' Bad Dog Biter, the tools described above, but the parties placed clear restrictions and continuing obligations on their actions going forward. For one, the parties agreed that Thomas would not sell nibblers utilizing the yellow body/black handle color configuration claimed by Rodman at the time. Further, the restrictions on Thomas were

---

4 Rodman is or was a licensee of Turner, a British national who held a patent on certain technology claimed to be contained in the nibbler.

5 Rodman's suit was based in part on a patent claim held by its supplier. The patent on which that claim was based, United States Patent No. 4,748,744 (the "'744 Patent"), expired in June of this year, about the same time Rodman began importing and selling the device at issue herein..

6 The Settlement Agreement executed by the parties contains a confidentiality provision. While Thomas does not believe the confidential provisions are especially pertinent, it is filing the document under seal out of an abundance of precaution to the wishes of the other signatories thereto.

premised on the condition that Rodman would cease selling silver colored nibblers resembling those sold by Thomas and would stick to its claimed yellow-body, black handled trade dress. (Settlement Agreement §3.04) Thomas also agreed to mark its Bad Dog Biter and successor nibblers acquired outside the United States with their country of origin (Settlement Agreement §3.01), to pay a portion of Rodman's accrued attorneys' fees, and to have its principal, Joseph M. Strong, execute a personal guaranty of that payment. (Settlement Agreement §3.07) The parties agreed that the Settlement Agreement and the obligations, rights, and remedies of the parties under it would be construed and determined under the laws of the State of Rhode Island. (Settlement Agreement §12)

Sometime during 2006, around the time that the patent on the Rodman Nibbler was about to expire, Rodman began importing and selling a second nibbler tool. The new tool sold by Rodman is, like the Bad Dog Biter, a two-headed nibbler with a removable plastic handle grip, a stepped-cylindrical metallic-finished body, and black steel cutting heads that are rotatable during operation (the "Rodman II"). In adding this double-headed/rotatable-head nibbler (just like Thomas') to its product line, Rodman made a number of substantial changes to the trade dress it had been using on the Rodman Nibbler. Rodman changed the color from the original Rodman Nibbler's yellow to metallic silver (just like Thomas', negating a condition in the Settlement Agreement), changed the metal box housing the tool from black to blue, and changed the formed interior packaging that holds the tool (and displays it at trade shows) from gray sponge-like foam to yellow foam rubber (just like Thomas'). Additionally, Rodman is now including in the box with the Rodman II an extra two-sided, pass-through punch and a

wrench for adjusting the nibbler tool – just like Thomas'. The Rodman II as packaged and displayed is essentially identical to the Bad Dog Biter. Both are sold in virtually identical powder-blue metal drill bit boxes with yellow, hard foam rubber inserts, and the packaging of the Rodman II appears in almost every respect to be nearly identical to the packaging of the Bad Dog Biter - right down to the size, shape, and construction of the metal box in which the product is sold,[7] the custom lining inside the box, and the extra head, extra biter blade/punch, and allen wrench included therein.[8]

On or about July 15, 2006, employees of Thomas purchased a Rodman II at the "EAA Airventure" show in Oshkosh, Wisconsin. *Verified Complaint* ¶ 24. Nowhere on the product, packaging, or instructions is the Rodman II Nibbler marked or labeled with its country of origin. *Verified Complaint* ¶ 25.

Rodman markets and sells the Rodman II at trade shows around the country including, on some occasions, shows at which Thomas is selling the Bad Dog Biter. Rodman has stated to prospective customers at trade shows that The Rodman II Nibbler is "just like" the Bad Dog Biter, at times gesturing and referring customers to demonstrations of the Bad Dog Biter being carried out at Thomas' show booth nearby. *Verified Complaint* ¶ 20. Rodman, by these actions, is in effect teaching users how to use the identical Rodman product in a manner that practices Thomas' patent, U.S. Pat. No. 7,047,613B2. (Thomas intends to assert that the Rodman II also infringes the patent

---

7 The graphics on the outside cover of the blue box are different than that on the Bad Dog Biter. However, nibblers are displayed at trade shows in open boxes and are routinely demonstrated to prospective customers out of the box in live presentations.

8 Rodman's president, Dale Chesgreen, stated in the affidavit submitted in support of Rodman's Opposition to Plaintiff's Motion for Preliminary Injunction that Rodman obtained the Rodman II from a Chinese manufacturer (Affidavit of Dale Chesgreen dated November 1, 2006, ¶¶ 6, 9), and that he requested a small modification to the product offered by the supplier – the addition of the letters "MD." (*Id.*, at ¶ 13) However, Rodman did not request any other changes in the product or its packaging.

claims about to issue on the device.)

Rodman claims it has "not done any trade shows in Rhode Island in the last five years," and that it presently maintains no contacts in the State of Rhode Island. *Chesgreen Affidavit*, ¶8. Rodman has not disclosed, however, where it *does* sell it products, whether its claimed "no-contact" with the State of Rhode Island is as true for its "independent sales representatives," and of course whether it has made sales to Rhode Island customers, regardless of where the sales occurred.[9]

In sum, Rodman sued Thomas in this court claiming the Bad Dog Biter was too close to its own, relinquished those claims and settled the suit, sought out and began selling a nibbler that is essentially identical to Thomas', and now claims it can't be reached in this court. Such maneuvering should be soundly rejected.[10]

## III. ARGUMENT

### A. This Court Has Personal Jurisdiction Over Rodman

A court may obtain personal jurisdiction over a defendant through general or specific jurisdiction, personal service upon defendant within the forum state, through consent, or through waiver by the defendant. *See Microfibres, Inc. v. McDevitt-Askew*, 20 F. Supp. 2d 316, 320 (D.R.I. 1998). In the present action, Thomas avers that Rodman has consented to the jurisdiction of this court for this litigation, and also that the facts

---

9 Rodman admitted, for example, that it appears and has sold products at the "Big E," which is held annually in West Springfield, Massachusetts, but Rodman did not disclose where the customers who purchased there come from.

10 Thomas has moved to stay determination of Rodman's Motion to Dismiss pending preliminary jurisdictional discovery aimed at uncovering some of the details that were omitted from Rodman's papers. Should the court have any doubt about its jurisdiction over Rodman based on the arguments presented, Thomas urges the court to permit limited jurisdictional discovery on the defendant who, at least historically, is no stranger to Rhode Island or to this court.

alleged in the Complaint are more than sufficient contacts for this court's jurisdiction over Rodman.[11]

**1. Rodman Has Consented to the Court's Jurisdiction**

Since personal jurisdiction is intended to protect a defendant's liberty interests, "it may be obviated by consent or otherwise waived."[12] *General Contracting & Trading Co. v. Interpole, Inc.*, 940 F.2d 20, 22 (1st Cir. 1991). "A defendant may manifest consent to a court's in personam jurisdiction in any number of ways, from failure seasonably to interpose a jurisdictional defense, to express acquiescence in the prosecution of a cause in a given forum, to submission implied from conduct." *Id.* Furthermore, "a party's consent to a court's jurisdiction may take place prior to the suit's institution." *Id.*; *see also Martel v. Stafford*, 992 F.2d 1244, 1248 (1st Cir. 1993) (recognizing the "basic premise . . . [that] a party may consent to a court's in personam jurisdiction before the commencement of an action).

Rodman not only initiated and prosecuted the prior litigation in this forum, it also negotiated and entered into a settlement agreement with a Rhode Island corporation imposing on that corporation and accepting for itself continuing obligations, chose to apply Rhode Island law, and took a security interest from a Rhode Island individual. It can be fairly said that Rodman has "manifested its consent" to personal jurisdiction here.

---

11 There are two types of personal jurisdiction, general and specific. "General jurisdiction exists when the litigation is not directly founded on the defendant's forum-based contacts, but the defendant has nevertheless engaged in continuous and systematic activity, unrelated to the suit, in the forum state." *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 618 (1st Cir. 2001). "Specific jurisdiction exists when there is a demonstrable nexus between a plaintiff's claims and a defendant's forum-based activities." *Id.*

12 There are fine distinctions between waiver and consent. Consent "customarily occurs by virtue of some adscititious event, arising from an extrinsic act or omission of the objector, beyond the borders of the suit proper" and "ordinarily consists of ex ante conduct." *See General Contracting & Trading Co. v. Interpole, Inc.*, 940 F.2d 20, 23 n. 3 (1st Cir. 1991).

In *General Contracting & Trading Co. v. Interpole, Inc.*, an out-of-state corporation was sued in New Hampshire, failed to appear, and the district court entered a default judgment. The foreign defendant then brought a separate suit against the third-party plaintiff from the first litigation in the same federal district court, based on actions "in connection with the same overall transaction." *Id.* at 21. After some partial settlements, consolidations, and appeals, the issue before the court came down to whether there was personal jurisdiction over the foreign corporation in the first lawsuit. In finding personal jurisdiction, the Court stated:

> a ruling that [the foreign corporation] did not submit to the court's jurisdiction in Suit No. 1 when it instituted Suit No. 2 would produce an unjust asymmetry, allowing a party ... to enjoy the full benefits of access to a state's courts qua plaintiff, while nonetheless retaining immunity from the courts' authority qua defendant in respect to claims asserted by the very party it was suing .... There is no warrant in either law or logic for accepting such an incongruous result. We, therefore, hold that the appellant, by initiating its own suit, submitted to the district court's jurisdiction in the prior action.

*Id.* at 23 (*quoting Adam v. Saenger*, 303 U.S. 59, 67-68 (U.S. 1938)). Although the party challenging jurisdiction in *General Contracting* had filed a *later* action, not an earlier one, the reasoning and rationale of the court is clearly applicable to the present case.[13] The fact that Rodman filed its action in this court *before* Thomas filed its present action ought not change the maxim that a plaintiff who purposefully avails himself of a particular forum surrenders jurisdictional objections to claims arising out of essentially the same facts that are brought against him in the same forum.

---

13 *General Contracting & Trading Co. v. Interpole, Inc.*, has been interpreted as "ruling that a plaintiff who purposefully avails himself of a particular forum surrenders jurisdictional objections to claims arising out of the same transaction that are brought against him in the same forum." *Martel v. Stafford*, 992 F.2d 1244, 1248 (1st Cir. 1993).

It would be an incongruous result indeed if Rodman were allowed to come into this forum and assert claims involving trade dress, false designation, and unfair competition against Thomas concerning one version of a nibbler tool, and then turn around and engage in the same uncompetitive acts and somehow avoid this court's jurisdiction. As the Supreme Court stated, where a "plaintiff having, by his voluntary act in demanding justice from the defendant, [has] submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence. It is the price which the state may exact as the condition of opening its courts to the plaintiff." *Adam v. Saenger*, 303 U.S. at 67-68.

**2. This Court has Specific Personal Jurisdiction over Rodman**

Rodman asserts that this Court cannot exercise specific personal jurisdiction over it "because Rodman essentially had no contact with the State of Rhode Island." (Rodman Memorandum in Support of Motion to Dismiss, p. 7) This argument is belied by the facts of this case, and moreover, completely disregards the well-established doctrine, first described by the Supreme Court in *Calder v. Jones*, 465 U.S. 783 (1984), that a court may exercise specific personal jurisdiction over defendants who commit intentional torts "calculated to cause injury [to a plaintiff in the forum state]." *Id.* at 791.

The determination of whether specific jurisdiction exists involves two inquiries: "whether a forum state's long-arm statute permits service of process and whether assertion of personal jurisdiction would violate due process." *Cent. Tools, Inc. v. Mitutoyo Corp.*, 381 F. Supp. 2d 71, 74 (D.R.I. 2005). Since Rhode Island's long arm statute is co-extensive with the limits of due process, "the two inquiries collapse into a

single inquiry: whether jurisdiction comports with due process."[14] *Id.* Due process demands minimum contacts between a nonresident defendant and the forum such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." *Northeastern Land Servs. v. Schulke*, 988 F. Supp. 54, 57 (D.R.I. 1997) (*quoting Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)). Specific jurisdiction requires that the defendant has connections with the state or with events within the state pertinent to the claim. *Andresen v. Diorio*, 349 F.3d 8, 12 (1st Cir. 2003).

The Court of Appeals for the First Circuit applies a three-part analysis in evaluating minimum contacts:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities. Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Sawtelle v. Farrell*, 70 F.3d 1381, 1388-90 (1st Cir. 1995).

**Relatedness**

The relatedness requirement is a "flexible, relaxed standard" which requires that the claim "underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities." *Northern Laminate Sales, Inc. v. Davis*, 403 F.3d 14, 25 (1st Cir.

---

14 The Rhode Island long-arm statute, as interpreted by the Supreme Court of Rhode Island, is coextensive with federal due process mandates. *See Almeida v. Radovsky*, 506 A.2d 1373, 1374 (R.I. 1986).

2005).[15] "[T]he [relatedness] requirement focuses on the nexus between the defendant's contacts and the plaintiff's cause of action." *Nowak v. Tak How Invs.*, 94 F.3d 708, 714 (1st Cir. 1996). In addition, "a defendant need not be physically present in the forum state to cause injury (and thus 'activity' for jurisdictional purposes) in the forum state." *Northern Laminate Sales,* 403 F.3d at 25 (*citing Calder v. Jones*, 465 U.S. at 789). The Supreme Court has held that "parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other state for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985).

Contrary to Rodman's assertion, Rodman's contacts with Rhode Island are meaningful and significant, and this cause of action arises out of and relates to those contacts. Most significantly, in December 2000, Rodman voluntarily commenced litigation against Thomas in this jurisdiction alleging patent and trade dress infringement, false designation of origin, and common law unfair competition under state law against Thomas concerning the version of the nibbler tool Thomas previously sold. Rodman negotiated and entered into a Settlement Agreement. The Settlement Agreement permitted each side to sell the nibbler tools each party was importing and selling at the time. Thomas, a Rhode Island business, was prohibited from selling nibbler tools utilizing the yellow body/black handle color configuration claimed by Rodman, but that restriction was conditional; if Rodman deviated from its trade dress, the restrictions on Thomas would expire. Thomas paid a portion on Rodman's attorney's fees, and Thomas'

---

15 *See also Ticketmaster-New York v. Alioto*, 26 F.3d 201, 206 (1st Cir. 1994) (noting that the constitutional catchphrase - "arising out of, or relating to," - is disjunctive in nature and emphasizing that this language "portends added flexibility and signals a relaxation of the applicable standard").

principal, a Rhode Island resident, executed a personal guaranty of the debt. Both parties agreed that the settlement agreement and the obligations, rights, and remedies of the parties under the agreement would be construed and determined under the laws of the State of Rhode Island. (Settlement Agreement §12) Rodman clearly contemplated ongoing interaction with Thomas in Rhode Island as the parties placed clear restrictions and ongoing obligations on their actions involving the nibbler tools and subsequent versions of the nibbler tools.

It is simply disingenuous for Rodman to claim that it has no contacts with this forum despite having come to Rhode Island in the first place and then engaging in intentional uncompetitive conduct directed at a Rhode Island corporation, the result of which is causing significant harm to the Rhode Island corporation. The current action relates to those contacts. In *Nowak*, the Court stated, in context of a personal injury suit, that:

> When a foreign corporation directly targets residents in an ongoing effort to further a business relationship, and achieves its purpose, it may not necessarily be unreasonable to subject that corporation to forum jurisdiction when the efforts lead to a tortious result. The corporation's own conduct increases the likelihood that a specific resident will respond favorably. If the resident is harmed while engaged in activities integral to the relationship the corporation sought to establish, we think the nexus between the contacts and the cause of action is sufficiently strong to survive the due process inquiry at least at the relatedness stage.

*Id.* at 715-716. The *Nowak* Court held that "[w]hile the nexus between [the defendant's conduct and the plaintiff's injury] does not constitute a proximate cause relationship, it does represent a meaningful link between [defendant's] contact and the harm suffered."[16]

---

16 The Court therefore need not find "proximate causation" between Rodman's contacts and this litigation. In *Nowak*, the Court specifically noted that in evaluating the relatedness prong it could find "no reason why, in the context of a relationship between a contractual or business association and a subsequent

*Id.* at 716. Rodman directly targeted and engaged Thomas in Rhode Island, and established a relationship governing and restricting each party's actions with respect to the nibbler tools. Rodman's contacts, integral to the relationship Rodman sought to establish, provides a meaningful link between Rodman's prior contact and the present harm to Thomas.

**Purposeful Availment**

To satisfy the purposeful availment requirement, "the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable." *Northern Laminate Sales, Inc. v. Davis*, 403 F.3d at 25. "The cornerstones upon which the concept of purposeful availment rest are voluntariness and foreseeability." *Sawtelle*, 70 F.3d at 1391. The purposeful availment requirement focuses on the deliberateness of the defendant's contacts, *Ticketmaster-New York v. Alioto*, 26 F.3d at 207, and exists to insulate the out-of-forum defendant from amenability to suit in a forum state with which he shares only "random, isolated, or fortuitous" contacts. *Sawtelle*, 70 F.3d at 1391.

Courts in this district have recognized the limited relevance of the conventional purposeful availment inquiry in tort actions, and have focused their inquiry on whether or not the defendant has purposefully directed his activities at residents of the forum, and whether the litigation results from alleged injuries that arise out of or relate to those

---

tort, the absence of proximate cause per se should always render the exercise of specific jurisdiction unconstitutional." *Nowak v. Tak How Invs.*, 94 F.3d at 715.

activities.[17] Indeed, the general rule in this circuit holds that where a defendant's out-of-forum actions intentionally cause tortious injury in the forum, jurisdiction will obtain for claims arising from that injury. *See e.g., Northern Laminate Sales, Inc.*, 403 F.3d at 26; *Hugel v. McNell*, 886 F.2d 1, 4 (1st Cir. 1989)("The knowledge that the major impact of the injury would be felt in the forum State constitutes a purposeful contact or substantial connection whereby the intentional tortfeasor could reasonably expect to be haled into the forum State's courts to defend his actions.").[18]

In the present case, Thomas alleges that Rodman intentionally copied Thomas' trade dress, engaged in unfair business practices, and failed to mark the tools with their country of origin, and that Thomas has suffered and will continue to suffer damage to its business. In addition, Thomas' goodwill and reputation have been damaged by Rodman's actions. Rodman cannot seriously dispute that it knew of Thomas or its trade dress – it had litigated the trade dress of the two companies -- or that its intentional acts were deliberately directed at a Rhode Island entity. Thomas' injuries occurred in Rhode Island and Rodman could reasonably expect to be haled into court in Rhode Island to answer for those injuries.

---

17 *See Northeastern Land Servs.*, 988 F. Supp. at 59 (citing *Thompson Trading, Ltd. v. Allied Lyons PLC*, 123 F.R.D. 417, 426 (D.R.I. 1989) ("one committing a tort in a forum does not purposefully avail himself of the benefits and protections of its laws, since such laws are not supporting and protecting his illegal activities"); *Venture Tape Corp. v. McGills Glass Warehouse*, 292 F. Supp. 2d 230, 233 (D. Mass. 2003)("Where the case involves torts that create causes of action in a forum state (even torts caused by acts done elsewhere) ... the threshold of purposeful availment is lower. The defendant allegedly causing harm in a state may understandably have sought no privileges there; instead the defendant's purpose may be said to be the targeting of the forum state and its residents.")

18 The First Circuit has held that the "*Calder* effects" test is a gauge for purposeful availment. *See United States v. Swiss Am. Bank*, Ltd., 274 F.3d 610, 623 (1st Cir. 2001). In *Calder*, the Supreme Court held that a court could assert personal jurisdiction over a nonresident where (i) their intentional actions were aimed at the forum State, (ii) they knew that their actions were likely to have a devastating impact on the plaintiff, and (iii) they knew that the brunt of the injury would be felt by the plaintiff in the forum State. 465 U.S. at 789-90.

In addition, the fact that Rodman voluntarily chose to initiate and maintain the prior litigation in Rhode Island and engage in settlement negotiations and enter the Settlement Agreement with Thomas in Rhode Island renders it clearly foreseeable that Rodman could find itself back in a Rhode Island court for an issue directly related to the tools at issue in the litigation and the Settlement Agreement.

Moreover, "[e]xercising jurisdiction is appropriate where the defendant purposefully derives economic benefits from its forum-state activities." *Nowak*, 94 F.3d at 717. By voluntarily negotiating and entering into the Settlement Agreement, which clearly curtailed and limited Thomas' efforts to compete against Rodman's products, both at the time of the settlement and in the future, Rodman derived an economic benefit from the in forum activity.

**Gestalt Factors**

Finally, because the relatedness and purposeful availment prongs are satisfied, the court must weigh the reasonableness of personal jurisdiction by examining the so-called "Gestalt factors." *See Sawtelle*, 70 F.3d at 1394. The First Circuit has enumerated the following factors to be used in determining the fairness and reasonableness of asserting personal jurisdiction:

> (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the judicial system's interest in obtaining the most effective resolution of the controversy; (5) the common interests of all sovereigns in promoting substantive social policies.

*Nowak*, 94 F.3d at 717.

i. Burden of Appearing

The First Circuit has recognized that "it is almost always inconvenient and costly for a party to litigate in a foreign jurisdiction. Thus for this particular gestalt factor to have any significance, the defendant must demonstrate that exercise of jurisdiction in the present circumstances is onerous in a special, unusual, or other constitutionally significant way." *Nowak*, 94 F.3d at 718. In its Memorandum, Rodman does not allege anything special or unusual about appearing in Rhode Island. In fact, less than six years ago, Rodman voluntarily chose to initiate a lawsuit against Thomas in this very jurisdiction. There is nothing special, unusual, or "constitutionally significant" about requiring it to appear here again.

ii. Forum State's Interest

It is plaintiff's intellectual property rights that are at issue in this litigation. Rhode Island has an obvious interest in protecting its citizens' intellectual property rights from tortious conduct. *See Northeastern Land Servs.*, 988 F. Supp. at 59 ("Rhode Island has an obvious interest in providing a civil forum to litigate alleged encroachments upon the property and trade secrets of Rhode Island corporations."); *Hasbro, Inc. v. Clue Computing, Inc.*, 994 F. Supp. 34, 45 (D. Mass. 1997). Moreover, a state has an interest in dealing with settlement agreements that terminated earlier litigation in the state.

iii. Plaintiff's Interest

Thomas' interest in obtaining convenient and effective relief weighs heavily in favor of exercising jurisdiction in Rhode Island. In addition, the First Circuit has "repeatedly observed that a plaintiff's choice of forum must be accorded a degree of deference with respect to the issue of its own convenience." *Sawtelle*, 70 F.3d at 1395.

Thomas submits that it is in litigation with Rodman for a second time not because it wants to be, but because Rodman, faced with the expiration of its patent rights, however slim, chose simply to make its product look like Thomas' in order to stay competitive.

iv. Judicial Interest in Effective Resolution

The fourth factor "focuses on the judicial system's interest in obtaining the most effective resolution of the controversy." *Nowak*, 94 F.3d 718. This factor clearly weights in favor of this court exercising jurisdiction. This court presided over the previous litigation between these parties involving the predecessor tools of the nibblers at issue here and the same legal theories and is consequently familiar with the issues involved. *See Brian Jackson & Co. v. Eximias Pharm. Corp.*, 248 F. Supp. 2d 31, 38 (D.R.I. 2003) ("The efficient administration of justice also favors Rhode Island, since this action is already proceeding here and this Court has become familiar with the claims involved.")

v. Common Interests of All Sovereigns

The final gestalt factor addresses the common interests of all sovereigns in promoting substantive social policies. "The most prominent policy implicated is the ability of a state to provide a convenient forum for its residents to redress injuries inflicted by out-of-forum actors." *Sawtelle*, 70 F.3d at 1395. This policy, coupled with the obvious interest in protecting its citizens' intellectual property rights from tortious conduct, again weighs in favor of finding jurisdiction in this case.

Moreover, despite Rodman's statement now that it marks all its nibblers with their country of origin, the Rodman II nibblers purchased by Thomas were *not marked*. Ensuring that Thomas would mark its products was central to the claims and to the resolution of the first litigation. Enforcement of Tariff Act requirements is a sound

judicial goal, and one that ought to be encouraged by providing a broad interpretation of jurisdiction in order to enable would-be plaintiffs to file suit where convenient for them to do so.

## IV. CONCLUSION

It is abundantly clear that by previously bringing suit in Rhode Island against Thomas – involving similar allegations and the same class of tools – Rodman has consented to this Court's jurisdiction over Thomas' present related claims. It is equally clear that Rodman not only knew about but *targeted* the plaintiff and its business for the activity complained of. Rodman therefore has sufficient minimum contacts with Rhode Island such that, on the specific facts of this case, the exercise of jurisdiction in Rhode Island is reasonable and does not offend the notions of fair play and substantial justice. Because jurisdiction lies and absent specific argument to the contrary, venue is also appropriate. Thomas respectfully requests that the Court deny Rodman's *Motion to Dismiss*.

Date: December 4, 2006

JOSEPH A. THOMAS, LTD
By Its Counsel,

/s/ Thomas R. Noel

Thomas R. Noel, Esq. (#4239)
John R. Harrington, Esq. (#7173)
NOEL & GYORGY LLP
50 South Main Street
Providence, RI 02903
(401) 272-7400
(401) 621-5688 (Facsimile)
TNoel@LawNoel.com

**CERTIFICATE OF SERVICE**

I do hereby certify that on the 4th day of December, 2006, a copy of this document was sent by electronic means to Ronald P. Langlois, Smith & Brink, P.C., One State Street, Suite 400, Providence RI 02908.

/s/ Thomas R. Noel